# EXHIBIT 7

## to

## Defendants' Motions *in Limine* regarding Damages

*Baxter Int'l, Inc. v. CareFusion Corp. et al.*
N.D. Ill. Case No. 1:15-cv-09986

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, DC  20549
FORM 10-Q

(MARK ONE)
/X/  Quarterly Report Pursuant to Section 13 or 15(d) of the
     Securities Exchange Act of 1934

For the quarterly period ended JUNE 30, 1998 or

/ /  Transition Report Pursuant to Section 13 or 15(d) of
     the Securities Exchange Act of 1934

For the transition period from _____ to _____

Commission File Number:      33-26398
                          -----------------------

ALARIS MEDICAL, INC.
- --------------------------------------------------------------------------------
(Exact name of registrant as specified in its charter)

Delaware                                        13-3492624
- ------------------------------------    ---------------------------------------
(State or other jurisdiction of         (I.R.S. Employer Identification No.)
incorporation or organization)

10221 Wateridge Circle, San Diego, CA  92121
- --------------------------------------------------------------------------------
(Address of principal executive offices)    (Zip Code)

(619) 458-7000
- --------------------------------------------------------------------------------
(Registrant's telephone number, including area code)


- --------------------------------------------------------------------------------
(Former name, former address and former fiscal year,
if changed since last report)


Indicate by check mark whether the registrant: (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days.    Yes    /X/       No    / /

On August 6, 1998, 59,174,039 shares of Registrant's Common Stock were
outstanding.

Page 1 of 27

<PAGE>

ALARIS MEDICAL, INC. AND SUBSIDIARIES
- --------------------------------------------------------------------------------

CF056967_0002



INDEX

PART I.  FINANCIAL INFORMATION
- --------------------------------

Item 1 - Financial Statements:

                                                                      Page
                                                                      ----
          Condensed consolidated balance sheet at
          December 31, 1997 and June 30, 1998..............................  3

          Condensed consolidated statement of operations for the three and
          six months ended June 30, 1997 and 1998.........................  4

          Condensed consolidated statement of cash flows for the
          six months ended June 30, 1997 and 1998.........................  5

          Condensed consolidated statement of changes in
          stockholders' equity for the period from
          December 31, 1997 to June 30, 1998..............................  6

          Notes to the condensed consolidated financial statements.........  7

  Item 2 - Management's Discussion and Analysis of Financial
          Condition and Results of Operations.....................................  14

PART II. OTHER INFORMATION
- --------------------------

  Item 1 - Legal Proceedings...............................................  24

  Item 6 - Exhibits and Reports on Form 8-K................................  25

                                 - 2 -
<PAGE>

                              FORM 10 - Q
                            PART 1 - ITEM 1
                         FINANCIAL INFORMATION

                   ALARIS MEDICAL, INC. AND SUBSIDIARIES
                    CONDENSED CONSOLIDATED BALANCE SHEET
          (DOLLAR AND SHARE AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA)
- --------------------------------------------------------------------------------

                                   ASSETS

<TABLE>
<CAPTION>

|                                    | DECEMBER 31, 1997 | JUNE 30, 1998 |
| ---------------------------------- | ----------------- | ------------- |
|                                    |                   | (UNAUDITED)   |
| <S>                                | <C>               | <C>           |
| Current assets:                    |                   |               |
| Cash...............................| $  6,984          | $    2,285    |
| Receivables, net..................| 83,406            | 82,274        |
| Inventories.......................| 61,666            | 65,619        |

CF056967_0003

```
Prepaid expenses and other current assets...........     23,260      22,352
                                                     ------------  -----------
            Total current assets.......................    175,316     172,530

Net investment in sales-type leases, less current
     portion...........................................     30,404      23,473
Property, plant and equipment, net.....................     55,365      56,693
Other non-current assets...............................     16,279      17,295
Intangible assets, net.................................    287,933     280,272
                                                     ------------  -----------
                                                        $565,297    $550,263
                                                     ------------  -----------
                                                     ------------  -----------
```

LIABILITIES AND STOCKHOLDERS' EQUITY

```
Current liabilities:
   Current portion of long-term debt................... $ 14,559    $  15,068
   Accounts payable....................................     24,042      23,669
   Accrued expenses and other current liabilities .....     52,668      56,213
                                                       ------------  -----------
            Total current liabilities..................     91,269      94,950
                                                       ------------  -----------
Long-term debt.........................................    431,571     417,277
Other non-current liabilities..........................     10,508       8,034
                                                       ------------  -----------
            Total non-current liabilities..............    442,079     425,311
                                                       ------------  -----------
```

Contingent liabilities and commitments (Note 7)

Stockholders' equity:
   Common stock, authorized 75,000 shares at $.01 par
   value; issued and outstanding - 59,102 shares and
   59,160 shares at December 31, 1997 and June 30,

```
   1998, respectively..................................        591         591
   Capital in excess of par value......................    148,341     148,523
   Accumulated deficit.................................. (111,330)   (113,091)
   Treasury stock......................................   (2,027)     (2,027)
   Equity adjustment for foreign currency translation..   (3,626)     (3,994)
                                                       ------------  -----------
            Total stockholders' equity.................     31,949      30,002
                                                       ------------  -----------
                                                        $565,297    $ 550,263
                                                       ------------  -----------
                                                       ------------  -----------
```

</TABLE>

            The accompanying notes are an integral part of these
                  condensed consolidated financial statements

                                    -3-
<PAGE>

                   ALARIS MEDICAL, INC. AND SUBSIDIARIES
          CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS (UNAUDITED)
          (DOLLAR AND SHARE AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA)
- ------------------------------------------------------------------------------

<TABLE>
<CAPTION>

                                            THREE MONTHS ENDED JUNE 30,    SIX MONTHS ENDED
JUNE 30,
                                            ---------------------------    -----------------
- --------

CF056967_0004

| | 1997 | 1998 | 1997 | 1998 |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Sales........................................... | $ 88,072 | $ 90,683 | $170,067 | $177,654 |
| Cost of sales.................................. | 47,361 | 46,499 | 94,331 | 91,353 |
| Gross margin.................................... | 40,711 | 44,184 | 75,736 | 86,301 |
| Selling and marketing expenses.................. | 16,414 | 17,101 | 31,909 | 34,230 |
| General and administrative expenses............. | 9,681 | 9,639 | 18,935 | 19,541 |
| Research and development expenses............... | 4,123 | 4,660 | 8,191 | 9,000 |
| Purchased in-process research and development... | - | 5,534 | - | 5,534 |
| Integration and other non-recurring charges..... | 12,247 | - | 15,899 | - |
| Total operating expenses................... | 42,465 | 36,934 | 74,934 | 68,305 |
| Lease interest income........................... | 1,029 | 1,060 | 2,191 | 2,222 |
| (Loss) income from operations.............. | (725) | 8,310 | 2,993 | 20,218 |
| Other income (expenses): | | | | |
| Interest income............................ | 227 | 85 | 385 | 147 |
| Interest expense........................... | (11,002) | (10,639) | (21,695) | (21,795) |
| Other, net................................. | (302) | (324) | (400) | (681) |
| Total other expense............................. | (11,077) | (10,878) | (21,710) | (22,329) |
| Loss before income taxes........................ | (11,802) | (2,568) | (18,717) | (2,111) |
| Benefit from income taxes....................... | (4,800) | (600) | (7,400) | (350) |
| Net loss........................................ | $ (7,002) | $ (1,968) | $(11,317) | $ (1,761) |
| Net loss per common share assuming no dilution............................... | $ (.12) | $ (.03) | $ (.19) | $ |

CF056967_0005

(.03)

--------

--------
```
                                                    --------------  -----------     ------------  ---

                                                    --------------  -----------     ------------  ---

```
Net loss per common share assuming
    dilution.................................    $   (.12)    $  (.03)   $  (.19)    $
(.03)
```
                                                    --------------- -----------     ------------  ---

                                                    --------------- -----------     ------------  ---
```

--------

--------
Weighted average common shares outstanding
    assuming no dilution.........................     58,635       58,680      58,788
58,669
```
                                                    --------------- -----------     ------------  ---

                                                    --------------- -----------     ------------  ---
```

--------

---------
Weighted average common shares outstanding
    assuming dilution............................     58,635       58,680      58,788
58,669
```
                                                    --------------- -----------     ------------  ---

                                                    --------------- -----------     ------------  ---
```

--------

--------

</TABLE>

The accompanying notes are an integral part of these
condensed consolidated financial statements

<PAGE>

-4-

ALARIS MEDICAL, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENT OF CASH FLOWS (UNAUDITED)
(DOLLARS IN THOUSANDS)
- ------------------------------------------------------------------------------------

<TABLE>
<CAPTION>

|                                                    | SIX MONTHS ENDED JUNE 30, | |
|----------------------------------------------------|------------|------------|
|                                                    | 1997       | 1998       |
| <S>                                                | <C>        | <C>        |
| Net cash (used) provided by operating activities   | $(2,776)   | $ 25,715   |
| Cash flows from investing activities:              |            |            |
|   Net decrease in restricted cash and              |            |            |
|     investments............................        | 2,332      | -          |
|   Return of capital by investee..............      | 148        | -          |
|   Net capital expenditures...................      | (9,717)    | (10,405)   |
|   Acquisition and license of technology .....      | -          | (6,547)    |
| Net cash used in investing activities...........   | (7,237)    | (16,952)   |
| Cash flows from financing activities:              |            |            |
|   Principal payments on long-term debt.......      | (3,622)    | (8,579)    |
|   Proceeds under revolving credit facility...      | 10,300     | 27,300     |
|   Repayments under revolving credit facility.      | (3,000)    | (32,250)   |
|   Debt issue costs...........................      | (429)      | -          |

CF056967_0006

```
        Purchase of treasury stock.................    (1,293)          -
        Proceeds from exercise of stock options ...      161           107
                                                      -----------   -----------
Net cash provided by (used in) financing
    activities                                          2,117       (13,422)
                                                      -----------   -----------
Effect of exchange rate changes on cash.........        (176)          (40)
                                                      -----------   -----------
Net decrease in cash............................       (8,072)       (4,699)
Cash at beginning of period.....................       12,084         6,984
                                                      -----------   -----------
Cash at end of period...........................      $ 4,012       $ 2,285
                                                      -----------   -----------
                                                      -----------   -----------
```

</TABLE>

The accompanying notes are an integral part of these
condensed consolidated financial statements

-5-

<PAGE>

ALARIS MEDICAL, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENT OF CHANGES IN
STOCKHOLDERS' EQUITY (UNAUDITED)
(DOLLAR AND SHARE AMOUNTS IN THOUSANDS)

<TABLE>
<CAPTION>

| | COMMON STOCK | | CAPITAL IN | | TREASURY STOCK | | EQUITY ADJUSTMENT FOR FOREIGN CURRENCY TRANSLATION | TOTAL |
| | | | EXCESS OF | ACCUMULATED | | | | |
| | SHARES | AMOUNT | PAR VALUE | DEFICIT | SHARES | AMOUNT | | |
| | ------- | ------ | ----------- | ----------- | ------- | ------- | -------- | --- ------- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Balance at December 31, 1997.... | 59,102 | $591 | $148,341 | $(111,330) | 453 | $(2,027) | $(3,626) | $31,949 |
| Exercise of stock options....... | 58 | | 107 | | | | | 107 |
| Equity adjustment for foreign currency translation.......... | | | | | | | (368) | (368) |
| Other equity.................... | | | 75 | | | | | 75 |
| Net loss for the period......... | | | | (1,761) | | | | (1,761) |
| | ------- | ------ | ----------- | ----------- | ------- | ------- | -------- | --- ------- |
| Balance at June 30, 1998........ | 59,160 | $591 | $148,523 | $(113,091) | 453 | $(2,027) | $(3,994) | $30,002 |

CF056967_0007

```
---  -------
---  -------
</TABLE>
```

                    The accompanying notes are an integral part of these
                    condensed consolidated financial statements


                                       -6-

<PAGE>

                        ALARIS MEDICAL, INC. AND SUBSIDIARIES
                 NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)
                 (DOLLARS AND SHARE AMOUNTS IN THOUSANDS, EXCEPT PER SHARE DATA)
- ------------------------------------------------------------------------------

NOTE 1 -- BUSINESS AND STATEMENT OF ACCOUNTING POLICY

THE COMPANY:
ALARIS Medical, Inc. ("ALARIS Medical"), formerly Advanced Medical, Inc.,
operating through its consolidated subsidiaries, designs, manufactures,
distributes and services intravenous infusion therapy and vital signs
measurement instruments and related disposables and accessories. On November
26, 1996, IMED Corporation ("IMED"), then a wholly-owned subsidiary of
Advanced Medical, Inc., ("Advanced Medical") acquired all of the outstanding
stock of IVAC Holdings, Inc. ("IVAC Holdings") and its subsidiaries including
IVAC Medical Systems, Inc. (Note 2). In connection with the acquisition,
IMED and IVAC Medical Systems, Inc. were merged into IVAC Holdings (the
"Merger"), which then changed its name to ALARIS Medical Systems, Inc.
("ALARIS Medical Systems"). ALARIS Medical and its subsidiaries are
collectively referred to as the "Company." The acquisition was accounted for
as a purchase.

STATEMENT OF ACCOUNTING POLICY:
The accompanying financial statements have been prepared by the Company
without audit pursuant to the rules and regulations of the Securities and
Exchange Commission. Certain information and footnote disclosures normally
included in financial statements prepared in accordance with generally
accepted accounting principles have been condensed or omitted pursuant to
those rules and regulations, although the Company believes that the
disclosures herein are adequate to make the information not misleading.

In the opinion of the Company, the accompanying financial statements contain
all adjustments, consisting of normal recurring adjustments, necessary for a
fair statement of the Company's financial position as of June 30, 1998, and
the results of its operations and its cash flows for the six months ended
June 30, 1997 and 1998.

USE OF ESTIMATES:
The preparation of financial statements in conformity with generally accepted
accounting principles requires management to make estimates and assumptions
that affect the reported amounts of assets and liabilities at the date of the
financial statements and the reported amounts of revenues and expenses during
the period. Actual results could differ from those estimates.

NET INCOME (LOSS) PER COMMON SHARE:
The Company's net income (loss) per common share assuming no dilution is
computed using the weighted average number of common shares outstanding. The
Company's net income (loss) per common share assuming dilution is computed
using the weighted average number of common shares outstanding plus dilutive
potential common shares using the treasury stock method at the average market
price during the reporting period (Note 6).

CF056967_0008

Case: 1:15-cv-09986 Document #: 551-7 Filed: 09/07/23 Page 9 of 76 PageID #:24088

<PAGE>

NOTE 2 -- THE MERGER

On November 26, 1996, IMED acquired all of the outstanding stock of IVAC
Holdings and its subsidiaries including IVAC Medical Systems, Inc., in
exchange for $390,000 plus acquired cash of $7,225 less total debt assumed
aggregating $173,314 plus related expenses. The Merger was financed with
$204,200 in bank debt and $200,000 in senior subordinated notes. Subsequent
to the acquisition, IVAC Medical Systems, Inc. and IMED were merged into IVAC
Holdings, which subsequently changed its name to ALARIS Medical Systems, Inc.

In connection with the Merger, ALARIS Medical contributed $19,588 to IMED
(the "Capital Contribution"). The Capital Contribution was funded in part
through the sale to Decisions Incorporated ("Decisions"), a corporation
wholly owned by ALARIS Medical's principal stockholder, of 13,333 shares of
its common stock for aggregate proceeds of $40,000 (the "Decisions
Contribution"). The balance of the Capital Contribution was funded with
existing cash balances of ALARIS Medical. The portion of the net proceeds of
the Decisions Contribution not applied to make the Capital Contribution was
used by ALARIS Medical to redeem $21,924 principal amount of its 15%
subordinated debentures due 1999 and fund the redemption of ALARIS Medical's
outstanding preferred stock. In connection with the Decisions Contribution,
Decisions exchanged an aggregate of $37,500 in principal amount of
convertible promissory notes previously issued by ALARIS Medical for 29,416
shares of ALARIS Medical common stock, including 3,333 shares issued as an
inducement to convert.

The acquisition was accounted for as a purchase, whereby the purchase price,
including related expenses, was allocated to identified assets, including
intangible assets, purchased research and development and liabilities based
upon their respective fair values. The excess of the purchase price over the
value of identified assets and liabilities, in the amount of $132,482, was
recorded as goodwill and is being amortized over its estimated life of thirty
years.

NOTE 3 -- ACQUISITIONS AND LICENSES

During the second quarter of 1998, the Company acquired the net assets of
Patient Solutions, Inc. ("PSI") for $5,250. PSI was a wholly-owned subsidiary
of Invacare Corporation and was focused on the development of an ambulatory
pump for use in the alternate site market. The transaction was accounted for
as a purchase with the net assets acquired recorded at their estimated fair
values. The rights to the pump under development were valued at $4,421 and
were recorded as a non-recurring charge included in purchased in-process
research and development. The underlying technology had not reached
technological feasibility and no alternative use has been identified.  The
Company estimates completing such development by the fourth quarter of 1998.

Also during the second quarter, the Company licensed technology from Caesarea
Medical Electronics Limited ("Caesarea") for a pole mounted volumetric
infusion pump being designed for developing international markets. At the
time of license, the development of the applications and functionality
required by the Company had not reached technological feasibility and no
alternative uses were identified. As a result, the initial license payment
and related expenses of approximately $1,200 were recorded as purchased
in-process research and development during the second quarter. Under the
terms of the license agreement, the Company is obligated to pay additional
consideration to Caesarea upon timely completion of certain development
milestones and delivery of specified numbers of assembly kits. The milestones
require completion by various dates through the first half of 1999 with the
first significant milestones expected to be met during the third quarter of
1998. If all such milestones are reached, the additional consideration will
total approximately $4,000.

CF056967_0009

Case: 1:15-cv-09986 Document #: 551-7 Filed: 09/07/23 Page 10 of 76 PageID #:24089

-8-

<PAGE>

On June 24, 1998, the Company entered into an agreement to acquire
Instromedix, Inc. ("Instromedix") for approximately $51,000 in cash,
assumption of approximately $5,100 of debt and the payment of approximately
$1,000 of seller transaction expenses. This acquisition was completed on
July 17, 1998 and was financed with $30,000 of ALARIS Medical Systems bank
term debt and proceeds from an ALARIS Medical debt offering. On July 28,
1998, ALARIS Medical completed the sale of $109,892 of 11-1/8% Senior
Discount Notes (the "Senior Discount Notes"), due 2008, receiving net
proceeds of $106,321. Interest accruing on these notes is added to the
outstanding principal balance through July 31, 2003. Interest accruing
subsequent to July 31, 2003 is payable in cash semi-annually in arrears on
February 1 and August 1.

NOTE 4 -- INVENTORIES

Inventories comprise the following:

<TABLE>
<CAPTION>

|  | DECEMBER 31, 1997 | JUNE 30, 1998 |
|---|---|---|
| <S> | <C> | <C> |
| Raw materials | $ 24,144 | $26,570 |
| Work-in-process | 8,363 | 7,843 |
| Finished goods | 29,159 | 31,206 |
|  | $ 61,666 | $65,619 |

NOTE 5 -- COMPREHENSIVE INCOME (LOSS)

Effective January 1, 1998, the Company adopted Statement of Financial
Accounting Standards No. 130, "Reporting Comprehensive Income." This
Statement requires that all items recognized under accounting standards as
components of comprehensive earnings be reported in an annual financial
statement that is displayed with the same prominence as other annual
financial statements. This Statement also requires that an entity classify
items of other comprehensive earnings by their nature in an annual financial
statement. For example, other comprehensive earnings may include foreign
currency translation adjustments, minimum pension liability adjustments, and
unrealized gains and losses on marketable securities classified as
available-for-sale. Annual financial statements for prior periods will be
reclassified, as required. ALARIS Medical's total comprehensive losses were
as follows:

|  | THREE MONTHS ENDED JUNE 30, | |
|---|---|---|
|  | 1997 | 1998 |
| <S> | <C> | <C> |
| Net loss | $ (7,002) | $(1,968) |
| Other comprehensive loss: |  |  |
| Foreign currency translation adjustments. | (1,332) | (309) |
| Comprehensive loss | $ (8,334) | $(2,277) |

</TABLE>

<TABLE>

CF056967_0010

<CAPTION>

|  | SIX MONTHS ENDED JUNE 30, | |
| --- | --- | --- |
|  | 1997 | 1998 |
| <S> | <C> | <C> |
| Net loss.................................... | $(11,317) | $(1,761) |
| Other comprehensive loss: | | |
| Foreign currency translation adjustments. | (2,534) | (368) |
| Comprehensive loss.......................... | $(13,851) | $(2,129) |

</TABLE>

-9-

<PAGE>

NOTE 6 -- EARNINGS PER SHARE

In February, 1997 the Financial Accounting Standards Board issued the
Statement of Financial Accounting Standards No. 128, "Earnings per Share"
("SFAS 128") which specifies the computation, presentation, and disclosure
requirements for earnings per share. The earnings per share information
contained in these financial statements, including those presented for prior
periods, conform with SFAS 128.

<TABLE>
<CAPTION>

|  | THREE MONTHS ENDED JUNE 30, | | | |
| --- | --- | --- | --- | --- |
|  | 1997 | | 1998 | |
|  | BASIC | DILUTED | BASIC | DILUTED |
| <S> | <C> | <C> | <C> | <C> |
| Net loss as reported............................ | $ (7,002) | $(7,002) | $(1,968) | $(1,968) |
| Weighted average common shares outstanding ....... | 58,635 | 58,635 | 58,680 | 58,680 |
| Net loss per common share........................ | $  (.12) | $  (.12) | $  (.03) | $ (.03) |

</TABLE>

<TABLE>
<CAPTION>

|  | SIX MONTHS ENDED JUNE 30, | |
| --- | --- | --- |
|  | 1997 | 1998 |

CF056967_0011

|                                              | BASIC        | DILUTED      | BASIC       | DILUTED    |
| -------------------------------------------- | ------------ | ------------ | ----------- | ---------- |
|                                              | ------------ | ------------ | ------------ | ---------- |
| &lt;S&gt;<br>Net loss as reported...............................<br>$(1,761) | &lt;C&gt;<br>$(11,317) | &lt;C&gt;<br>$(11,317) | &lt;C&gt;<br>$(1,761) | &lt;C&gt; |
|                                              | ------------ | ------------ | ------------ | ---------- |
|                                              | ------------ | ------------ | ------------ | ---------- |
| Weighted average common shares outstanding ....... | 58,788 | 58,788 | 58,669 | 58,669 |
|                                              | ------------ | ------------ | ------------ | ---------- |
|                                              | ------------ | ------------ | ------------ | ---------- |
| Net loss per common share........................ $<br>(.03) | (.19) | $  (.19) | $  (.03) | $ |
|                                              | ------------ | ------------ | ------------ | ---------- |
|                                              | ------------ | ------------ | ------------ | ---------- |

&lt;/TABLE&gt;

Potential common shares are not included in the diluted computation when the
Company reports a net loss, as they are antidilutive. As a result, net loss
per common share assuming no dilution and dilution are the same when the
Company experiences a net loss.

The Company's 7.25% Debentures were not included in the calculation of
diluted earnings per share in the three and six months ended June 30, 1997
and 1998 as they are antidilutive. For both three and six month periods
ended June 30, the $16,152 of convertible debentures, if converted at an
exercise price of $18.14 per share, would result in an increase of 890 common
shares and an increase of $176 and $352 net of taxes, to net income, due to
the reduction in interest expense. Options outstanding at June 30, 1997 and
1998 were excluded due to their antidilutive nature. Had such options been
included, the weighted average shares would have increased by 886 and 1,204
for the three and six month periods ended June 30, 1997, respectively, and
increased by 1,807 and 1,687 for the three and six months ended June 30,
1998, respectively.

NOTE 7 -- CONTINGENCIES AND LITIGATION

GOVERNMENT REGULATION AND FIELD CORRECTIONS

The United States Food and Drug Administration (the "FDA"), pursuant to the
Federal Food, Drug, and Cosmetic Act (the "FDC Act"), regulates the
introduction of medical devices into commerce, as well as testing
manufacturing procedures, labeling, adverse event reporting and
record-keeping with respect to such

                                    -10-

&lt;PAGE&gt;

products. The process of obtaining market clearances from the FDA for new
products can be time-consuming and expensive and there can be no assurance
that such clearances will be granted or that FDA review will not involve
delays adversely affecting the marketing and sale of products. Enforcement
of the FDC Act depends heavily on administrative interpretation and there can
be no assurance that interpretations made by the FDA or other regulatory
bodies will not have a material adverse effect on the business, financial
condition, results of operations or cash flows. The FDA and state agencies
routinely inspect the Company to determine whether the Company is in
compliance with various requirements relating to manufacturing practices,
testing, quality control, complaint handling, medical device reporting and

CF056967_0012

product labeling. Such inspections can result in such agencies requiring the
Company to take certain corrective actions for non-complying conditions
observed during the inspections. A determination that the Company is in
violation of the FDC Act could lead to the imposition of civil sanctions,
including fines, recall orders, orders for repair or refund or product
seizures and criminal sanctions. Since 1994, the Company has on twelve
occasions removed products from the market that were found not to meet
acceptable standards. None of such recalls materially interfered with the
Company's operations and all such product lines, except the Model 599 Series
infusion pump, were subsequently returned to the market. The Company
continues, however, to sell administration sets and replacement parts for the
Model 599 Series infusion pump. In addition, the Company has initiated a
voluntary safety alert of its Model 597/598 and Model 599 Series infusion
pumps. Moreover, the Company has initiated a voluntary field correction of
approximately 50,000 of its Gemini PC-1 and PC-2 infusion pumps because
failure of specific electrical components on the power regulator printed
circuit board may result in improper regulation of the battery charge
voltage, which may cause the battery to overheat. The Company recorded a
charge of $2,500 to cost of sales for the quarter ended March 31, 1997 on
account of this voluntary field correction. The Company initiated a
voluntary field correction of its Signature Edition infusion pumps to correct
a malfunction (of an electronic line filter component (which malfunction may
occur when a user fails to follow the Company's written cleaning instructions
and can result in an electrical short). The Company is not aware of the
occurrence of any injury incidents relating to a malfunction of this type.
In the third quarter of 1998, the Company will initiate a recall of its
Gemini PC-4 infusion pumps to correct certain electro-mechanical problems
which may cause one or more channels of the device to audibly and visibly
alarm and temporarily cease operation. Although there can be no assurance,
the Company believes that these voluntary field corrections, along with
adjustments and corrections that may be made to various Company products from
time to time as an ordinary part of the business of the Company, will not
have a material adverse effect on the business, financial condition, results
of operations or cash flows.

LITIGATION

The Company is a defendant in a lawsuit filed in June 1996 by Sherwood
Medical, Inc. against IVAC Holdings which alleges infringement of two patents
by reason of certain activities including the sale by IVAC Holdings of
disposable probe covers for use with the Company's infrared tympanic
thermometer. The lawsuit seeks injunctive relief, treble damages and the
recovery of costs and attorney fees. The Company believes it has sufficient
defenses to all claims, including the defenses of noninfringement and
invalidity and intends to vigorously defend this action. However, there can
be no assurance that the Company will successfully defend all claims made by
Sherwood and the failure of the Company to successfully prevail in this
lawsuit could have a material adverse effect on the Company's operations,
financial condition and cash flows.

The Company is a defendant in a QUI TAM lawsuit filed by a former IMED
employee in the United States District Court for the Northern District of
Illinois. On November 15, 1996, an amended complaint was filed which alleges
fraud in the inducement, breach of employment contract, common law fraud and
violations of the Federal False Claims Act and Medicare Fraud and Abuse Act.
To date, the United States has declined to intervene in this action. The
Company believes it has sufficient defenses to all claims by the plaintiff.

-11-

<PAGE>

However, there can be no assurance that the Company will successfully defend
all claims made in this lawsuit and the failure of the Company to prevail in
this lawsuit could have a material adverse effect on the Company's
operations, financial condition and cash flows.

CF056967_0013

The Company was recently informed that on April 20, 1998, Becton Dickinson
and Company ("Becton") filed a complaint (the "Complaint") in the United
States District Court for the District of Utah alleging that the Company's
SmartSite Needle Free System infringes certain patents licensed to Becton.
The Complaint has not yet been served on the Company and the Company does not
know whether or not the Complaint will be timely served. However, if the
Complaint is timely served, the Company intends to vigorously defend any
claim brought against it with respect to this matter. There can be no
assurance that the court would find in the Company's favor if the Complaint
were to be pursued or that if the court were to find that the Company's
SmartSite Needle Free System infringes the patents licensed to Becton that
such finding would not have a material adverse effect on the business,
financial condition, results of operations or cash flows of the Company.

UNITED STATES CUSTOMS SERVICE MATTER

During the years 1988 through 1995, Cal Pacifico acted as the Company's
United States customs broker and importer of record with respect to the
importation into the United States of finished products ("Finished Products")
assembled at the Company's two maquiladora assembly plants in Tijuana,
Mexico. In May 1995, Cal Pacifico received a pre-penalty notice from the
United States Customs Service ("Customs") to the effect that Customs intended
to assess additional duties and substantial penalties against Cal Pacifico
for its alleged failure, during the years 1988 through 1992, to comply with
certain documentary requirements regarding the importation of goods on behalf
of its clients, including the Company. Customs recently assessed additional
duties with respect to Cal Pacifico's importation of goods on behalf of its
clients, including the importation of the Company's Finished Products, for
the years 1993 and 1994, and it is anticipated that Customs will issue a
pre-penalty notice to Cal Pacifico in respect of these years as well
(collectively with the amounts referred to in the immediately preceding
sentence, the "Disputed Amounts"). The Company has been advised by its
special Customs counsel that, under applicable law, no person, by fraud,
gross negligence or negligence, may (i) import merchandise into the commerce
of the United States by means of any material and false document, statement
or act, or any material omission, or (ii) aid or abet any other person to
import merchandise in such manner. No proceeding has been initiated by
Customs against the Company in respect of the matters which are the subject
of the proceeding against Cal Pacifico. Since Cal Pacifico was the Company's
United States customs broker and importer of record during each of the
foregoing years, the Company believes that it is unlikely that Customs will
assess against the Company any portion of the Disputed Amounts.

Cal Pacifico is contesting Customs' assessment of the Disputed Amounts. Cal
Pacifico's challenge to the assessment of the Disputed Amounts is in its
preliminary stages. Given the present posture of Cal Pacifico's challenge,
and the inherent uncertainty of contested matters such as this, it is not
possible for the Company to express an opinion as to the likelihood that Cal
Pacifico will prevail on its challenge. The Company has not been informed by
Cal Pacifico or Customs as to the specific amount of the Disputed Amounts.

Cal Pacifico has advised the Company that, should Cal Pacifico's challenge to
the assessment of the Disputed Amounts prove to be unsuccessful, it will seek
recovery from the Company, through arbitration, for any portion of the
Disputed Amounts which it is required to pay to Customs. As part of the
settlement agreement which resolved the Company's contract dispute with Cal
Pacifico during the second quarter of 1997, the Company paid Cal

                                      -12-
<PAGE>

Pacifico $550, which is to be applied toward Cal Pacifico's payment of
Disputed Amounts. The $550 payment by the Company is to be credited toward
any portion of the Disputed Amounts which the arbitrator determines the
Company owes to Cal Pacifico. The actual amount so determined by the
arbitrator may be less or greater than $550. Although the ultimate outcome

CF056967_0014

of such an arbitration proceeding cannot be guaranteed, the Company believes
that it has meritorious defenses to claims with respect to Disputed Amounts
which Cal Pacifico might raise against the Company. These defenses would be
based, among other factors, on the contractual relationship between the
Company and Cal Pacifico (including a defense with respect to the
availability of indemnification under the agreements between Cal Pacifico and
the Company), the conduct of Cal Pacifico with respect to both the Company
and Customs, and the compliance obligations of Cal Pacifico under applicable
customs laws. Inasmuch as Cal Pacifico's challenge before Customs is still
pending and any claim against the Company for indemnification would be based
on Cal Pacifico's ultimate lack of success in that challenge, and inasmuch as
any arbitration proceeding by which Cal Pacifico might seek indemnification
has not been filed nor has Cal Pacifico committed itself to the theories
under which it might seek indemnification or the recovery of damages from the
Company, it is not possible for the Company to express an opinion at this
time as to the likelihood of an unfavorable outcome in such a proceeding.

OTHER

The Company is also a defendant in various actions, claims, and legal
proceedings arising from its normal business operations. Management believes
they have meritorious defenses and intends to vigorously defend against all
allegations and claims. As the ultimate outcome of these matters is uncertain,
no contingent liabilities or provisions have been recorded in the accompanying
financial statements for such matters. However, in management's opinion, based
on discussions with legal counsel, liabilities arising from such matters, if
any, will not have a material adverse effect on consolidated financial position,
results of operations or cash flows.

                                        -13-

<PAGE>


                                PART I - ITEM 2

            Management's Discussion and Analysis of Financial Condition
                           and Results of Operations
- -----------------------------------------------------------------------------------

General

ALARIS Medical is a holding company for ALARIS Medical Systems. ALARIS
Medical also identifies and evaluates potential acquisitions and investments,
and performs various corporate functions. As a holding company, ALARIS
Medical currently has no revenues to fund its operating and interest expense
and relies on its existing cash and cash generated from operations of ALARIS
Medical Systems, external borrowings and other external sources of funds to
meet its obligations. Capitalized terms used but not defined herein have the
meaning ascribed to them in the Notes to the Condensed Consolidated Financial
Statements.

The Company is a leading provider of infusion systems and related
technologies to the United States hospital market, with the largest installed
base of pump delivery lines ("channels"). The Company is also a leader in the
international infusion systems market. The Company's infusion systems, which
are used to deliver one or more fluids, primarily pharmaceuticals or
nutritionals, to patients, consist of single and multi-channel infusion pumps
and controllers, and proprietary and non-proprietary disposable
administration sets (i.e., plastic tubing and pump interfaces). In addition,
the Company is a leading provider of patient monitoring products that measure
and monitor temperature, pulse, pulse oximetry and blood pressure, with the
largest installed base of hospital thermometry systems in the United States.

In recent years, the Company's results of operations have been affected by
the cost containment pressures applicable to health care providers. In
particular, in order to reduce costs, certain hospitals have adopted a

CF056967_0015

protocol increasing the maximum time between disposable administration set
changes from every 24 hours to as much as every 72 hours. Notwithstanding
this change in protocol, unit sales volume of the Company's disposable
administration sets increased in every year since 1993, primarily as a result
of the growth in its installed base of infusion pumps. However, uncertainty
remains with regard to future changes within the healthcare industry. The
trend towards managed care and economically motivated buyers in the U.S. may
result in continued pressure on selling prices of products and compression on
gross margins. The U.S. marketplace is increasingly characterized by
consolidation among healthcare providers and purchasers of medical products.
The Company's profitability is affected by the increasing use of Group
Purchasing Organizations ("GPOs") which are better able to negotiate
favorable pricing from providers of infusion systems, such as the Company,
and which police compliance with exclusive buying arrangements for their
members. These buying arrangements, in certain situations, also may result in
the GPO requiring removal of the Company's existing infusion pumps. The
Company expects that such GPOs will become increasingly more common and may
have an adverse effect on the Company's future profitability.

                                        -14-

<PAGE>

RESULTS OF OPERATIONS

The following table sets forth, for the periods indicated, selected financial
information expressed as a percentage of sales:

<TABLE>
<CAPTION>

| ENDED JUNE 30, | THREE MONTHS ENDED JUNE 30, | | SIX MONTHS |
|---|---|---|---|
| -------------- | | | ------------ |
| 1998 | 1997 | 1998 | 1997 |
| ------------ | ------------ | ------------ | ------------ |
| - ----------- | | | |
| <S> | <C> | <C> | <C> |
| <C> | | | |
| Sales............................................ | 100.0% | 100.0% | 100.0% |
| 100.0% | | | |
| Cost of sales.................................... | 53.8 | 51.3 | 55.5 |
| 51.4 | | | |
| | ------- | ------- | ------- |
| ------ | | | |
| Gross margin..................................... | 46.2% | 48.7% | 44.5% |
| 48.6% | | | |
| Selling and marketing expenses.................. | 18.6 | 18.9 | 18.8 |
| 19.3 | | | |
| General and administrative expenses............. | 11.0 | 10.6 | 11.1 |
| 11.0 | | | |
| Research and development expenses............... | 4.7 | 5.1 | 4.8 |
| 5.1 | | | |
| Purchased in-process research and development | - | 6.1 | - |
| 3.1 | | | |
| Integration and other non-recurring charges..... | 13.9 | - | 9.3 |
| - | | | |
| Lease interest income........................... | 1.2 | 1.2 | 1.3 |
| 1.3 | | | |
| | ------- | ------- | ------- |
| ------ | | | |
| Income from operations.......................... | (0.8) | 9.2 | 1.8 |
| 11.4 | | | |
| Interest expense................................ | (12.5) | (11.7) | (12.8) |

CF056967_0016

```
(12.3)
Other, net...............................................          (.1)             (.3)             -
(.3)
                                                              --------         --------         --------
------
Loss before income taxes................................         (13.4)           (2.8)          (11.0)
(1.2)
Benefit from income taxes................................         (5.4)            (.6)            (4.3)
(.2)
                                                              --------         --------         --------
------
Net loss.................................................         (8.0%)           (2.2%)          (6.7)
(1.0)
                                                              --------         --------         --------
------
                                                              --------         --------         --------
------
Other Data:
   Adjusted EBITDA.......................................          23.3%            24.3%           22.2%
23.8%
```

</TABLE>

<TABLE>
<CAPTION>

| | THREE MONTHS ENDED JUNE 30, | | SIX MONTHS ENDED JUNE 30, |
| | --- | --- | --- |
| | 1997 | 1998 | 1997 |
| | | | 1998 |
| | (IN THOUSANDS) | | (IN THOUSANDS) |
| <S> | <C> | <C> | <C> |
| Adjusted EBITDA (1)............................... | $   20,560 | $   22,032 | $   37,822 |
| $  42,224 | | | |
| Inventory purchase price allocation adjustment (2) | - | - | (1,607) |
| - | | | |
| Integration and other non-recurring expense............ | (12,247) | - | (15,899) |
| - | | | |
| Depreciation and amortization (3)..................... | (9,038) | (8,188) | (17,323) |
| (16,472) | | | |
| Purchased in-process research and development (4) | - | (5,534) | - |
| (5,534) | | | |
| Interest income........................................ | 227 | 85 | 385 |
| 147 | | | |
| Interest expense....................................... | (11,002) | (10,639) | (21,695) |
| (21,795) | | | |
| Other, net............................................. | (302) | (324) | (400) |
| (681) | | | |
| (Provision for) benefit from income taxes.............. | 4,800 | 600 | 7,400 |
| 350 | | | |
| | ------- | ------- | ------- |
| ------ | | | |
| Net income (loss)..................................... | $   (7,002) | $   (1,968) | $   (11,317) |
| $  (1,761) | | | |
| | ------- | ------- | ------- |
| ------ | | | |
| | ------- | ------- | ------- |
| ------ | | | |

CF056967_0017

      </TABLE>

- -------------------------
(1)    Adjusted EBITDA represents income from operations before restructuring,
       integration and other non-recurring charges, non-cash purchase accounting
       charges and depreciation and amortization. Adjusted EBITDA does not
       represent net income or cash flows from operations, as these terms are
       defined under generally accepted accounting principles, and should not be
       considered as an alternative to net income as an indicator of the
       Company's operating performance or to cash flows as a measure of
       liquidity. ALARIS Medical has included information concerning Adjusted
       EBITDA herein because it understands that such

                                         -15-

<PAGE>

       information is used by investors as one measure of an issuer's
       historical ability to service debt. Restructuring and other one-time
       non-recurring charges are excluded from Adjusted EBITDA as ALARIS Medical
       believes that the inclusion of these items would not be helpful to an
       investor's understanding of ALARIS Medical's ability to service debt.
       ALARIS Medical's computation of Adjusted EBITDA may not be comparable to
       similar titled measures of other companies.

(2)    Amount represents that portion of the purchase accounting adjustments
       made to adjust the acquired IVAC inventory to its estimated fair value on
       the Merger date which was charged to cost of sales during the first
       quarter of 1997.

(3)    Depreciation and amortization excludes amortization of debt discount and
       issuance costs included in interest expense.

(4)    Amount represents that portion of the purchase accounting adjustments
       related to the value assigned to the acquired in-process research and
       development of projects acquired from PSI and Caesarea for which
       technological feasibility had not been established and for which there
       was no alternative future use.

The following table summarizes sales to customers located in the United States
and international locations:

<TABLE>
<CAPTION>

| Ended June 30, | Three Months Ended June 30, | | Six Months |
|---|---|---|---|
| | 1997 | 1998 | 1997 |
| 1998 | | | |
| | (in millions) | | (in |
| millions) | | | |
| <S> | <C> | <C> | <C> |
| U.S. sales.................................................. $ | 55.4 | $   57.0 | $   106.8 |
| $ 109.5 | | | |
| International sales......................................... | 32.7 | 33.7 | 63.3 |
| 68.1 | | | |
| Total sales.......................................... $ | 88.1 | $   90.7 | $   170.1 |

CF056967_0018

$ 177.6

--------

--------

</TABLE>

For purposes of this discussion and analysis, the three months ended June 30, 1997 and 1998 are referred to as Second Quarter 1997 and Second Quarter 1998, respectively, and the six months ended June 30, 1997 and 1998 are referred to as 1997 and 1998, respectively.

Three Months Ended June 30, 1997 Compared to Three Months Ended June 30, 1998

SALES
Sales increased $2.6 million during Second Quarter 1998 as compared to Second Quarter 1997. International sales increased $1.0 million, or 3.2% while United States sales increased $1.6 million, or 2.8%. The increase in international sales is primarily due to increases in drug infusion disposable administration set revenue of $1.0 million. The majority of the Company's international sales are denominated in foreign currency. Due to a stronger U.S. dollar in 1998 as compared to the actual foreign currency exchange rates in effect during Second Quarter 1997, translation of Second Quarter 1998 international sales were adversely impacted by $1.2 million. The increase in U.S. sales in Second Quarter 1998 as compared to Second Quarter 1997 is primarily due to increases in drug infusion disposable administration set revenue of $2.0 million and patient monitoring revenue of $0.6 million. These increases were offset by a decrease in drug infusion instrument revenue of $1.0 million.

GROSS MARGIN
The gross margin percentage increased from 46.2% in Second Quarter 1997 to 48.7% in Second Quarter 1998 primarily due to increased sales of higher margin disposable administration sets as well as stable pricing and continued benefits realized from ongoing cost reduction efforts.

-16-

<PAGE>

SELLING AND MARKETING EXPENSES
Selling and marketing expenses increased $0.7 million, or 4.2%, during Second Quarter 1998 as compared to Second Quarter 1997. As a percentage of sales, selling and marketing expenses increased from 18.6% in Second Quarter 1997 to 18.9% in Second Quarter 1998. Domestic expenses decreased by $0.8 million, or 7.8%, from Second Quarter 1997 due to lower commissions, and personnel costs. International expenses increased $1.5 million, or 24.2%, from Second Quarter 1997. These increases were due to increases in personnel and investment in international direct operations in Italy and Norway during the latter part of 1997.

GENERAL AND ADMINISTRATIVE EXPENSES
Second Quarter 1998 general and administrative expenses was consistent with Second Quarter 1997. As a percentage of sales, general and administrative expenses decreased from 11.0% in 1997 to 10.6% in 1998. Domestic expenses decreased $1.4 million due to lower consulting and legal fees. International expenses increased by $1.3 million, or 100.0%, primarily as a result of the conversion of certain European dealer operations into direct operations, expansion of the European headquarters and quality initiatives to obtain required CE markings on products.

RESEARCH AND DEVELOPMENT EXPENSES
Research and development expenses increased approximately $0.5 million, or 13.0%, during Second Quarter 1998 as compared to Second Quarter 1997 primarily due to increased activities associated with the later development stages of various domestic and international engineering projects for

CF056967_0019

infusion systems and disposable administration sets.

INTEGRATION AND OTHER NON-RECURRING CHARGES
The Company incurred $12.2 million in costs to integrate the IMED and IVAC
operations during 1997. These costs are in addition to restructuring and
integration charges of $15.3 million recorded in the fourth quarter of 1996.
The Second Quarter 1997 expense consists primarily of the write-off of a
product distribution and license agreement with a third party developer of an
ambulatory and alternate site infusion pump of $4.5 million, maquiladora
dispute settlement and related costs of $4.1 million, information systems
conversion costs of $1.1 million and other integration costs of $2.5 million.
The Company reviewed its products and related research and development
activities and market opportunities in order to focus on projects that will
provide greater competitive advantage and shareholder return. That review
resulted in the termination of the aforesaid product distribution and license
agreement. The $4.5 million charge related to such termination includes a
$4.3 million non-cash charge representing the write-off of the intangible
asset associated with such agreement.

PURCHASED IN-PROCESS RESEARCH AND DEVELOPMENT
In connection with the PSI acquisition and the technology license agreement
with Caesarea, during the second quarter of 1998 the Company incurred a
one-time $5.5 million write-off related to the value assigned to the acquired
in-process research and development of the projects for which technological
feasibility had not been established and for which there was no alternative
future use. The Company has continued to invest in the development necessary
to obtain technological feasibility of these projects.

INCOME FROM OPERATIONS
Income from operations increased $9.0 million during Second Quarter 1998 as
compared to Second Quarter 1997 primarily due to increased sales and gross
margin in Second Quarter 1998 and to the Second Quarter 1997 operating
results including significant integration charges, as discussed above which
were not incurred in Second Quarter 1998.

                                      -17-

<PAGE>

ADJUSTED EBITDA

Adjusted EBITDA increased $1.5 million during Second Quarter 1998 as compared
to Second Quarter 1997. As a percentage of sales, Adjusted EBITDA increased
from 23.3%, or $20.6 million, for Second Quarter 1997 to 24.3%, or $22.0
million, for Second Quarter 1998 due to the reasons discussed above. Adjusted
EBITDA represents income from operations before non-recurring non-cash
purchase accounting charges, integration charges and depreciation and
amortization. Adjusted EBITDA does not represent net income or cash flows
from operations, as these terms are defined under generally accepted
accounting principles, and should not be considered as an alternative to net
income or to cash flows as an indicator of the Company's operating
performance or to cash flows as a measure of liquidity. The Company has
included information concerning Adjusted EBITDA herein because it understands
that such information is used by investors as a measure of an issuer's
historical ability to service debt. Integration and other one-time
non-recurring charges are excluded from Adjusted EBITDA as the Company
believes that the inclusion of these items would not be helpful to an
investor's understanding of the Company's ability to service debt. The
Company's computation of Adjusted EBITDA may not be comparable to similar
titled measures of other companies.

INTEREST EXPENSE
Interest expense decreased $0.4 million during Second Quarter 1998 primarily
due to reduced interest rates on the Company's bank credit facility resulting
from an amendment to such debt agreement during the Second Quarter of 1998
(see Liquidity and Capital Resources).

CF056967_0020

Case: 1:15-cv-09986 Document #: 551-7 Filed: 09/07/23 Page 21 of 76 PageID #:24100

SIX MONTHS ENDED JUNE 30, 1997 COMPARED TO SIX MONTHS ENDED JUNE 30, 1998

### SALES
Sales increased $7.6 million during 1998 as compared to 1997. International
sales increased $4.8 million, or 7.6% while United States sales increased $2.8
million, or 2.6%. The increase in international sales is primarily due to
increases in drug infusion instrument revenue of $1.8 million and drug infusion
disposable administration set revenue of $2.1 million. The majority of the
Company's international sales are denominated in foreign currency. Due to a
stronger U.S. dollar in 1998 as compared to the actual foreign currency exchange
rates in effect during 1997, translation of 1998 international sales were
adversely impacted by $2.6 million. The increase in U.S. sales in 1998 as
compared to 1997 is primarily due to increases in drug infusion disposable
administration set revenue of $3.3 million and patient monitoring revenue of
$1.3 million. These increases were offset by a decrease in drug infusion
instrument revenue of $1.8 million.

### GROSS MARGIN
The gross margin percentage increased from 44.5% in 1997 to 48.6% in 1998
primarily due to $4.1 million of non-recurring costs included in 1997 cost of
sales. Exclusive of $1.6 million of non-recurring purchase accounting inventory
adjustments and $2.5 million related to a voluntary field correction of certain
Gemini PC-1 and PC-2 infusion pumps charged to cost of sales during 1997, the
gross margin percentage for 1997 was 46.9%. The improvement over 1997 is due to
increased sales of higher margin disposable administration sets as well as the
benefits realized from ongoing cost reduction efforts and purchasing synergies.

### SELLING AND MARKETING EXPENSES
Selling and marketing expenses increased $2.3 million, or 7.3%, during 1998 as
compared to 1997. As a percentage of sales, selling and marketing expenses
increased from 18.8% in 1997 to 19.3% in 1998. Domestic expenses decreased by
$0.3 million, or 1.6%, from 1997 due primarily to lower commissions earned on
instrument sales. International expenses increased $2.6 million, or 20.1%, from
1997. These increases were due to increases in personnel and investment in
international direct operations in Italy and Norway during the latter part of
1997.

-18-

<PAGE>

### GENERAL AND ADMINISTRATIVE EXPENSES
General and administrative expenses increased $0.6 million, or 3.2%, during
1998 as compared to 1997. As a percentage of sales, general and
administrative expenses decreased from 11.1% in 1997 to 11.0% in 1998.
Domestic expenses decreased $1.1 million due to decreases in legal and
consulting fees. International expenses increased by $1.7 million, or 54.8%,
primarily as a result of the conversion of certain European dealer operations
into direct operations, expansion of the European headquarters and quality
initiatives to obtain required CE markings on products.

### RESEARCH AND DEVELOPMENT EXPENSES
Research and development expenses increased approximately $0.8 million, or 9.9%,
during 1998 as compared to 1997 primarily due to increased activities associated
with the later development stages of various domestic and international
engineering projects for infusion systems and disposable administration sets.

### INTEGRATION AND OTHER  NON-RECURRING CHARGES
The Company incurred $15.9 million in costs to integrate the IMED and IVAC
operations during 1997. These costs are in addition to restructuring and
integration charges of $15.3 million recorded in the fourth quarter of 1996.
The 1997 expense consists primarily of the write-off of a product
distribution and license agreement with a third party developer of an
ambulatory and alternate site infusion pump of $4.5 million, maquiladora
settlement and related costs of $4.1 million, information systems conversion
costs of $1.6 million, management consulting fees of $1.4 million, severance

CF056967_0021

of $1.3 million and other integration costs of $3.0 million. The Company
reviewed its products and related research and development activities and
market opportunities in order to focus on projects that will provide greater
competitive advantage and shareholder return. That review resulted in the
termination of the aforesaid product distribution and license agreement. The
$4.5 million charge related to such termination includes a $4.3 million
non-cash charge representing the write-off of the intangible asset associated
with such agreement.

PURCHASED IN-PROCESS RESEARCH AND DEVELOPMENT
In connection with the PSI acquisition and the technology license agreement with
Caesarea, during the second quarter of 1998 the Company incurred a one-time $5.5
million write-off related to the value assigned to the acquired in-process
research and development of the projects for which technological feasibility had
not been established and for which there was no alternative future use. The
Company has continued to invest in the development necessary to obtain
technological feasibility of these projects.

INCOME FROM OPERATIONS
Income from operations increased $17.2 million during 1998 as compared to 1997
primarily due to improved sales and gross margins and to the 1997 operating
results including significant integration charges and expenses related to the
field correction on the Gemini pumps as discussed above which were not incurred
in 1998.

ADJUSTED EBITDA
Adjusted EBITDA increased $4.4 million during 1998 as compared to 1997. As a
percentage of sales, Adjusted EBITDA increased from 22.2%, or $37.8 million, for
1997 to 23.8%, or $42.2 million, for 1998 due to the reasons discussed above.
Adjusted EBITDA represents income from operations before non-recurring non-cash
purchase accounting charges, integration charges and depreciation and
amortization. Adjusted EBITDA does not represent net income or cash flows from
operations, as these terms are defined under generally accepted accounting
principles, and should not be considered as an alternative to net income or to
cash flows as an indicator of the Company's operating performance or to cash
flows as a measure of liquidity. The Company has included information concerning
Adjusted

                                      -19-

<PAGE>

EBITDA herein because it understands that such information is used by investors
as a measure of an issuer's historical ability to service debt. Integration and
other one-time non-recurring charges are excluded from Adjusted EBITDA as the
Company believes that the inclusion of these items would not be helpful to an
investor's understanding of the Company's ability to service debt. The Company's
computation of Adjusted EBITDA may not be comparable to similar titled measures
of other companies.

INTEREST EXPENSE
Interest expense increased $0.1 million during 1998 primarily due to a higher
average balance on the Company's revolving credit facility in the first quarter
of 1998, partially offset by reduced interest rates on the Company's bank credit
facility resulting from an amendment to such debt agreement during the Second
Quarter of 1998. (see Liquidity and Capital Resources).

LIQUIDITY AND CAPITAL RESOURCES

The Company's primary sources of liquidity have been cash flow from
operations and borrowings under the bank facility. The Company expects to
continue to meet its liquidity needs including capital expenditure
requirements with cash flow from the operations of ALARIS Medical Systems and
remaining cash proceeds from the issuance of the Senior Discount Notes in
July 1998. In addition to operating expenses, the Company's primary
historical use of funds has been and its future use of funds will continue to

CF056967_0022

be to fund capital expenditures and strategic acquisitions and to pay debt service on outstanding indebtedness.

At June 30, 1998, the Company's outstanding indebtedness was $432.3 million, which includes $192.9 million of bank term debt under the credit facility and $200.0 million of Senior Subordinated Notes due 2006 (the "Notes"), which were issued in connection with the Merger. The bank debt bears interest at floating rates based, at the Company's option, on Eurodollar or prime rates. During the second quarter of 1997, the Company entered into an interest rate protection agreement covering 50% of its term loan borrowings. Such agreement fixed the interest rate charged on such borrowings resulting in a weighted average fixed rate of 9.6% on the principal balance covered. As a result, a one percent increase in the rate of interest charged on indebtedness outstanding under the credit facility at June 30, 1998 would result in additional annual interest expense of approximately $1.0 million. During March 1998, the bank credit facility was amended and the interest rates on the bank debt reduced. As a result, the weighted average interest rate, including the effect of the interest rate protection agreement, was reduced to 8.5% based on the amounts outstanding at the time of the amendment. The Company incurred fees of approximately $0.4 million related to such interest rate reductions. Included in total consolidated debt, at June 30, 1998, ALARIS Medical had outstanding $16.2 million of 7 1/4% Convertible Debentures.

In connection with obtaining the Merger financing, the Company also obtained a $50.0 million revolving credit line as part of the credit facility. At June 30, 1998, $20.3 million in borrowings and $0.5 million under letters of credit were outstanding under this line of credit and $29.2 million was available.

In July 1998, in connection with the Instromedix acquisition, the Company amended its bank credit facility. The amendment provided for the banks' consent to the Instromedix acquisition, increased the revolving credit facility to $60 million and provided the Company an additional $30 million under the Tranche D term debt. The Company used the $30 million term debt borrowing, along with approximately $3 million from the revolving credit line, to fund the payments required upon closing the Instromedix acquisition. Subsequent to closing the Instromedix acquisition, ALARIS Medical completed the sale of $109.9 million of 11-1/8% Senior Discount Notes, due 2008, receiving net proceeds of approximately $106.3 million. Interest accruing on these notes is added to the outstanding principal balance through July 31, 2003. Interest accruing subsequent to July 31, 2003 is payable in cash semi-annually in arrears

-20-

<PAGE>

on February 1 and August 1. Upon receipt of the net proceeds from the Senior Discount Notes, ALARIS Medical paid its remaining obligations to the Instromedix shareholders and contributed the remaining proceeds to ALARIS Medical Systems, as required under the amended bank credit agreement. ALARIS Medical Systems then repaid the amount outstanding under its revolving credit line.

In connection with the Merger, the Company assumed IVAC's obligations to Siemens Infusion Systems Ltd. ("SIS"). These obligations relate to the payment of additional purchase consideration related to the acquisition of the MiniMed product line (the predecessor product line to MS III). The Company's remaining obligation to SIS is the greater of $3.0 million or 8% of the prior year's MS III sales in 1999. The Company made the minimum 1998 payment of $3.0 million during the first quarter of 1998.

As a result of the Company's significant indebtedness, the Company expects to incur significant interest expense in future periods. The Company believes that cash provided by operations will be sufficient to meet its interest expense obligations.

CF056967_0023

Annual amortization of the Company's indebtedness is $6.0 million for the remaining six months of 1998 and $15.8 million and $14.0 million for 1999 and 2000, respectively.

The Convertible Debentures provide for semi-annual interest payments of approximately $0.6 million and mature on January 15, 2002. The Notes and the credit facility permit ALARIS Medical Systems to fund interest payments on the Convertible Debentures and to make limited distributions to ALARIS Medical to fund operating expenses and to pay income taxes; provided that, with respect to the credit facility, there exists no default or event of default under the credit facility. The Notes and the credit facility, however, restrict distributions to ALARIS Medical to fund the repayment of the Convertible Debentures at maturity.

During Second Quarter 1998, the Company made cash payments of approximately $0.5 million related to merger and integration costs accrued at December 31, 1997. During the quarter ended June 30, 1997 the Company made cash payments of approximately $2.5 million related to merger and integration costs accrued at December 31, 1996, as well as payments of approximately $5.8 million for integration costs expensed during the second quarter of 1997.

During the Second Quarter of 1998 the Company made capital expenditures of approximately $5.4 million and anticipates it will make capital expenditures of approximately $30.0 million for the full year.

During the first quarter of 1998, the Company created a corporate development function to assess product and company acquisitions, distribution alliances and joint ventures which would expand Company technologies into unserved markets. While there can be no assurances that the Company will complete additional acquisitions, depending on the value of potential acquisitions, the Company might fund such transactions through a variety of sources, including existing or new debt facilities or through the sale of equity securities.

The Company believes that, based on current levels of performance, it will generate cash flow from operations, together with the remaining net proceeds from the Senior Discount Notes, sufficient at least through the next twelve months to fund its operations, make planned capital expenditures and make required payments of principal and interest under its credit facility and interest on the Notes; however, the Company may not generate sufficient cash flow from operations to repay the Notes at maturity, to make scheduled payments on the Senior Discount Notes or to repay the Senior Discount Notes at maturity. Accordingly, the Company may have to refinance the Notes and the Senior Discount Notes at or prior to maturity or sell assets or raise equity capital to repay such debt. In addition, the Company's ability to fund

                                      -21-

<PAGE>

its operations, to make planned capital expenditures and to make scheduled principal and interest payments will be dependent on the Company's future operating performance, which is itself dependent on a number of factors, many of which the Company cannot control, including conditions affecting the Company's foreign operations, prevailing economic conditions, availability of other sources of liquidity, and financial, business, regulatory and other factors affecting the Company's business and operations.

YEAR 2000
In addition to routine capital expenditures, and in connection with the Merger, the Company has made significant expenditures for the acquisition of enterprise-wide information system software and hardware and the related design, testing and implementation. The new system is year 2000 compliant while the Company's existing information system for its domestic operations does not properly recognize and process transactions dated in the year 2000. Additionally, certain aspects of the Company's domestic information system

CF056967_0024

Case: 1:15-cv-09986 Document #: 551-7 Filed: 09/07/23 Page 25 of 76 PageID #:24104

can not properly associate with transactions and activities dated subsequent to 1998. The Company successfully implemented certain financial applications of the new system and began utilizing such applications at the beginning of 1998. The Company is in the final phase of testing its new system for the remainder of it domestic business processes and expects to complete the conversion to the new system by the end of the third quarter of 1998. The Company believes the primary information system for its international operations is not directly affected by the year 2000. However, due to the increased significance of its international operations, the Company is also converting the international information systems to a system common with the domestic operations.  The international project is scheduled for completion in 1999. The international system is also designed to properly process transactions denominated in euro currency. Euro currency is a new monetary unit which certain European countries can begin using in 1999.

In order to successfully provide product to its customers, the Company is dependent upon the timely fulfillment of its supply orders from its chosen vendors.  The Company has identified potentially critical suppliers and attempted to determine if such suppliers have identified and/or addressed their own year 2000 issues by means of questionnaires. At this time, the Company has not identified or been informed of any significant suppliers that will not be able to fulfill the Company's orders.  However, many of the Company's key suppliers have acknowledged that they must make improvements to their systems to properly deal with year 2000 orders and issues.  As a result, there can be no assurances that key suppliers will be able to timely fill the Company's future orders.  The Company is in the process of evaluating what alternatives are available if key suppliers could not provide required materials and supplies to the Company when ordered.  While a formal contingency plan related to this risk has not yet been completed by the Company, alternatives would be to increase inventory levels of key supplies and seek supplies from other vendors.

Due to the inherent complexities in converting enterprise-wide information systems, there can be no assurance that the Company's domestic information system conversion will be completed in the planned time frame.  If the Company were not able to successfully implement the new system prior to 1999, the Company's ability to take orders, ship product, invoice for shipments and collect cash would be adversely impacted.  This could result in a material adverse impact on the Company's financial condition, results of operations and cash flows.  Additionally, there can be no assurance that all significant primary and back-up suppliers will be able to fill the Company's orders due to their own year 2000 issues. Such supplier failures could have a material adverse impact on the Company's financial condition, results of operations and cash flows.

During fiscal year 1997 and the six months ended June 30, 1998, the Company made combined capital and operating expenditures of approximately $6.0 million and $2.3 million, respectively, related to the new enterprise-wide information system. To complete the identified phases of the project, the Company

-22-

<PAGE>

anticipates additional expenditures for the remainder of 1998 and for 1999 of approximately $4.4 million and $3.5 million, respectively.

SEASONALITY
Infusion instrument sales are typically higher in the fourth quarter due to sales compensation plans which reward the achievement of annual quotas and the seasonal characteristics of the industry, including hospital purchasing patterns.  First quarter sales are traditionally not as strong as the fourth quarter.  The Company anticipates that this trend will continue but is unable to predict the effect, if any, from health care reform and increased competitive pressures.

CF056967_0025

BACKLOG
The backlog of orders, believed to be firm, at June 30, 1997 and 1998 was
$7.8 million and $5.5 million, respectively.

FOREIGN OPERATIONS
As a result of the Merger, the Company has significant foreign operations.
Accordingly, the Company is subject to various risks, including without
limitation, foreign currency risks. Historically, the Company has not entered
into foreign currency contracts to hedge such exposure and such risk. Due to
changes in foreign currency exchange rates during 1998, primarily a
strengthening of the U.S. dollar against many European currencies, the
Company recognized a foreign currency transaction loss of approximately $0.2
million during Second Quarter 1998. The Company will evaluate hedging
programs during 1998 to limit the exposure to the Company resulting from
changes in foreign currency exchange rates.

HEALTH CARE REFORM
Heightened public awareness and concerns regarding the growth in overall
health care expenditures in the United States may result in the enactment of
legislation affecting payment mechanisms and health care delivery.
Legislation which imposes limits on the number and type of medical procedures
which may be performed or which has the effect of restricting a provider's
ability to select specific devices or products for use in administrating
medical care may adversely impact the demand for the Company's products. In
addition, legislation which imposes restrictions on the price which may be
charged for medical products may adversely affect the Company's results of
operations. It is not possible to predict the extent to which the Company or
the health care industry in general may be adversely affected by the
aforementioned in the future.

FORWARD-LOOKING STATEMENTS
Forward-Looking Statements in this report are made pursuant to the Safe
Harbor Provisions of the Private Securities Litigation Reform Act of 1995.
Persons reading this report are cautioned that such forward-looking
statements involve risks and uncertainties, including, without limitation,
the effect of legislative and regulatory changes effecting the health care
industry; the potential of increased levels of competition; technological
changes; the dependence of the Company upon the success of new products and
ongoing research and development efforts; restrictions contained in the
instruments governing the Company's indebtedness; the significant leverage to
which the Company is subject; and other matters referred to in this report.

-23-

<PAGE>


                                 PART II
                            OTHER INFORMATION
- --------------------------------------------------------------------------------


ITEM 1.  LEGAL PROCEEDINGS

See Note 7 to the Condensed Consolidated Financial Statements.

-24-

<PAGE>


ITEM 6.  EXHIBITS AND REPORTS ON FORM 8-K

(a)  Exhibits

2.1(a)  --  Agreement to Purchase Selected Assets dated May 18, 1998 among
            ALARIS Medical Systems, Inc., Invacare Corporation and Patient

CF056967_0026

            Solutions, Inc.

2.1(b)  --  Agreement to furnish to the Securities and Exchange Commission, upon
            request, omitted exhibits from the Agreement to Purchase Selected
            Assets dated May 18, 1998.

2.2  --     Agreement and Plan of Merger dated June 24, 1998 by and among ALARIS
            Medical, Inc., ALARIS Medical Systems, Inc., Herbert J. and Shirley
            L. Semler, Instromedix, Inc. and the shareholders of Instromedix,
            Inc.  (Incorporated by reference to Exhibit 2 to ALARIS Medical,
            Inc.'s report on Form 8-K dated July 30, 1998.)

10.1(a) --  Agreement dated May 7, 1998 among ALARIS Medical Systems, Inc. and
            Caesarea Medical Electronics Limited.

10.1(b) --  Agreement to furnish to the Securities and Exchange Commission, upon
            request, omitted exhibits and schedules from the Agreement dated
            May 7, 1998.

27   --     Financial Data Schedule

            ------------------------------

(b)  Reports on Form 8-K

None.

                                   -25-

<PAGE>

                              SIGNATURES
                              ----------

        Pursuant to the requirements of the Securities Exchange Act of 1934,
the registrant has duly caused this report to be signed on its behalf by the
undersigned, thereunto duly authorized.

                                  ALARIS MEDICAL, INC.
                                  ---------------------------------
                                  (REGISTRANT)

    Date:   August 11, 1998       By: /s/ DOUGLAS C. JEFFRIES
                                  -------------------------------
                                  Douglas C. Jeffries
                                  Vice President and Chief
                                  Financial Officer

                                   -26-

<PAGE>

                              EXHIBIT INDEX
- ---------------------------------------------------------------------------------

Exhibit
 No.

CF056967_0027

    2.1(a) -- Agreement to Purchase Selected Assets dated May 18, 1998 among
              ALARIS Medical Systems, Inc., Invacare Corporation and Patient
              Solutions, Inc.

    2.1(b) -- Agreement to furnish to the Securities and Exchange Commission, upon
              request, omitted exhibits from the Agreement to Purchase Selected
              Assets dated May 18, 1998.

    2.2    -- Agreement and Plan of Merger dated June 24, 1998 by and among ALARIS
              Medical, Inc., ALARIS Medical Systems, Inc., Herbert J. and Shirley
              L. Semler, Instromedix, Inc. and the shareholders of Instromedix,
              Inc. (Incorporated by reference to Exhibit 2 to ALARIS Medical,
              Inc.'s report on Form 8-K dated July 30, 1998.)

    10.1(a) -- Agreement dated May 7, 1998 among ALARIS Medical Systems, Inc. and
              Caesarea Medical Electronics Limited.

    10.1(b) -- Agreement to furnish to the Securities and Exchange Commission, upon
              request, omitted exhibits and schedules from the Agreement dated May
              7, 1998.

    27     -- Financial Data Schedule

                                      -27-

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-2.1(A)
<SEQUENCE>2
<DESCRIPTION>EX-2.1(A)
<TEXT>

<PAGE>

                                                        EXHIBIT 2.1(a)


                      AGREEMENT TO PURCHASE SELECTED ASSETS

        This AGREEMENT TO PURCHASE SELECTED ASSETS (this "Agreement") is
effective as of May 18, 1998 (the "Effective Date"), by and among ALARIS
Medical Systems, Inc., a Delaware corporation ("Buyer"), Invacare Corporation,
an Ohio corporation ("Parent") and Patient Solutions Inc., d/b/a Invacare
Infusion Systems, a Delaware corporation and a wholly-owned subsidiary of
Parent ("Seller"), with reference to the following facts:

        WHEREAS, Buyer desires to purchase from Seller and Seller desires to
sell to Buyer, on the terms and subject to the conditions of this Agreement,
certain selected assets of Seller.

        NOW, THEREFORE, in consideration of the foregoing premise and the
representations, warranties, covenants and agreements contained below, the
parties agree as follows:

                                   ARTICLE 1

                     PURCHASE AND SALE OF SELECTED ASSETS

        1.1    PURCHASE AND SALE.  On the Closing Date (as defined in Section 2
below), Seller agrees to sell, transfer, assign and deliver to Buyer and Buyer
agrees to purchase, accept and acquire from Seller, all of Seller's right,
title and interest in and to the assets (the "Assets") of Seller described in
the Bill of Sale and the Patent Assignment Agreement and the 510(k) Assignment
Agreement attached as EXHIBITS A, B and C (collectively, the "Conveyance
Documents").  On the Closing Date, Seller shall deliver executed Conveyance

CF056967_0028

Documents to Buyer and shall simultaneously take all additional steps and
execute all additional documents and instruments as may be necessary to put
Buyer in possession and complete operating control of the Assets and to
transfer all Seller's right, title and interest in and to the Assets to Buyer.
Seller agrees that Buyer shall also have the right to contact and retain
certain employees, contractors and consultants of Seller including those
persons whose names are set forth on EXHIBIT D, attached hereto.

        1.2    PURCHASE PRICE. Upon the terms and subject to the conditions
contained herein, the purchase price to be paid by Buyer to Seller for the
sale, transfer, assignment and delivery of the Assets (the "Purchase Price")
shall be as follows:

        (a)    $4,750,000 in cash at the Closing, subject to Section 1.3.

        (b)    the cancellation of that certain Promissory Note for $375,000
dated March 31, 1998 issued pursuant to that certain No-Shop Agreement dated
March 31, 1998 (the "No-Shop Agreement") at the Closing.

        (c)    $125,000 in cash previously paid to Seller on March 31, 1998
pursuant to the No-Shop Agreement.

        1.3    CLOSING BALANCE SHEET ADJUSTMENT.

        (a)    Within thirty (30) days after the Closing Date, Seller
shall cause to be prepared and shall deliver to Buyer a balance sheet of Seller
as of the close of business on the Closing Date, which balance sheet shall
reflect, among other things, total Current Assets, total Current Liabilities
and Net Plant and Equipment ("Closing Date Balance Sheet"). The Closing Date
Balance Sheet shall be prepared in accordance with GAAP applied in a manner
consistent with that utilized in preparing the Financial Statements (as defined
in Section 3.6).

<PAGE>

        (b)    If Buyer does not dispute the amounts set forth in the
Closing Date Balance Sheet, the Closing Date Balance Sheet shall be conclusive.
If Buyer disputes any amount set forth in the Closing Date Balance Sheet,
Buyer shall so notify Seller in writing (specifying his objections and the
reasons therefor in reasonable detail) within thirty (30) days following
receipt thereof and the parties will use all reasonable efforts to resolve any
such disputes. If any such dispute cannot promptly be resolved (but in any
event within thirty (30) days after submission of the written objections of
Buyer, the parties agree that they will submit the matter to the office of
JAMS/ENdispute located in San Diego, California (or, if none, then the office
of JAMS/Endispute located closest to San Diego, California) to be arbitrated by
a single arbitrator to be mutually selected by the parties. The resolution of
the dispute by JAMS/Endispute will be conclusive and binding upon the parties.
The fees and expenses of JAMS/ENdispute will be paid one-half by Seller and
one-half by Buyer. The Closing Date Balance Sheet and the information set
forth thereon, as finally determined pursuant to this Section 1.3(b), is
hereinafter referred to as the "Final Closing Balance Sheet."

        (c)    In the event the Current Assets and Net Plant and
Equipment less Current Liabilities set forth in the Final Closing Balance Sheet
is less than the Current Assets and Net Plant and Equipment less Current
Liabilities set forth in the December 31, 1997 Balance Sheet contained in
Schedule 3.6 (the "Assets Shortfall"), then the Seller and Parent, jointly and
severally, shall be liable to pay over to Buyer an amount in cash equal to the
Assets Shortfall.

        (d)    Any payment required to be made under Section 1.3(c) shall
be made within five (5) business days after the determination thereof ("Due
Date"), without setoff for any other matter, by wire transfer to an account
designated by Buyer and shall, in addition to such amount, include interest on
the amount required to be paid calculated from the Closing Date through the Due

CF056967_0029

Date at a rate of twelve percent (12%) per annum. Any payment to be made
pursuant to Section 1.3(c) which is not made on the Due Date shall bear
interest at the rate of fifteen percent (15%) per annum from the Due Date until
the date paid; provided that no interest shall accrue on any payment due under
Section 1.3(c) for so long as a dispute exists under Section 1.3(b) unless the
final determination of such dispute requires a payment by the Seller or Parent
under Section 1.3(c) of more than $50,000.

    1.4    ASSUMED LIABILITIES. Upon the terms and subject to the
conditions contained herein, Buyer shall assume all of the current obligations
and liabilities of Seller set forth on attached EXHIBIT E (the "Assumed
Liabilities"), which shall set forth the obligations and liabilities being
assumed as of April 30, 1998. Buyer shall also assume the liabilities of
Seller incurred in the ordinary course of Seller's business between April 30,
1998 and the Closing Date; provided, however, that no liabilities or
obligations relating to obsolete inventory, or unrecorded or unwritten
commitments to customers or distributors shall be assumed by Buyer. Buyer
shall not assume and shall under no circumstances be responsible for, and
Seller shall retain and be responsible for, any liabilities or obligations of
Seller related to the Assets of Seller or Parent whatsoever, regardless of
amount, character or description, or whether accrued, contingent, determined,
undetermined, known or unknown or otherwise, including (without limitation) any
obligation or liability whatsoever arising from the conduct of Seller's
business or Parent's business at or prior to the Closing Date other than the
Assumed Liabilities. Furthermore, and without limiting in any way the
foregoing, Buyer shall not assume and shall under no circumstances be
responsible for, and Seller shall retain and be responsible for, any
liabilities or obligations of Seller related to the employees, consultants and
contractors of Seller or Parent whatsoever, regardless of amount, character or
description, or whether accrued, contingent, determined, undetermined, known or
unknown or otherwise, including (without limitation) any obligation or
liability whatsoever arising from any employment event or from any employment,
consulting or contracting agreement related to the periods or entered into
prior to the Closing. Without limiting the breadth of the foregoing
provisions, Seller shall retain and be responsible for, any liabilities or
obligations of Seller arising from any representation by Seller or Parent
concerning payment of any salary continuation, any representation by Seller or
Parent concerning extension of any termination date, any representation by
Seller or Parent concerning payment of any termination allowance, any
representation by Seller or Parent concerning payment of any retention
allowance, any representation by Seller or Parent concerning payment of any
accrued benefit and any representation by Seller or Parent concerning any
continuation of any fringe benefit.

<PAGE>

                                    -2-

    1.5    GUARANTY OF PAYMENT OF ACCOUNTS RECEIVABLE AND INTERCOMPANY
RECEIVABLES. As a material inducement to Buyer's execution of this Agreement,
and payment of the consideration hereunder, each of Seller and Parent guarantee
that the accounts receivable as set forth on the 1997 Balance Sheet in Schedule
3.6 and the Closing Date Balance Sheet (the "Accounts Receivable") will be
fully and completely paid and discharged as of the date which is seventy-five
(75) calendar days after the Closing Date (the Receivable Date"). The unpaid
balance of all Accounts Receivable as of Receivable Date shall be paid by
Seller, in the form of a certified or cashier's check, on or before the date
which is ten (10) business days after the Receivable Date. Payments received
from customers by Buyer after the Closing Date shall be applied to such
customer's Account Receivable on a first in, first out basis (that is, to the
oldest unpaid invoice), unless customer indicates payment is to be applied
otherwise. Following such payment by Seller, Buyer shall assign all unpaid
Accounts Receivable to Seller. Any amounts received as payments on the
Accounts Receivable by Buyer on or after the Receivable Date shall be held by
Buyer as custodian for Seller and, further, shall be paid by Buyer to Seller
within ten (10) business days of the end of each calendar month, commencing

CF056967_0030

with the first calendar month ending after the Receivable Date. Buyer shall
make a reasonable effort to collect the Accounts Receivable and shall
cooperate, at Seller's request and expense, in collecting Receivables assigned
to Seller.

     1.6     ALLOCATION OF PURCHASE PRICE.  The Purchase Price to be paid by
Buyer to Seller hereunder shall be allocated among the Assets in a manner to be
mutually agreed upon by the parties.  The parties hereto agree to report this
transaction for federal and state tax purposes in accordance with such
allocation of Purchase Price.

                                  ARTICLE 2

                                   CLOSING

     The closing (the "Closing") shall be consummated at the offices of
ALARIS Medical Systems, Inc., 10022 Wateridge Circle, San Diego, CA 92121-2733,
at 10:00 a.m. (Pacific Standard Time) on May 18, 1998.  The date of such
Closing is herein referred to as the "Closing Date."  At the Closing, the
parties to this Agreement will exchange funds, documents, agreements,
certificates, opinions and other instruments and documents (including without
limitation the Conveyance Documents) so as to cause the terms and conditions of
this Agreement to be satisfied.  All documents and instruments delivered at the
Closing pursuant to this Article 2 shall be dated and effective for all
purposes as of the Closing Date.

                                  ARTICLE 3

                      REPRESENTATIONS AND WARRANTIES
                          OF SELLER AND PARENT

     Except as set forth in the disclosure schedule attached hereto as
EXHIBIT F and referencing the specific section of this Article 3 (the
"Disclosure Schedule"), the Seller and Parent, jointly and severally, hereby
represent and warrant to Buyer as follows:

     3.1     CORPORATE ORGANIZATION AND CAPITALIZATION.  Seller and Parent are
corporations duly organized, validly existing and in good standing under the
laws of the State of Ohio, and have full power and authority to carry on their
respective businesses as now being conducted.  The authorized capital stock of
the Seller consists solely of 15,000,000 shares of Common Stock, $.001 par
value per share, of which 3,284,102 shares of Common Stock are issued and
outstanding. There are no outstanding options, warrants, rights, contracts,
agreements, commitments, understandings or arrangements by which Seller is or
may be bound or obligated to issue any additional shares of its respective
capital stock or any security convertible thereto or exchangeable therefor or
to repurchase any of the foregoing.

                                    -3-

<PAGE>

     3.2     AUTHORIZATION.  The execution, delivery and performance by Seller
and Parent of this Agreement, and all documents and instruments contemplated
hereby, referenced herein or executed in connection herewith (collectively, the
"Related Documents"), and the consummation by Seller and Parent of the
transactions contemplated hereby and therein, have been duly authorized and
approved by all necessary corporate proceedings of Seller and Parent.  This
Agreement and each of the Related Documents have been duly executed and
delivered by Seller and Parent and each constitutes a legal, valid and binding
agreement of Seller and Parent, enforceable against Seller and Parent in
accordance with their respective terms, except as limited by bankruptcy,
insolvency or other laws of general application relating to the enforcement of
creditors' rights.

     3.3     TITLE; CONDITION OF ASSETS.  Except as set forth on the

CF056967_0031

Disclosure Schedule, Seller has good, marketable and insurable title to all of the Assets, free and clear of all mortgages, liens (tax or otherwise), pledges, charges, leases, encumbrances, claims or restrictions of any kind or character. The Assets are in good operating condition with no known defects, excepting normal wear and tear, and conform with all applicable laws, regulations, ordinances and the like. The Assets constitute all of the material rights and properties, tangible or intangible, real or personal, which are used in the conduct of the business of Seller, as such business is presently being conducted. No other material properties or rights, whether or not owned by Seller, are required for the operation of such business as presently being operated. Seller is in possession and operating control of all of its assets, properties and rights related to the conduct of its business. The Assets are not subject to any liability or obligation of whatever nature, whether known or unknown, absolute, accrued, contingent or otherwise.

        3.4    NO VIOLATION.  The execution, delivery and performance of this Agreement and the Related Documents by Seller and Parent will not (with notice and/or the lapse of time) result in a breach or violation of, or constitute a material default under, their respective Articles of Incorporation, Code of Regulations or any agreement to which Seller or Parent is a party or by which Seller or Parent is bound, and will not be in violation of any constitution, statute, judgment, order, rule, regulation or other restriction in effect at the Closing Date of any court or federal, state or other Governmental Authority having jurisdiction over Seller, Parent or the Assets. Neither Seller or Parent is a party to, subject to or bound by any agreement or judgment, order, writ, injunction or decree of any court or federal, state or other Governmental Authority that prevents or impairs the consummation of the transactions contemplated by this Agreement or the Related Documents or the rights of the Buyer hereunder and thereunder.

        3.5    GOVERNMENTAL AUTHORITIES.  Except as set forth in the Disclosure Schedule, neither Seller nor Parent is required to submit any notice, report or other filing to any Governmental Authority nor is any consent, approval or authorization of any Governmental Authority required to be obtained in connection with the consummation of the transactions contemplated hereby or in the Related Documents.

        3.6    FINANCIAL STATEMENTS.  The Disclosure Schedule contains an unaudited Balance Sheet of Seller ("Balance Sheet") as at December 31, 1997 and at April 30, 1998 (the "Balance Sheet Date"), and a Statement of Income and Expense of Seller for the four-month period then ended (the "Income Statement"), collectively referred to herein as the "Financial Statements." The Balance Sheet fairly and accurately represents the financial position of Seller as of the Balance Sheet Date and the Income Statement accurately represents the results of the operations of Seller for such periods, each of which has been prepared in accordance with GAAP. Neither Seller, Seller's officers, employees or agents or Parent, Parent's officers, employees or agents have employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions contemplated hereby or the Related Documents.

        3.7    INVENTORY.  All inventory of Seller reflected on the Balance Sheet is (except to the extent of reserves reflected thereon) of a quality and quantity usable and salable in the ordinary course of Seller's business as of the Balance Sheet Date, and all such inventory is reflected on the Balance Sheet with adequate provisions or adjustments for damaged, defective or excess inventory, slow-moving inventory and inventory obsolescence and shrinkage at the lower of cost or realizable market value using the first-in, first-out (FIFO) method of valuation in accordance with GAAP consistently applied.

                                        -4-

<PAGE>

        3.8    LITIGATION.  Except as set forth in the Disclosure Schedule, there are no claims, actions, litigation, suits, proceedings or investigations

CF056967_0032

pending or threatened against or affecting any of the Assets or the
consummation of the transactions contemplated hereby or the Related Documents,
at law or in equity or before or by any governmental or regulatory authority,
agency or instrumentality or before any arbitrator of any kind, and there is no
valid basis for any such claim, action, litigation, suit, proceeding or
investigation. The Disclosure Schedule contains a list and brief description of
all claims, actions, litigation, suits, hearings, proceedings or investigations
relating to the Assets which resulted in a judgment, settlement, compromise,
release, payment or award of any nature and which arose within three years
prior to the Closing Date. No governmental or regulatory authority, agency or
instrumentality has at any time challenged or questioned the legal right of
Seller to sell any of its products or to provide any of its services in the
present manner or as contemplated in the conduct of the Seller's business.

        3.9   CONTRACTS. Seller is not (and, to the best knowledge of Seller
and Parent no other party is) in breach or default under (with notice and/or
the lapse of time), and there is no valid basis for a claim of breach or
default under, any material agreement, instrument, commitment, contract or
other obligation of any type to which Seller is a party or is bound, or to
which the Assets are subject, and no event has occurred which constitutes or,
with the lapse of time and/or the giving of notice, will constitute such a
breach or default. The Assets are not subject to any agreement, contract,
commitment or instrument maintained by Seller or Parent, or other obligation,
whether written or oral and of whatever nature. A true copy of each agreement,
contract, commitment or instrument of the type set forth above has been
provided to Buyer's counsel prior to Closing and an accurate listing of same
has been set forth in the Disclosure Schedule ("Scheduled Contracts"). All
Scheduled Contracts are in full force and effect and are valid, binding and
enforceable in accordance with their respective terms; all parties to such
Scheduled Contracts have complied with the provisions thereof; no such party is
in default under any of the terms thereof and no event has occurred that (with
the passage of time and/or the giving of notice) would constitute a default by
any party under any provision thereof. Seller will continue to be entitled to
the full benefits thereof after the Closing without the consent of or notice to
any third party and the transactions contemplated hereby and in the Related
Documents will not create any termination rights in favor of any third party or
otherwise change the material rights and obligations of the parties thereunder.

        3.10  COMPLIANCE WITH LAW. Seller is, in the conduct of the Seller's
business and ownership and use of the Assets, in compliance with all applicable
foreign, federal, state or local laws, statutes, rules, regulations,
ordinances, codes, orders, licenses, franchises, permits, authorizations and
concessions (collectively, "Regulations"), as such apply to the Assets,
including without limitation, any applicable intellectual property law or other
Regulations in respect of any of Seller's operations related to its business,
except where its non-compliance could not reasonably be expected to have a
material adverse effect on the Assets or the transactions contemplated by this
Agreement.

        3.11  LICENSES, PERMITS AND AUTHORIZATIONS. The Disclosure Schedule
contains a list of all approvals, authorizations, consents, licenses,
franchises, orders and other permits of, and filings with, any governmental
authority, whether foreign, federal, state or local ("Permits"), which are
required for or benefit the Assets or the conduct of Seller's business. All
Permits are in full force and effect.

        3.12  ENVIRONMENTAL MATTERS.

        (a)   The operations of Seller are currently and have at all
times been in compliance in all material respects with all applicable
Environmental Laws.

        (b)   There are not currently nor have there even been any
underground storage tanks on any real property owned, operated or leased by
Seller. No Hazardous Material has been stored, generated, treated, discharged
or released in or upon any real property owned, operated or leased by Seller

CF056967_0033

during the period of such ownership or before the period of Seller's or a predecessor of Seller's ownership, lease or operation in violation of, or in a quantity reportable under, any Environmental Law or that is reasonably likely to result in any material Environmental Costs and Liabilities.

-5-

<PAGE>

        (c)    Seller is not subject to any Environmental Costs and Liabilities, and, to Seller's and Parent's knowledge, no facts or circumstances exist which could give rise to any Environmental Costs and Liabilities.

        (d)    The Disclosure Schedule lists all Environmental Permits maintained by Seller. Such Environmental Permits are all Environmental Permits necessary for Seller's operations and (i) Seller is in compliance in all respects with such Environmental Permits, (ii) there are no Legal Proceedings pending nor, to Seller's and Parent's knowledge, threatened to revoke such Environmental Permits, (iii) Seller and Parent have not received any notice from any Governmental Authority to the effect that there is lacking any Environmental Permit required for the current use or operation of any property owned, operated or leased by Seller or any of its Affiliates and (iv) the consummation of the transactions contemplated hereby will not constitute a transfer or assignment of any such Environmental Permits nor will such consummation require any filing or registration with or notice to any governmental authority and all such Environmental Permits shall remain in full force after the Closing Date.

        (e)    Neither Seller nor any of its Affiliates nor, to Seller's and Parent's knowledge, any predecessor of Seller or such Affiliates, are subject to any outstanding written Order of any Governmental Authority or other Person, or, to the knowledge of Seller or Parent, any federal, state, local or foreign investigation respecting (i) actual or alleged violations of Environmental Laws, (ii) any Remedial Action or (iii) any Environmental costs and liabilities. Neither Seller nor any of its Affiliates, nor to Seller's and Parent's knowledge, any predecessor of Seller or its Affiliates have received any written notice from any Governmental Authority respecting any violation of Environmental Laws.

        (f)    There are no Legal Proceedings pending or, to the Seller's and Parent's knowledge, threatened against Seller or any of its Affiliates, alleging the violation of any Environmental Law or Environmental Permit.

        (g)    Neither Seller nor any of its Affiliates nor, to the Seller's and Parent's knowledge, any predecessor of Seller or any of its Affiliates, has filed any notice under federal, state or local law indicating past or present treatment, storage or disposal of or reporting a Release of any Hazardous Material.

        (h)    None of the operations of Seller nor any of its Affiliates or, to Seller's and Parent's knowledge, of any predecessor of Seller; or any of its Affiliates involves or previously involved the generation, transportation, treatment, storage or disposal of Hazardous Waste, as defined under 40 C.F.R. Parts 260-270 or any state, local or foreign equivalent.

        (i)    Seller and Parent have not received notice of liability or potential liability at, nor are there any pending or threatened legal proceedings with respect to, any facility at which Seller or its Affiliates, or to Seller's and Parent's knowledge, any predecessor of Seller or such Affiliates, has transported, disposed of, or arranged for the transportation at or disposal of any Hazardous Material. There has been no environmental investigation, study, audit, test, review or other analysis conducted in relation to the current or prior business of the Seller or any of its Affiliates, nor to Seller's and Parent's knowledge, any predecessor of Seller or its Affiliates or any property or facility now or previously owned or leased by any Principal Shareholder, Seller or any of their respective Affiliates,

CF056967_0034

Case: 1:15-cv-09986 Document #: 551-7 Filed: 09/07/23 Page 35 of 76 PageID #:24114

other than those listed on the Disclosure Schedule, copies of which have been
delivered to Buyer.

          (j)     There is no asbestos, asbestos-containing building
materials, polychlorinated biphenyls, or urea formaldehyde presently in use or
otherwise located at any real property currently owned, operated or leased by
Seller.

          3.13    TAX MATTERS.  Except as set forth on the Disclosure Schedule:

                                       -6-

<PAGE>

          (a)     All Tax Returns that were or will be required to be filed
by, or with respect to, Seller on or before the Closing Date have been or will
be filed on a timely basis in accordance with the laws, regulations and
administrative requirements of the appropriate Taxing Authority in all
jurisdictions in which such Tax Returns were or will be required to be filed.
All such Tax Returns that have been filed were, when filed, and continue to be,
true, correct and complete.

          (b)     All Taxes due and payable on or before the Closing Date
that are either (i) required to be shown on any Tax Return filed by, or with
respect to, Seller or (ii) which were not required to be shown on any Tax
Return but which were or will be required to be paid by or with respect to
Seller, have been or will be timely paid on or before the Closing Date.  All
Taxes that Seller was or will be required by law to withhold or collect have
been (in the case of those that were already required to be withheld or
collected) or will be duly withheld or collected and, to the extent required,
have been (in the case of those that were already required to be paid) or will
be paid to the appropriate Taxing Authority.  There are no Tax Liens, and will
be no Tax Liens on the Closing Date, with respect to Taxes upon any of the
properties or assets, real or personal, tangible or intangible, of Seller.  Any
liability of Seller for Taxes not yet due and payable has adequately been
provided for by Seller on its Financial Statements (whether or not required to
be disclosed under GAAP).

          (c)     There is no action, dispute, suit, proceeding,
investigation, assessment, audit or claim now pending against, or with respect
to, Seller in respect of any Tax nor is any action, dispute, suit, procedure,
investigation, assessment, audit or claim for additional Tax expected by Seller
to be asserted by any Taxing Authority.  No Taxing Authority has proposed any
adjustment with respect to any action, dispute, suit, proceeding,
investigation, assessment, audit or claim against or with respect to Seller.
All deficiencies proposed (plus any interest, penalties and additions to Tax
that were or are proposed to be assessed thereon, if any) with respect to
Seller have been paid.  There are no outstanding waiver or extensions of any
statute of limitations relating to either the filing of any Tax Return or the
payment of any Tax for which Seller may be labile and no Taxing Authority has
either formally or informally requested such a waiver or extension.

          (d)     No claim has ever been made by any Taxing Authority in any
jurisdiction in which no Tax Return is filed by, or with respect to, Seller
that Seller may be subject to taxation by that jurisdiction.

          (e)     Seller has never been included in a consolidated, combined
or unitary Tax Return nor has Seller ever been a party to any tax sharing or
similar agreement or arrangement.

          (f)     Seller does not have any liability (whether contingent or
otherwise) for Taxes of any other Person (i) under Treasury Regulations Section
1.1502-6 (or any successor provision thereto or any similar provision under
state, local or foreign law); (ii) as a successor or transferee or (iii) by
contract (whether written or unwritten).

CF056967_0035

(g)     No consent to the application of Section 341(f)(2) of the Code has been filed with respect to any property or assets held or acquired (or to be acquired) by Seller.

(h)     No property owned by Seller is property that Buyer or Seller will be required to treat as being owned by another person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately before the enactment of the Tax Reform Act of 1986, or is "tax-exempt use property" within the meaning of Section 168(h)(1) of the Code.

(i)     Seller is neither subject to an adjustment under Section 481 of the Code nor has been required by, nor has requested or received the permission of, any Taxing Authority to change its methods of accounting.

-7-

<PAGE>

(j)     Seller is not a foreign person within the meaning of Section 1445 of the Code and Seller is not and has not been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(k)     Seller does not have in effect any tax elections for Federal income tax purposes under Sections 108, 168, 338, 441, 471, 1017, 1033 or 4977 of the Code.

(l)     There is no contract, agreement, plan or arrangement covering any Person that, individually or collectively, could give rise to the payment of any amount that would not be deductible by Buyer or Seller by reason of Sections 162(m) or 280G of the Code or as excessive or unreasonable compensation.

(m)     Seller is not a party (other than as an investor) to any industrial development bond.

(n)     Since May 25, 1995, Seller has never engaged in any exchange under which the gain realized on such exchange was not recognized due to Section 1031 of the Code.

3.14    INTANGIBLE PROPERTY RIGHTS. The Disclosure Schedule lists all patents, patent applications, inventions, licenses, trade names, trademarks, service marks, brandmarks, copyrights or registrations or applications therefor, franchises and other assets of like kind (such assets and rights herein called "Rights"), used in Seller's business, which are registered in the name of Seller or which affect the Assets in any manner whatsoever (including any such rights held by Parent), the ownership of all the foregoing being separately stated. The expiration dates, if any, of each of the Rights are set forth in the Disclosure Schedule by product. Seller or Parent owns and possesses all Rights used in the conduct of Seller's business; such Rights are adequate for the conduct of Seller's business and the ownership and development of the Assets, and will not be adversely affected by the transactions contemplated hereby and in the Related Documents; and are not being infringed or violated by any other person or entity. All Rights are, and upon the consummation of the transactions contemplated by this Agreement and the Related Documents will be, vested in Buyer free of any equities, claims, liens, encumbrances or restrictions of whatever nature and Seller has not granted any license or right thereto to others. No products sold or services provided by Seller infringe the rights of others. All licenses granted to Seller by others with respect to the business of Seller are set forth in the Disclosure Schedule, and all such licenses are freely assignable. No director, officer, employee, agent or affiliate of Seller or Parent owns, directly or indirectly, in whole or in part, any Rights which the business of Seller has used, or the use of which is necessary for or in furtherance of the business of Seller as

CF056967_0036

now conducted or which affect the Assets in any manner whatsoever. All
technology, data, processes, formulas, trade secrets and the like used in the
operation of Seller's business (herein called "Know-How") are owned exclusively
by Seller, free of any equities, claims, liens, encumbrances or restrictions of
whatever nature and Seller has not granted any license or right thereto to
others. Upon consummation of the transactions contemplated by this Agreement
and the Related Documents, Buyer shall have all rights and interest in and to
such Know-How and Seller shall maintain such in strict confidence, which
obligation of confidentiality shall survive the Closing hereunder.

        3.15    INSURANCE. The Disclosure Schedule contains a list and brief
description of each insurance policy to which Seller or Parent has been a
party, a named insured or otherwise the beneficiary of coverage at any time in
the past three years in connection with the Assets or Seller's business and of
individual claims in excess of $50,000, and similar claims in excess, in the
aggregate, of $200,000 during any 12-month period, made by Seller or Parent
within three years prior to the date hereof, under any insurance policies.
Such insurance is adequate in kind and amount to cover known insurable risks of
Seller and is, and will continue to be, in full force and effect for the
benefit of the Buyer and the Assets.

        3.16    EMPLOYEE RELATIONS. Seller is in material compliance with all
applicable laws respecting employment and employment practices, terms and
conditions of employment, and wages and hours, and there are no arrears in the
payment of wages or social security taxes. Seller has no continuing obligation
for health, life, medical insurance or other similar fringe benefits to any
former employee of the Seller. Seller has no accrued or unfunded liabilities
with respect to employees who have been terminated or given notice of
termination prior to the Closing Date. Seller has provided to Buyer a true,
correct and complete list of the payroll of Seller as at the Closing

                                        -8-

<PAGE>

Date, including the job descriptions and salary or wage rates of, and bonuses
payable to, each of its employees. The Disclosure Schedule sets forth a list
of all employment or compensation agreements with each officer and employee of
Seller (including all severance, "stay-put" and similar agreements and all
agreements which result in the creation or occurrence of any right, duty or
obligation based upon, or as a result of, any change of control of Seller or
its assets. To Seller's knowledge, no executive, key employee or group of
employees has any plans to terminate employment with Seller.

        3.17    LABOR MATTERS. Seller has not experienced any labor disputes or
any work stoppages due to labor disagreements and there is no such dispute or
work stoppage threatened against Seller. No employee of Seller is represented
by any union or collective bargaining agent and to the knowledge of Parent and
Seller, there has been no union organizational effort in respect of any
employees of Seller since December 31, 1996. There are no pending or, to the
knowledge of Parent and Seller, threatened Legal Proceedings by any Person or
Governmental Authority against Seller with respect to any violation or alleged
violation of any applicable federal, state or local laws, rules or regulations
(a) prohibiting discrimination on any basis, including, without limitation, on
the basis of race, color, religion, sex, disability, national origin or age or
(b) relating to employment or labor, including, without limitation, those
related to immigration, wages, hours or plant closing.

        3.18    BENEFIT PLANS.

                (a)     The Disclosure Schedule sets forth a complete and correct
list of all "employee benefit plans," as defined in Section 3(3) of ERISA, and
all plans, programs, policies, arrangements or agreement with respect to
employment, termination, severance pay, vacation pay, company awards, salary
continuation, disability, sick leave, retirement, deferred compensation, bonus
or other incentive compensation, stock purchase, stock option or other

CF056967_0037

equity-based compensation, hospitalization, medical insurance, life insurance,
educational assistance, arrangements or other employee benefit arrangements
(whether written or oral) covering employees or former employees of Seller, or
with respect to which Seller has any obligation or liability ("Benefit Plans").

                (b)    True, correct and complete copies of the following
documents, with respect to each of the Benefit Plans, have been delivered to
Buyer: (i) any plans and related trust documents, including all amendments
thereto, (ii) the three most recent annual reports (Forms 5500) and schedules
thereto, (iii) the most recent financial statements and actuarial valuations if
any, (iv) the most recent IRS determination letter, (v) the most recent summary
plan descriptions, and (vi) the premium expenses and claims experience for each
Benefit Plan which is a welfare benefit plan for the period from January 1,
1996 to the last day of the month preceding the date hereof.

                (c)    Each of the Benefit Plans intended to quality under
Section 401 of the Code has been so qualified since its inception and has
received a favorable determination letter from the IRS as to such qualified
status, and nothing has occurred with respect to the operation of any such plan
which could cause the loss of such qualification or the imposition of any
material liability, penalty or tax under ERISA or the Code.

                (d)    Each of the Benefit Plans has been administered in
accordance with its terms and has been maintained in compliance, in form and
operation, with all applicable laws, including, without limitation, ERISA and
the Code. Neither the Seller nor any "party in interest" or "disqualified
person" with respect to the Benefit Plans has engage in a non-exempt prohibited
transaction within the meaning of Section 4975 of the Code or Section 406 of
ERISA.

                (e)    All contributions and premiums required to be made by law
or by the terms of any Benefit Plan or any agreement related thereto have been
timely made, and no accumulated funding deficiency (as defined in Section 412
of the Code) exists with respect to any of the Benefit Plans subject to Section
412 of the Code. With respect to the Benefit Plans, individually and in the
aggregate, there are no funded benefit obligations for which contributions are
due and have not been made or for which contributions are due and have not been
made or for which contributions have not been properly accrued as required by
GAAP and there are no unfunded benefit

                                      -9-

<PAGE>

obligations which have not been (i) accounted for by reserves (if required by
GAAP) or (ii) if required (and to the extent required, if any), properly
disclosed in accordance with GAAP, in the Balance Sheet.

                (f)    Seller does not currently maintain, sponsor or contribute
to (nor is it required to contribute to) any "defined benefit plan" as defined
in Section 3(35) of ERISA, any "multiemployer plan" as defined in Section 3(37)
of ERISA or any "multiple employer plan" within the meaning of Sections 4063 or
4064 of ERISA. With respect to any "employee benefit plan" (as defined in
Section 3(3) of ERISA), or any similar plan maintained outside of the United
States, whether or not terminated currently or formerly maintained or
contributed by Seller or any entity which was at any time treated as a single
employer, determined under Section 414(b), (c), (m) or (o) of the Code, with
Seller, no liability currently exists and no event has occurred and no
condition exists, which could subject Seller, Parent or Buyer directly or
indirectly (through an indemnification agreement or otherwise) to any
liability, including without limitation, any liability under Title IV of ERISA,
including without limitation Sections 4064, 4069 or 4204 of ERISA, or Section
412, 4971, 4975 or 4980B of the Code. Seller has not engaged in, or is a
successor or parent corporation to an entity that has engaged in, a transaction
described in Section 4069 of ERISA.

CF056967_0038

(g)     There have been no Legal Proceedings instituted or claims
asserted against any of the Benefit Plans, the assets of any such plans or
Seller, or the plan administrator or any fiduciary of the Benefit Plans with
respect to the operation of such plans (other than routine benefit claims), and
there are no facts or circumstances which are reasonably likely to form the
basis for any such Legal Proceeding or claims.

(h)     Neither the execution and delivery of this Agreement nor
the consummation of the transactions contemplated hereby will (i) result in any
payment becoming due to or increase any compensation of any current or former
director, officer or employee of Seller, (ii) increase any benefits otherwise
payable under any Benefit Plan, or (iii) result in the acceleration of the time
of payment or vesting of any such compensation or benefits.

(i)     Seller does not provide, and is not obligated to provide,
medical, hospital, dental, life or other similar benefits to any current or
former employee after his or her termination of employment with Seller, except
as may be required under Section 4980B of the Code and Part 6 of Subtitle B of
Title I of ERISA.

(j)     Except as set forth on the Disclosure Schedule, there is
no contract, agreement, plan or arrangement, covering any employee of Seller
that, individually or collectively, could give rise to the payment of any
amount that would not be deductible by virtue of Section 280G of the Code.

3.19   BANKS.  The Disclosure Schedule sets forth:  (i) the name of
every bank in which Seller has an account or safe deposit box; (ii) the
identifying numbers of all such accounts and safe deposit boxes and (iii) the
names of all persons having power to borrow, discount debt obligations, cash or
draw checks or otherwise act on behalf of Seller in any dealings with such
banks.

3.20   CAPITAL EXPENDITURES.  The Disclosure Schedule sets forth a list
of each of Seller's approved capital expenditure projects (including without
limitation, each construction project) involving in excess of $50,000
including: (i) projects which have been commenced but are not yet completed;
(ii) projects which have not been commenced and (iii) projects which have been
completed in respect of which payment has been made, within the past twelve
(12) months.

3.21   PRODUCTS LIABILITY AND PERSONAL INJURY CLAIMS.  The Disclosure
Schedule sets forth a list of all claims for products liability or personal
injury due to, resulting from or associated with, any product manufactured or
supplied by Seller now pending against Seller or which have been pending
against Seller at any time during the past three years.

                                      -10-

<PAGE>

3.22   POWERS OF ATTORNEY.  The Disclosure Schedule sets forth a list of
the names of all persons holding powers of attorney from Seller or authorized
to act as agents for Seller.

3.23   PRODUCT WARRANTIES.  The Disclosure Schedule sets forth the forms
of Seller's product warranties that are currently applicable to products sold
by Seller or in respect of which Seller is obligated.

3.24   ABSENCE OF CERTAIN CHANGES.  Except as set forth in the
Disclosure Schedule, since the Balance Sheet Date, Seller has operated its
business in the ordinary and usual course and in a manner consistent with past
practice, and without limiting the generality of the foregoing, there has not
been:

(a)     any change or any event, occurrence, development or fact
that alone or in the aggregate has had, or would reasonably be expected to

CF056967_0039

have, a Material Adverse Effect with respect to Seller;

            (b)    any amendment to Seller's articles of incorporation or bylaws;

            (c)    any employment contract or collective bargaining agreement, written or oral, entered into or materially modified by Seller, any increase in or agreement to increase the base compensation payable to (except such increases which are in the ordinary course of Seller's business, consistent with past practice, or as otherwise disclosed herein) or any other material change in employment or compensation or benefits with respect to any director, officer or employee, or adoption, repeal, amendment or modification of any bonus, profit-sharing, retirement deferred compensation, incentive, severance or other Benefit Plan, contract or commitment by Seller;

            (d)    any incurrence or assumption by Seller of any material Indebtedness;

            (e)    the imposition of any material Encumbrance upon any of the assets, tangible or intangible, of Seller;

            (f)    any material damage, destruction or loss with respect to the properties or assets of Seller, whether or not covered by insurance;

            (g)    any payment, loan or advance of any amount to, or sale, transfer or lease of any of Seller's assets to, or any agreement or arrangement with, any shareholder of Seller or any of their respective Affiliates;

            (h)    any change in the Tax or accounting principles, methods, practices or procedures followed by Seller or any change in the depreciation or amortization policies or rates theretofore adopted by Seller, except as required by GAAP and disclosed to Buyer;

            (i)    any change or revocation by Seller of any Tax election or any agreement or settlement with any Taxing Authority;

            (j)    any acquisition by Seller by merging or consolidating with, or by purchasing a substantial portion of the assets of, or by any other manner, any business or corporation, partnership, association or other business organization or division thereof;

            (k)    any sale, lease or other transfer or disposition by Seller of a material amount of its assets, tangible or intangible, other than for fair consideration in the ordinary course of business in a manner consistent with past practice;

            (l)    any contract (or series of related contracts) entered into by Seller either involving more than $25,000 individually (or $50,000 in the aggregate) or outside the ordinary course of business;

-11-

<PAGE>

            (m)    any acceleration, termination, material modification or cancellation of any contract involving more than $25,000 individually (or $50,000 in the aggregate) to which Seller is a party or by which it or its properties is bound;

            (n)    any capital expenditure (or series of related capital expenditures) by Seller either involving more than $25,000 individually (or $50,000 in the aggregate) or outside the ordinary course of business;

            (o)    any capital investment in, any loan to or any acquisition of the securities or assets of, any other person;

CF056967_0040

(p)      any material delay or postponement of payment of accounts
payable or other liabilities of Seller outside the ordinary course of business
consistent with past practice;

(q)      any cancellation, compromise, waiver or release of any
material right or claim of Seller outside the ordinary course of business;

(r)      any license or sublicense of any rights of Seller under or
with respect to its intellectual property Rights; or

(s)      any agreement, undertaking or legal obligation, whether in
writing or otherwise, by Seller to do any of the foregoing.

3.25    TITLE TO PROPERTY; LEASES; ENCUMBRANCES.

(a)      Except as set forth on the Disclosure Schedule, Seller has
good and valid title to all assets (other than real property or interests in
real property) reflected on the Balance Sheet or thereafter acquired, except
for those since sold or otherwise transferred or disposed of in the ordinary
course of business consistent with past practice, in each cash free and clear
of Encumbrances except Permitted Liens.

(b)      Seller does not own and has never owned any fee interest
in any real property. The Disclosure Schedule sets forth a complete list of
all real property and interests in real property leased by Seller ("Leased Real
Property"). Seller has a good and valid and binding leasehold interest in the
Leased Real Property, free and clear of all Encumbrances except Permitted
Liens. Seller has no obligations to perform any capital improvements and all
capital improvements required to be made by Seller under the leases are fully
paid for.

(c)      The plants, buildings, structures and equipment of Seller
are substantially free of defects, are in good operating condition and repair
and have been reasonably maintained consistent with standards generally
followed in the industry (giving due account to the age and length of use of
same, ordinary wear and tear excepted), are substantially suitable for their
present uses and, in the case of plants, buildings and other structures
(including, without limitation, the roofs thereof), are structurally sound.

3.26 PRODUCTS.  Set forth on the Disclosure Schedule is a list of all of
Seller's products.  Each of the products sold by Seller:  (a) is, and at all
times up to and including the sale thereof has been, in compliance in all
material respects with all applicable federal, state,local and foreign laws and
regulations and (b) is, and at all relevant times has been, fit for the ordinary
purposes for which it is intended to be used and conforms in all material
respects to any promises or affirmations of fact made in all regulatory filings
pertaining thereto and made on the container or label for such product or in
connection with its sale.  There is no design or manufacturing defect with
respect to any of such products.  Seller has not received written notice of any
product warranty claims other than such claims as do not exceed, in the
aggregate, the applicable reserve therefor reflected on the Balance Sheet.
Warranty reserves are established and reflected on the Financial Statements to
insure that the estimated costs of

                                   -12-

<PAGE>

providing warranty services or upgrades, improvements and extended service
pursuant to contractual obligations are recognized in the period in which the
sale of products is recorded prior to and as of the Closing Date.

3.27  FDC/FDA COMPLIANCE.  Seller warrants that it is in compliance
with the provisions of the Federal Food, Drug and Cosmetic Act ("FDC Act")
relating to medical devices.  Specifically, Seller warrants and represents that
each device that it manufactures or distributes is the subject of a 510(k)

CF056967_0041

premarket notification which resulted in a finding of substantial equivalence by the FDA. Seller warrants that none of the devices found substantially equivalent by FDA have been modified in such a manner as to require the submission of a new 510(k) premarket notification, and that none of the devices have been labeled or promoted in such a manner as to require the submission of a new 510(k) notification. Seller warrants that all the devices that it distributes are listed with the FDA, and that Seller has registered with FDA. Seller warrants that all devices are manufactured in accordance with the current Good Manufacturing Practices regulations. 21 C.F.R. Part 820. Seller warrants that it has submitted all reports necessary to be submitted in accordance with the Medical Device Reporting regulations. 21 C.F.R. Part 803. Seller warrants that it has labeled and promoted its devices in accordance with the provisions of the FDC Act and FDA's implementing regulations. Seller further represents and warrants that its devices are not misbranded, adulterated, or otherwise in violation of the FDC Act or FDA's regulations.

     3.28  GUARANTIES. Seller is not a guarantor or otherwise is liable for any liability or obligation (including indebtedness) of any other Person.

     3.29  NOTES AND ACCOUNTS RECEIVABLE. All notes and accounts receivable of Seller are reflected properly on their books and records, are valid receivables subject (to Seller's knowledge after due inquiry) to no setoff or counterclaims, are current and collectible, and will be collected in accordance with their terms at their recorded amounts, subject only to the reserve for bad debts set forth on the Balance Sheet as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of Seller.

     3.30  PAYMENTS. Neither Seller, nor any of its officers, directors, employees or, to the best knowledge of Seller, agents, has, directly or indirectly, within three years prior to the date hereof, given or made or agreed to give or make any material political contribution or any material questionable, improper or illegal commission, payment, gratuity, gift, or similar benefit to any customer, supplier, governmental employee or other person (foreign or domestic) who is or may be in a position to help or hinder Seller's business (or assist Seller in connection with any actual or proposed transaction). Seller, has not participated, during such period, directly or indirectly, in any boycotts or similar practices in connection with the Assets.

     3.31  CUSTOMERS AND SUPPLIERS. The Disclosure Schedule hereto contains a list of Seller's ten largest customers and suppliers (measured by dollar volume in each case) during the calendar year 1997 and during the first three months of 1998, showing with respect to each, the name and address, dollar volume and nature of the relationship (including the principal categories of products bought or sold). Seller is not required to provide any bonding or other financial security arrangements in connection with any of the transactions with any of its customers or suppliers in the ordinary course of Seller's business. Seller has not received any direct communication (whether oral or written) of any intention of any customer identified on the Disclosure Schedule to discontinue its relationship as a customer of, or materially reduce its purchases from Seller (or, post-Closing, from Buyer).

     3.32  NO MISSTATEMENTS. Neither this Agreement or the Related Documents, nor any other document, certificate or written statement prepared or furnished by Seller, Parent or their respective representatives and furnished to Buyer or Buyer's representatives in connection herewith or therewith, contain any untrue statement of material fact or omits to state a material fact necessary in order to make the statements contained herein and therein not misleading as of the date hereof or thereof. There is no fact known to Seller or Parent that adversely affects the value of the Assets or the Seller's business, prospects, financial condition or operations which has not been set forth in this Agreement or the Disclosure Schedule.

                               ARTICLE 4

CF056967_0042

<PAGE>

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Seller as follows:

4.1    ORGANIZATION; AUTHORITY.  Buyer is a corporation duly organized,
validly existing and in good standing under the laws of the State of Delaware,
and has all requisite power and authority to enter into this Agreement and
perform its obligations hereunder.

4.2    AUTHORITY RELATIVE TO AGREEMENT.  The execution, delivery and
performance of this Agreement and the Related Agreements by Buyer and the
consummation of the transactions contemplated hereby and therein, have been
duly and validly authorized by all necessary corporate action of Buyer.  This
Agreement and the Related Agreements have been duly executed and delivered and
constitute the legal, valid and binding obligations of Buyer, each enforceable
in accordance with their respective terms, except as limited by bankruptcy,
insolvency, or other laws of general application relating to the enforcement of
creditor's rights.

4.3    NO CONFLICT WITH OTHER INSTRUMENTS OR AGREEMENTS.  The execution,
delivery and performance of this Agreement or the Related Agreements by Buyer
will not result in a material breach or violation of, or constitute a material
default under, Buyer's Articles of Incorporation, Bylaws or any agreement to
which Buyer is a party or by which Buyer is bound or to which any of Buyer's
property is subject and, to the best of Buyer's knowledge, will not be in
violation of any statute, judgment, order, rule or regulation in effect at the
date hereof of any court or federal, state or other regulatory authority or
governmental body having jurisdiction over Buyer.

### ARTICLE 5

#### CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BUYER

Each and every obligation of Buyer under this Agreement to be performed
on or before the Closing Date shall be subject to the satisfaction, on or
before the Closing Date, of the following conditions precedent, except to the
extent that Buyer shall have waived such satisfaction in writing:

5.1    PERFORMANCE.  Each of Seller and Parent shall have performed and
complied with all agreements, covenants and conditions required by this
Agreement to be performed and complied with by Seller and/or Parent on or
before the Closing Date.  Buyer shall have received a certificate of each of
the President or Chief Financial Officer of the Seller and Parent dated as of
the Closing Date and certifying to the fulfillment of the foregoing conditions
and the absence of any material adverse change, in a form reasonably acceptable
to Buyer and its counsel.

5.2    NON-COMPETITION AGREEMENTS.    Parent and Buyer shall have each
entered into a Non-Competition Agreement ("Non-Competition Agreement") in
substantially the same form as attached EXHIBIT G.

5.3    CERTAIN AGREEMENTS.  Seller and Buyer shall have entered into the
Bill of Sale, Patent Assignment Agreement, 510(k) Assignment Agreement and the
Assignment of Lease Agreement attached hereto as EXHIBITS A, B, C and H.

5.4    OPINION OF SELLER'S COUNSEL.  Buyer shall receive an opinion of
the Seller's counsel, dated the Closing Date, in form and substance reasonably
satisfactory to Buyer and its counsel.

5.5    RELEASE OF CLAIMS.  Seller shall deliver a release ("Release") to
Buyer of all claims or rights of Seller with respect to the Assets or against
Buyer in connection with the transactions contemplated by this Agreement and
the Related Documents, in substantially the same form as attached EXHIBIT I.

CF056967_0043

-14-

<PAGE>

5.6    APPROVAL. This Agreement and the Related Documents and the
transactions contemplated hereby and thereby shall have been approved by
Seller's Board of Directors and by Buyer's Board of Directors.

5.7    GOVERNMENTAL APPROVALS. As of the Closing, all authorizations,
approvals or permits of or filings with any governmental authority that were
required by law prior to and in connection with the transfer of the Assets or
the transactions contemplated by this Agreement or the Related Documents shall
have been duly obtained or made and shall be effective as of the Closing.

5.8    BULK SALES COMPLIANCE. Seller shall have complied with any
applicable bulk sales laws and regulations, or provided its indemnity for any
Claims and Losses (as defined in Section 7.1) resulting from failure to so
comply in lieu thereof

5.9    DUE DILIGENCE. Buyer shall have completed financial, business
and legal due diligence reviews satisfactory to Buyer and its agents and
representatives, including: (i) review of financial statements and accounting
and legal records; (ii) completion of an operational review and evaluation,
including review for compliance with Regulatory Requirements; and (iii)
completion of satisfactory physical inspections with respect to certain
equipment and other tangible assets.

5.10    THIRD PARTY ARRANGEMENTS AND APPROVALS. Seller shall have
confirmed to Buyer's satisfaction the continuation of all Seller's key
employees and the receipt of any required third party approvals to the
transactions contemplated herein such that all material contract rights of
Seller remain in full force and effect after the Closing.

5.11    HIRING OF CERTAIN EMPLOYEES. As of the Closing, Buyer shall have
had the opportunity to hire the employees and retain the contractors and
consultants of Seller designated on attached EXHIBIT D, and Seller shall not
have prevented or impeded such hiring or retention. Any such employees,
contractors or consultants actually hired or retained by Buyer shall have
executed the Proprietary Information and Inventions Agreement in the form
provided by Buyer and its counsel.

ARTICLE 6

CONDITIONS PRECEDENT TO THE
OBLIGATIONS OF SELLER AND PARENT

Each and every obligation of Seller and/or Parent under this Agreement
to be performed on or before the Closing Date shall be subject to the
satisfaction, on or before the Closing Date, of each of the following
conditions precedent, except to the extent that the Seller and/or Parent, as
appropriate, shall have waived in writing such satisfaction.

6.1    PERFORMANCE. Buyer shall have performed and complied with all
agreements, covenants and conditions required by this Agreement to be performed
and complied with by Buyer on or before the Closing Date. Seller shall have
received a certificate of the President or Chief Financial Officer of the Buyer
dated as of the Closing Date and certifying to the fulfillment of the
foregoing, in a form reasonably acceptable to Seller, Parent and their counsel.

6.2    APPROVAL. This Agreement and the Related Documents and the
transactions contemplated hereby and thereby shall have been approved by
Seller's Board of Directors and by Buyer's Board of Directors.

6.3    GOVERNMENTAL APPROVALS. As of the Closing, all authorizations,
approvals or permits of or filings with any governmental authority that were

CF056967_0044

Case: 1:15-cv-09986 Document #: 551-7 Filed: 09/07/23 Page 45 of 76 PageID #:24124

required by law prior to and in connection with the transfer of the Assets or
the transactions contemplated by this Agreement or the Related Documents shall
have been duly obtained or made and shall be effective as of the Closing.

-15-

<PAGE>

6.4    RESALE CERTIFICATE.  Buyer shall have delivered to Seller a valid
California Resale Certificate with respect to that portion of the Assets
consisting of inventory.

## ARTICLE 7

### INDEMNIFICATION

7.1    GRANT OF INDEMNITY.

(a)    INDEMNIFICATION BY SELLER.  As an inducement to Buyer to
enter into this Agreement and the Related Documents, and acknowledging that
Buyer is relying on the indemnification provided in this Section 7 in entering
into this Agreement and the Related Documents, Seller and Parent, jointly and
severally, agree, to indemnify, defend and hold harmless Buyer and its
affiliates, parent corporation and subsidiaries, and their respective
employees, officers, directors, representatives, agents, counsel, successors
and assigns (collectively, "Buyer Affiliates"), from and against any claims,
losses, liability, obligations, lawsuits, judgments, settlements, governmental
investigations, deficiencies, damages, costs or expenses of whatever nature,
whether known or unknown, accrued, absolute, contingent or otherwise including,
without limitation, interest, penalties, attorneys' fees, costs of
investigation and all amounts paid in defense or settlement of the foregoing,
reduced by and to the extent of any insurance proceeds received with respect to
any of the foregoing (collectively "Claims and Losses"), suffered or incurred
by Buyer or Buyer Affiliates as a result of or in connection with the
following: (i) any and all debts, liabilities and obligations of Seller or
related to the Assets (other than the Assumed Liabilities), whether known or
unknown, accrued, absolute, contingent or otherwise, arising out of or relating
to the business and operations of Seller or related to the Assets prior to or
on the Closing Date or which arise after the Closing Date but which are based
upon or arise out of any act, transaction, circumstance, state of facts or
other condition which occurred or existed on or before the Closing Date,
whether or not then known, accrued, due or payable; (ii) a breach of any
obligation, representation, warranty, covenant or agreement of Seller or Parent
in this Agreement or any Related Document, or because any representation or
warranty by Seller and Parent contained in this Agreement or any Related
Document, in any document furnished or required to be furnished pursuant to
this Agreement by Seller or Parent to Buyer or any of its representatives, or
any documents furnished to Buyer in connection with the Closing hereunder,
shall be false; (iii) any litigation arising out of or based upon events or
operative facts occurring prior to or on the Closing Date, in connection with
the Seller or the Assets, whether or not disclosed on the Disclosure Schedule,
including claims, without limitation, made by employees or former employees of
Seller or Parent; (iv) any and all claims, including legal, administrative or
creditor claims or actions, in connection with the Seller or the Assets or the
transfer of Assets hereunder, if any fact material to any such claim or cause
of action pleaded or stated there occurred prior to or on the Closing Date; and
(v) costs and expenses (including reasonable attorneys' fees) incurred by Buyer
in connection with any demand, action, suit, proceeding, demand, assessment or
judgment incident to any of the foregoing (collectively, "Buyer's Damages").

(b)    INDEMNIFICATION BY BUYER.  As an inducement to Seller to
enter into this Agreement and the Related Documents, and acknowledging that
Seller and Parent are relying on the indemnification provided in this Section 7
in entering into this Agreement and the Related Documents, Buyer agrees to
indemnify, defend and hold harmless Seller, Parent and their respective
affiliates, agents, successors and assigns (collectively, "Seller/Parent

CF056967_0045

Affiliates"), from and against any Claims and Losses suffered or incurred by
Seller or Parent as a result of or in connection with the following: (i) a
breach of any obligation, representation, warranty, covenant or agreement of
Buyer in this Agreement or any Related Document, or because any representation
or warranty by Buyer contained in this Agreement or any Related Document, in
any document furnished or required to be furnished pursuant to this Agreement
by Buyer to Seller and/or Parent, or any of their representatives, or any
documents furnished to Seller and/or Parent in connection with the Closing
hereunder, shall be false; (ii) any and all liabilities of Seller or Parent of
any nature arising solely out of the Assets after the Closing Date except for
matters which are the subject of indemnification pursuant to Section 7.1(a);
and (iii) costs and expenses (including reasonable attorneys' fees) incurred by
Seller or Parent in connection with any action, suit, proceeding, demand,
assessment or judgment incident to any of the foregoing (collectively,
"Seller/Parent Damages").

-16-

<PAGE>

          (c)  DEFENSE AND SETTLEMENT.  Buyer shall have the right to
defend a claim of infringement or misappropriation asserted by a third party
with litigation counsel of its choice and shall instruct said counsel to
diligently and energetically defend.  Buyer shall keep Seller apprised of the
developments in the action.  Seller shall cooperate in the defense of each and
every claim. Without limitation, the cooperation shall include making available
documents and or witnesses as may be within the control of Seller, cooperating
in assisting Buyer to determine all particulars of operation of the accused
product or method, and in identifying and proving counterclaims against the
third party. Buyer shall retain control of the litigation and shall therefore,
have the right to make the final decision with respect to defenses,
counterclaims and strategy. Seller shall strictly observe all conduct and
communication rules that litigation counsel shall impose with respect to the
claim or litigation, including, but not limited to, issuance of press releases,
public statements and even to statements to individuals within the employ of
Seller who either do not have a strict need to know, or, to whom communication
would be restricted by reason of any protective order in effect.  Buyer shall
be entitled to settle any third party claim in any manner which, in Buyer's
sole judgment, is appropriate, and Seller shall cooperate and comply with such
acts as shall be required to accomplish settlement.

     7.2  REPRESENTATION, COOPERATION AND SETTLEMENT.

          (a)  Each party agrees to give prompt notice to the other, of
any claim against the other, which might give rise to a claim based on the
indemnity contained in Sections 7.1 and 7.2, stating the nature and basis of
the claim and the amount thereof.

          (b)  In the event any claims, action, suit or proceeding is
brought against a party (the "Indemnified Party") with respect to which the
other party (the "Indemnifying Party") may have liability under the indemnity
contained in Sections 7.1 and 7.2 hereof, the Indemnified Party shall permit
the Indemnifying Party to assume the defense of any such claim or any
litigation resulting from such claim, provided that Buyer shall not be required
to permit Seller or Parent to assume the defense of any third party claim which
if not first paid, discharged, or otherwise complied with would result in a
material interruption or cessation of the conduct of Buyer's business or any
material part thereof or materially impair the value of the Assets.  Failure by
the Indemnifying Party to notify the Indemnified Party of its election to
defend any such claim or action by a third party within thirty (30) days after
notice thereof shall have been given by the Indemnified Party, shall be deemed
a waiver of any such election. If the Indemnifying Party assumes the defense of
such claim or litigation resulting therefrom, the obligations of the
Indemnifying Party hereunder as to such claim shall include taking all steps
reasonably necessary in the defense or settlement of such claim or litigation
resulting therefrom, including the retention of competent counsel satisfactory

CF056967_0046

to the Indemnified Party, and holding the Indemnified Party harmless from and against any and all damage resulting from, arising out of, or incurred with respect to any settlement approved by the Indemnifying Party or any judgment in connection with such claim or litigation resulting therefrom. The Indemnifying Party shall not, in the defense of such claim or litigation, consent to the entry of any judgment (other than a judgment of dismissal on the merits without costs) except with the written consent of the Indemnified Party nor enter into any settlement (except with the written consent of the Indemnified Party) which does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Party a release from all liability in respect to such claim or litigation.

(c)    If the Indemnifying Party shall not assume the defense of any such claim by a third party or litigation resulting therefrom, the Indemnified Party may defend against such claim or litigation in such manner as it deems appropriate. The Indemnifying Party shall, in accordance with the provisions hereof, promptly reimburse the Indemnified Party for the amount of any settlement reasonably entered into by the Indemnified Party and for all damage incurred by the Indemnified Party in connection with the defense against or settlement of such claim or litigation.

7.3  INTEREST.  In the case of payments to third parties (including federal, state, local or other tax authorities) which are indemnifiable hereunder, the amount of the indemnifying party's liability under this Article 7 with respect thereto shall include interest on the amount of such payment from the effective date of the indemnified party's notice of such payment to the indemnifying party or the date on which such payment is made (whichever is later) through the date on which the indemnified party shall have been indemnified therefor, at a simple rate of

-17-

<PAGE>

interest equal to eight percent (8%) per annum; provided, in no event shall such rate exceed the maximum rate permitted by law.

7.4    SURVIVAL OF REPRESENTATIONS AND WARRANTIES.  All the representations and warranties of the Seller and Parent contained in Article 3 and of the Buyer in Article 4 above shall survive the Closing hereunder and shall continue in full force and effect after such Closing for a period of thirty (30) months after the Closing Date; provided, however, that (i) the representations and warranties in Sections 3.12, 3.13 and 3.18 shall continue to survive after the Closing Date until the expiration of all applicable statutes of limitations, and (ii) the representations and warranties in Section 3.14 shall continue to survive after the Closing Date for a period of five (5) years.

7.5    LIMITATIONS ON INDEMNIFICATION.

7.5.1  Notwithstanding the other provisions of Section 7 hereof, the Buyer agrees that with respect to demands by Buyer for indemnification for Claims and Losses relating to breaches of representations or warranties by the Seller:

(a)    The Seller shall indemnify Buyer only for the amount by which the aggregate of all Claims actually suffered exceeds Fifty Thousand Dollars ($50,000.00) (this sum being referred to hereafter as the "Deductible").

(b)    No demand for indemnification under Section 7 shall be made with respect to any Claim that is not for an amount at least equal to One Thousand Dollars ($1,000.00) (a "De minimis Claim"), and no De minimis Claim shall be taken into account for the purpose of determining whether the aggregate Claims exceed the Deductible.

(c)    The maximum total liability for all Claims shall be

CF056967_0047

the total Purchase Price.

        7.5.2  Notwithstanding the other provisions of Section 7 hereof,
the Buyer agrees that with respect to demands by Buyer for indemnification for
any Claims hereunder against the Seller:

        (a)  No demand for indemnification under Section 7 shall
be made with respect to any claim to the extent the Claim arises wholly as a
result of the passing or amending after the Closing Date of a statute, rule or
other government regulation with retroactive effect.

        (b)  The amount of any Claim subject to indemnification
shall be determined after taking into account the present value of any tax
benefits (net of tax detriments) accruing to Buyer (or any member of its
consolidated group) as a result of such Claim, but only to the extent that the
present value of the tax benefits can be estimated based upon assumptions
reasonable under the circumstances.

## ARTICLE 8

### TRANSACTIONS SUBSEQUENT TO THE CLOSING DATE

        8.1  FURTHER ASSURANCES. From time to time after the Closing Date,
the parties shall execute, deliver and acknowledge all such further instruments
of transfer and conveyance and shall perform all such other acts as any other
party may reasonably request to more effectively transfer the Assets and to
otherwise carry out the transactions contemplated by this Agreement and the
Related Documents.

        8.2  SALES AND USE TAXES. Any sales, use or other transfer tax which is
payable as the result of the transactions contemplated by this Agreement shall
be paid by Seller in full compliance with applicable law.

-18-

<PAGE>

        8.3  CONTINUED COOPERATION. Each of the parties hereto shall continue
to cooperate after the Closing to effect the substance and intent of the
transactions described in this Agreement.

        8.4  FULL ACCESS. Subsequent to the Closing, each of Seller and
Parent shall, upon request, provide Buyer and Buyer's representatives with any
information as Buyer may reasonably request in order to verify performance of
and compliance with the representations, warranties, covenants and conditions
applicable to Seller and Parent hereunder or the Related Documents.

## ARTICLE 9

### MISCELLANEOUS PROVISIONS

        9.1  INVESTIGATIONS AND SURVIVAL. The respective representations,
warranties, covenants and agreements of Seller, Parent and Buyer herein and in
the Related Documents, or in any certificates or other documents delivered
prior to or at the Closing, shall not be deemed modified, waived or otherwise
affected by any investigation made by any party or its representatives hereto.

        9.2  SUCCESSORS AND ASSIGNS. This Agreement may not be assigned by a
party without the prior written consent of the parties hereto which consent
shall not be unreasonably withheld or delayed; provided, however, this
Agreement may be assigned and the obligations hereunder delegated by the Buyer
to a purchaser or acquiror of all or substantially all of the business, stock
or assets of Buyer in whatever form of corporate transaction or to any other
corporation or entity that, directly or indirectly, through one or more
intermediaries, controls, is controlled by or under common control with Buyer
without the consent of Seller or Parent. Except as otherwise provided herein,

CF056967_0048

the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors, assigns, heirs, legatees, executors and administrators of the parties.

    9.3    GOVERNING LAW; JURISDICTION AND VENUE; SEVERABILITY.  This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to principles of conflicts of law.  The parties agree that any dispute regarding the interpretation or validity of this Agreement shall be subject to the exclusive jurisdiction of the state and federal courts in and for the County of San Diego, California, and each party hereby agrees to submit to the personal and exclusive jurisdiction and venue of such courts.  If any term, covenant or condition of this Agreement is held to be to any extent invalid, void, or otherwise unenforceable by any court or arbitrator, the remainder of this Agreement shall not be affected thereby and each term, covenant and condition of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

    9.4    ENTIRE AGREEMENT; MODIFICATION AND WAIVER.  This Agreement, together with the agreements and documents referred to herein, constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements and understandings.  All Exhibits and Schedules attached hereto are incorporated herein by this reference.  This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all parties hereto. No covenant, term or condition or the breach thereof shall be deemed waived, unless it is waived in writing and signed by the party against whom the waiver is claimed.  Any waiver of breach of any covenant, term or condition shall not be deemed to be a waiver of any preceding or succeeding breach of the same or any other covenant, term or condition.  The failure of any party to insist upon strict performance of any covenant, term or condition hereunder shall not constitute a waiver of such party's right to demand strict compliance therewith in the future.  Time is of the essence for purposes of each and every provision of this Agreement.

    9.5    NOTICES.  All payments, notices, requests, demands and other communications required or permitted hereunder shall be in writing and shall be delivered personally (which shall include delivery by courier or overnight delivery service) or sent by certified or registered mail postage prepaid, certified or return receipt requested, or sent by facsimile transmission, to the parties at their respective address set forth below or at such other address as shall be given in writing by a party to the other party.  Items delivered personally or by facsimile

                                      -19-

<PAGE>

transmission shall be deemed delivered on the date of actual delivery; items sent by certified or regular mail shall be deemed delivered three (3) days after mailing.

        If to Buyer:      ALARIS Medical Systems, Inc.
                          10221 Wateridge Circle
                          San Diego, CA  92121-2733
                          Attn: Legal Department
                          Facsimile:  (619) 458-6156

        If to Parent:     Invacare Corporation
                          One Invacare Way
                          Elyria, Ohio 44036-2125
                          Attn:  Chief Financial Officer
                          Facsimile:  _____

        If to Seller:     Invacare Infusion Systems
                          One Invacare Way
                          Elyria, Ohio 44036-2125

CF056967_0049

                          Attn:  Chief Financial Officer
                          Facsimile: _____

        9.6  PAYMENT OF FEES AND EXPENSES.  Each party to this Agreement shall
be responsible for, and shall pay, all of its own legal, accounting and other
transactional fees and expenses incurred in the negotiation and preparation of
this Agreement and the Related Documents and the transactions contemplated
herein and therein.

        9.7  DRAFTING PARTY.  The provisions of this Agreement, and the
documents and instruments referred to herein, have been examined, negotiated,
drafted and revised by counsel for each party hereto and no implication shall
be drawn nor made against any party hereto by virtue of the drafting of this
Agreement.

        9.8  COUNTERPARTS.  This Agreement may be executed in multiple copies,
each of which shall be deemed an original and all of which shall constitute a
single agreement binding on all parties.

                                   ARTICLE 10

                              CERTAIN DEFINITIONS

        10.1  DEFINITIONS.  The following terms as used in this Agreement shall
have the meaning indicated below:

            "AFFILIATE" means, with respect to any Person, any other person
controlling, controlled by or under common control with, such Person.

            "AFFILIATED GROUP" means any affiliated group within the meaning
of Section 1504 of the Code (or any similar group defined under a similar
provision of state, local or foreign law).

            "APPROVALS" means, collectively, permits, approvals,
authorizations, consents, clearances, licenses, franchises, concessions,
orders, exemptions or other permits of all governmental or regulatory agencies,
whether federal, state, local or foreign.

            "CERCLA" means the Comprehensive Environmental Response,
Compensation and Liability Act of 1980.

                                     -20-

<PAGE>

            "CODE" means the Internal Revenue Code of 1986, as amended.

            "ENCUMBRANCES" means all mortgages, deeds of trust, claims,
security interests, liens, pledges, leases, subleases, charges, escrows,
options, proxies, rights of occupancy, rights of first refusal, preemptive
rights, covenants, conditional limitations, hypothecations, prior assignments,
easements, title retention agreements, indentures, security agreements or other
encumbrances of any kind.

            "ENVIRONMENTAL COSTS AND LIABILITIES" means any and all
liabilities, obligations, damages, deficiencies, losses, fines, penalties,
judgments, assessments, costs and expenses (including, without limitation,
reasonable fees, costs and disbursements of legal counsel, experts, engineers
and consultants): (a) any violation by Seller of Environmental Laws; (b) any
Remedial Action with respect to any property currently or formerly owned by
Seller that is required under Environmental Laws or pursuant to the
requirements of any governmental agency charged with the enforcement of
Environmental Laws; (c) damages to property or natural resources resulting from
the Release by Seller of Hazardous Materials at any property currently or
formerly owned by Seller; (d) human exposure to Hazardous Materials in
connection with Seller's operations; and (e) the Release of Hazardous Materials

CF056967_0050

at any property at which any Hazardous Material generated by Seller was disposed of.

"ENVIRONMENTAL LAW" means any and all federal, state and local statutes, ordinances, regulations and rules relating to environmental quality, pollution control, natural resources, health, safety, the handling and disposal of Hazardous Materials, contamination and clean-up, including, without limitation, the Clean Air Act, 42 U.S.C. Section 7401 ET SEQ.; the Clean Water Act, 33 U.S.C. Section 1251 ET SEQ., and the Water Quality Act of 1987; the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. Section 136 ET SEQ.; the Marine Protection, Research and Sanctuaries Act, 33 U.S.C. Section 1401 SET SEQ.; the National Environmental Policy Act, 42 U.S.C. Section 4321 ET SEQ.; the Noise Control Act, 42 U.S.C. Section 4901 ET SEQ.; the Occupational Safety and Health Act, 29 U.S.C. Section 651 ET SEQ.; the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 ET SEQ., as amended by the Hazardous and Solid Waste Amendments of 1984; the Safe Drinking Water Act, 42 U.S.C. Section 300f ET SEQ.; the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 ET SEQ., as amended by the Superfund Amendments and Reauthorization Act, the Emergency Planning and Community Right-to-Know Act and the Radon Gas and Indoor Air Quality Research Act; the Toxic Substances Control Act, 15 U.S.C. Section 2601 ET SEQ.; the Atomic Energy Act, 42 U.S.C. Section 2011 ET SEQ., and the Nuclear Waste Policy Act of 1982, 42 U.S.C. Section 10101 ET SEQ.; and state and local environmental statutes and ordinances with implementing regulations and rules.

"ENVIRONMENTAL PERMITS" means any permit, Approval, authorization, license, variance, registration or permission required under any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the applicable regulations promulgated thereunder.

"FDA" means the United States Food and Drug Administration.

"FEDERAL TAX" means any tax imposed under the Code.

"GOVERNMENTAL AUTHORITY" means any foreign, United States, Federal, State, municipal or other governmental or regulatory department, commission, administration, board, bureau, agency or instrumentality.

"GAAP" means generally accepted accounting principles.

"HAZARDOUS MATERIAL" means any of the following, including mixtures thereof: any substance, pollutant, contaminant, waste, by-product or constituent regulated under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 ET SEQ.; oil and petroleum products and natural gas, natural gas liquids, liquified natural gas and synthetic gas usable for fuel; pesticides regulated under the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. Section 136 ET SEQ.; asbestos and asbestos-containing materials, PCB's, urea formaldehyde foam insulation and other substances regulated under the Toxic Substances

-21-

<PAGE>

Control Act, 15 U.S.C. Section 2601 ET SEQ.; source material, special nuclear material, by-product material and any other radioactive materials or radioactive wastes, however produced, regulated under the Atomic Energy Act or the Nuclear Waste Policy Act of 1982; chemicals subject to the OSHA Hazard Communication Standard, 29 C.F.R. Section 1910.1200 ET SEQ.; industrial process and pollution control wastes, whether or not hazardous within the meaning of the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 ET SEQ.; medical waste and special waste; and any other substance defined in or regulated under Environmental Laws.

CF056967_0051

Case: 1:15-cv-09986 Document #: 551-7 Filed: 09/07/23 Page 52 of 76 PageID #:24131

"INDEBTEDNESS" means, with respect to any Person, any indebtedness, secured or unsecured, (a) in respect of borrowed money (whether or not the recourse of the lender is to the whole of the assets of such Person or only to a portion thereof), and evidenced by bonds, notes, debentures or similar instruments or letters of credit, to the extent of the face value thereof (or, in the case of evidence of indebtedness issued at a discount, the current accredet value thereof) or (b) representing the balance deferred and unpaid of the purchase price of property or services (other than accounts payable (including trade payables) in the ordinary course of business) and shall also include, to the extent not otherwise included, (i) any capitalized lease obligations and (ii) the face value of guaranties of items of other Persons which would be included within this definition for such other Persons (whether or not such items would appear upon the balance sheet of the guarantor).

"IRS" means the United States Internal Revenue Service.

"LEGAL PROCEEDING" means any judicial, administrative or arbitral actions, suits, investigations, proceedings (public or private) or governmental proceedings.

"MATERIAL ADVERSE EFFECT" means with respect to any Person, any change or effect that has or that is reasonably likely to have a material adverse effect on the condition (financial or otherwise), results of operations, business, prospects or assets of such Person and its Subsidiaries taken as a whole (other than as a result of changes in general economic or political conditions generally or in general economic or political conditions applicable to the health care industry generally).

"PERMITTED LIEN" means (i) any encumbrances disclosed on any Financial Statement; (ii) Tax Liens which are not yet due and payable or which are being contested in good faith and, with respect to which have adequately been provided for on applicable financial statements (whether or not required to be disclosed under GAAP); (iii) liens incurred in the ordinary course of business in connection with workers compensation, unemployment insurance and other types of social security benefits; (iv) mechanics', carriers', workmen's, repairmen's or other like liens arising out of or incurred in the ordinary course of business; (v) liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business; (vi) liens created by or existing from any litigation or legal proceeding that is being contested and (vii) with respect to real property and interests therein) easements (including, without limitation, reciprocal easement agreements and utility agreements), zoning requirements, rights of way, covenants, consents, agreements, reservations, encroachments, variances and other similar restrictions, charges or encumbrances (whether or not recorded) that do not, individually or in the aggregate, impair the continued use and operation of the assets to which they relate the applicable business.

"PERSON" and "PERSON" means any natural person and any corporation, trust, partnership, limited liability partnership, limited liability company, limited liability corporation,venture or business entity.

"REGULATED ENVIRONMENTAL ACTIVITY" means any emission generation, treatment, storage, recycling, discharge transportation or disposal of any Hazardous Material.

"RELEASE" means any discharge, emission, spill, leakage, deposit, injection, migration on or into the indoor or outdoor environment or into or out of any property, including, but not limited to, a "Release" as defined in CERCLA at 42 U.S.C. Section 9601(22).

"REMEDIAL ACTION" means all actions, including any capital expenditures, required by any Governmental Authority or under any Environmental Laws or which a reasonable Person would undertake

CF056967_0052

-22-

<PAGE>

voluntarily to (i) clean up, remove, treat, or in any other way address any Hazardous Materials or other substance; (ii) prevent the Release or threat of Release, or minimize the further Release of any Hazardous Materials; (iii) perform pre-remedial studies and investigations or post-remedial monitoring, operations, maintenance and care; or (iv) bring facilities on any property owned, operated or leased by Seller and its Affiliates into compliance with all Environmental Laws and Environmental Permits.

          "SUBSIDIARY" means with respect to any Person, (a) each corporation, partnership, joint venture or other legal entity of which such Person owns, either directly or indirectly, more than 50% of the stock or other equity interests the holders of which are generally entitled to vote for the election of the board of directors or similar governing body of such corporation, partnership, joint venture or other legal entity, (b) each partnership in which such Person or another Subsidiary of such Person is the general or managing partner and (c) each limited liability company in which such Person or another Subsidiary of such Person is the managing member or otherwise controls (by contract, through ownership of membership interests or otherwise).

          "TAX" or "TAXES" means all taxes, charges, fees, imposts, duties, levies or other assessments by any Taxing Authority, including (without limitation), all net income, alternative or add-on minimum, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, estimated, together with any interest and any penalties, fines, additions to tax or additional amounts (whether disputed or not) imposed by any Taxing Authority (domestic or foreign) and shall include any transferee liability in respect of Taxes.

          "TAX ASSET" means any net operating loss, net capital loss, investment tax credit or tax attribute which could reduce Taxes (including, without limitation, deductions and credits related to alternative minimum Taxes).

          "TAX AUTHORITY" means any governmental authority.

          "TAX LIEN" or "TAX LIENS" means any Encumbrance relating to Taxes, other than a lien of the type described in clause (ii) of the definition of Permitted Liens.

          "TAX RETURN" or "TAX RETURNS" means any United States Federal, state, local and/or foreign return, declaration, report, claim for refund, or information return or statement relating to Taxes, including all schedules and attachments thereto, and including any amendment thereof.

          [REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

-23-

<PAGE>

          IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

"Buyer"                              "Seller"

ALARIS MEDICAL SYSTEMS, INC., a      PATIENT SOLUTIONS INC. D/B/A
Delaware corporation                 INVACARE INFUSION SYSTEMS, INC., a
Delaware corporation

CF056967_0053

By:                                          By:
    -------------------------------              ------------------------------

Its:                                         Its:
    -------------------------------              ------------------------------


"Parent"

INVACARE CORPORATION, an Ohio
corporation

By:
    -------------------------------

Its:
    -------------------------------


                    [COUNTERPART SIGNATURE PAGE TO
                    AGREEMENT TO PURCHASE SELECTED ASSETS]

<PAGE>

                            EXHIBIT A

                            BILL OF SALE

<PAGE>

                            EXHIBIT "B"

                    PATENT ASSIGNMENT AGREEMENT

<PAGE>

                            EXHIBIT "C"

                    510(K) ASSIGNMENT AGREEMENT

<PAGE>

                            EXHIBIT "D"

                    LIST OF ELIGIBLE EMPLOYEES

<PAGE>

                            EXHIBIT "E"

            LIST OF CURRENT OBLIGATIONS AND LIABILITIES

<PAGE>

                            EXHIBIT "F"

                    DISCLOSURE SCHEDULE

CF056967_0054

<PAGE>

EXHIBIT "G"

FORM OF NON-COMPETITION AGREEMENT

<PAGE>

EXHIBIT "H"

ASSIGNMENT OF LEASE AGREEMENT

<PAGE>

EXHIBIT "I"

RELEASE

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-2.1(B)
<SEQUENCE>3
<DESCRIPTION>EX-2.1(B)
<TEXT>

<PAGE>

EXHIBIT 2.1(b)

ALARIS Medical, Inc. hereby agrees to furnish to the Securities and Exchange
Commission, upon its request, the exhibits to the Agreement to Purchase
Selected Assets dated May 18, 1998 by and among ALARIS Medical Systems, Inc.,
Invacare Corporation and Patient Solutions, Inc. filed as Exhibit 2.1(a) to
ALARIS Medical, Inc.'s Form 10-Q dated August 11, 1998.

                                    ALARIS MEDICAL, INC.
                                    -----------------------------
                                    (REGISTRANT)


Date:   August 11, 1998             By: /s/ DOUGLAS C. JEFFRIES
                                    -----------------------------
                                    Douglas C. Jeffries
                                    Vice President and Chief
                                    Financial Officer

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.1(A)
<SEQUENCE>4
<DESCRIPTION>EX-10.1(A)
<TEXT>

<PAGE>

CF056967_0055

Case: 1:15-cv-09986 Document #: 551-7 Filed: 09/07/23 Page 56 of 76 PageID #:24135

EXHIBIT 10.1(a)

## AGREEMENT

AGREEMENT, dated as of May 7, 1998, by and between ALARIS Medical Systems, Inc., a Delaware corporation ("Alaris"), having an address at 10221 Wateridge Circle, San Diego, CA 92121 and Caesarea Medical Electronics Limited, a private limited company organized under the Israeli Companies Ordinance ("Caesarea"), having an address at 5 Rakefet Street, P.O. Box 1166, Caesarea, 38900, Israel.

### W I T N E S S E T H:

WHEREAS, Caesarea has developed certain volumetric infusion pump technology, including the NIKI Technology (as hereinafter defined) and desires to transfer the same to Alaris on the terms set forth herein; and

WHEREAS, Caesarea transferred technology to Clintec Nutrition Company ("Clintec") pursuant to the terms of an Agreement on the Transfer of Intellectual Property dated July 14, 1996 (the "Transfer Agreement"), by and between Caesarea and Clintec, as amended by letter agreement dated November 6, 1997, between Caesarea and Nestle Clinical Nutrition ("Nestle"), as successor-in-interest to Clintec; and

WHEREAS, pursuant to the Transfer Agreement, Clintec granted to Caesarea an exclusive, royalty-free license for unrestricted parenteral use of specified technology (the "License") for a period of 20 years from July 14, 1996; and

WHEREAS, Caesarea desires to transfer the License to Alaris and, in connection therewith, Alaris, Caesarea and Nestec, S.A., as successor-in-interest to Nestle, have entered into a letter agreement dated as of May 6, 1998 in the form of Exhibit A hereto.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.   DEFINITIONS.  Capitalized terms used in this Agreement and not otherwise defined shall have the meanings set forth below:

"ACT"  means The Food, Drug and Cosmetic Act (21 U.S.C. Sections 310 ET. SEQ.), as amended from time to time, and the regulations promulgated thereunder.

"BANKRUPTCY" means, with respect to Caesarea: (A) that Caesarea shall have: (i) made an assignment for the benefit of creditors; (ii) filed a voluntary petition in bankruptcy; (iii) been adjudicated bankrupt or insolvent, or had entered against it an order for relief, in any bankruptcy or insolvency proceeding; (iv) filed a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (v) filed an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding set forth in (iv) above; (vi) sought, consented to, or acquiesced in the appointment of a trustee, receiver, or liquidator of all or any

<PAGE>

substantial part of its properties; or: (B) if: (i) 120 days after the commencement of any proceeding against it seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, the proceeding has not been dismissed; or (ii) within 90 days after the appointment, without Caesarea's consent or acquiescence, of a trustee, receiver, or liquidator of it or all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated.

CF056967_0056

"BUSINESS DAY" means any weekday on which commercial banks in both New York, New York and Caesarea, Israel are not required or authorized by law to close.

"DIRECT COST" shall mean and be calculated in the manner specified on Schedule 1(a) hereto.

"DOCUMENTS" shall mean all of the documents, plans, drawings, documentation, marketing materials and service materials related to the NIKI Technology, including, without limitation, those listed on Schedule 1(b) hereto.

"EU" means the European Union.

"EXISTING DISTRIBUTION AGREEMENTS" means the distribution, license or transfer agreements listed on Schedule 1(c) hereto.

"EXISTING RIGHTS" means the patents, patent applications, trademarks, trade names and other Intellectual Property listed on Schedule 1(d) hereto.

"FDA" means the United States Food and Drug Administration, or any successor agency.

"FIELD" means the field of parenteral infusion through the use of a volumetric infusion pump and all complementary, related and associated activities.

"F.O.B." means Free on Board, as such term is defined in the International Chamber of Commerce publication "International Incoterms 1990."

"GOOD MANUFACTURING PRACTICES" means: (A) the applicable current quality system (good manufacturing practice) regulations promulgated from time to time by (i) the FDA in accordance with the Act and (ii) to the extent applicable, European regulatory agencies; and (B) directives of the International Standards Organization, all for subcontractors.

"IMPROVEMENT" means any enhancement or modification of the NIKI Technology, the NIKI Pump or the I.V. Valve that permits the NIKI Technology or products based thereon, the NIKI Pump, or the I.V. Valve, as the case may be, to perform its function in a better or more useful way.

"INTELLECTUAL PROPERTY" means all intellectual property, including, but not limited to, inventions, all patent and patent applications and all divisions, continuations, continuations-in-part, re-examinations and reissues of any of the foregoing, copyrights, trademarks, trade names, copyright

2

<PAGE>

applications, trade secrets, know-how, formulas, compositions of matter, software, algorithms, designs, manufacturing technology and other intellectual property and rights (including, without limitation, any intellectual property rights related thereto), including any foreign counterparts to any of the above.

"I.V. VALVE" means the device described on Schedule 1(e) hereto.

"MANUFACTURING ASSEMBLY KITS" means a complete set of all of the items forth on Schedule 1(f), which constitute all of the components necessary to assemble a Phase 1 NIKI Pump.

"MANUFACTURING DOCUMENTATION PACKAGE" means the items set forth on Schedule 1(g) Part 1 (Phase I NIKI Pump); Part 2 (Phase 2 NIKI Pump) and Part 3 (Phase 3 NIKI Pump) hereto.

"MILESTONE" means a Phase 1 Milestone, a Phase 2 Milestone or a Phase 3 Milestone, as the case may be.

CF056967_0057

Case: 1:15-cv-09986 Document #: 551-7 Filed: 09/07/23 Page 58 of 76 PageID #:24137

"NIKI PUMP" means a volumetric infusion pump incorporating some or all of the NIKI Technology including, without limitation, the Phase 1 NIKI Pump; the Phase 2 NIKI Pump; and the Phase 3 NIKI Pump, including any Improvements to the NIKI Pump.

"NIKI TECHNOLOGY" means: (A) all Intellectual Property included or utilized in, by or with respect to, the following inventions: (i) the Peristaltic Pump; (ii) the I.V. Valve; (iii) the Pump System with Error Detection; (iv) the System and Method; (B) the Existing Rights; and (C) any other Intellectual Property having any application in the Field at any time licensed to, owned, developed, created or reduced to practice by or on behalf of Caesarea, its employees or officers; provided, however, that NIKI Technology shall not include Intellectual Property transferred in accordance with the Transfer Agreement except to the extent that such Intellectual Property forms part of the technology subject to the License. The parties acknowledge and agree that any valve, other than the I.V. Valve, and any syringe pump at any time licensed to, owned, developed, created or reduced to practice by or on behalf of Caesarea, its employees or officers, shall not be deemed part of the NIKI Technology.

"PERISTALTIC PUMP" means the device described in Schedule 1(h) hereto.

"PERSON" means any individual, corporation, association, partnership, limited liability company, joint venture, trust or other entity or organization.

"PHASE 1 MILESTONES" means all of the sequential steps specified in Sections 6(a)(i) through 6(a) (iv) hereof.

"PHASE 1 NIKI PUMP" means the NIKI Pump having the specifications set forth on Schedule 1(i) Part 1 hereto.

"PHASE 2 MILESTONES" means all of the sequential steps specified in Sections 6(b)(i) through 6(b) (iii) hereof.

3

<PAGE>

"PHASE 2 NIKI PUMP" means the NIKI Pump having the specifications set forth on Schedule 1(i) Part 2 hereto.

"PHASE 3 MILESTONES" means all of the sequential steps specified in Sections 6(c)(i) through 6(c) (iii) hereof.

"PHASE 3 NIKI PUMP" means the NIKI Pump having the specifications set forth on Schedule 1(i) Part 3 hereto.

"PUMP SYSTEM WITH ERROR DETECTION" means the device described on Schedule 1(j) hereto.

SPECIFIED LOCATION" means such location or locations as may, from time to time, be specified by Alaris by notice to Caesarea as the location or locations at which Alaris intends to take receipt of any NIKI Pump, Manufacturing Assembly Kit or any other device, good, document or product to be delivered by Caesarea hereunder.

"SYSTEM AND METHOD" means the systems and methods described on Schedule 1(k) hereto.

"TEST DISPOSABLES" shall mean the disposables listed in Part 1 of Schedule 1(i) as the same are hereafter delivered by Alaris to Caesarea.

"US" means the United States of America.

2.    SALE. Caesarea hereby sells, assigns, transfers, conveys and

CF056967_0058

delivers (the "Sale") to Alaris, its successors, assigns and sublicensees, on an exclusive, worldwide, royalty free basis, all of Caesarea's right, title and interest in and to the License and the NIKI Technology, including, without limitation, all rights, powers and privileges to: (i) conduct research and development with respect to the NIKI Technology; and (ii) make, have made, use, lease, sell, offer to sell and import the NIKI Pump, the I.V. Valve and any and all other products, goods or devices incorporating the NIKI Technology. Alaris is not assuming any of Caesarea's obligations under the Transfer Agreement.

    3.  IMPROVEMENTS.

    (a) In addition to the Sale (and not in limitation thereof), Caesarea and Swi Barak hereby grant (and shall cause each of their respective affiliates, employees and officers to grant) to Alaris, during the period commencing on the date hereof and ending on the seventh anniversary of the date of first commercial sale by Alaris of a NIKI Pump, the exclusive, worldwide right and royalty-free license to use and exploit any Improvements made by or on behalf of Caesarea, its affiliates or any of their respective employees and officers, or in which any such person has any direct or indirect ownership, interest, right or participation, for any purpose, including, without limitation, the right to make, have made, use lease, sell, offer to sell and import any product incorporating any Improvements.

4

<PAGE>

    (b) Caesarea acknowledges and agrees that Alaris shall have the right to make or have made Improvements and that any Improvements made by or on behalf of Alaris shall be the sole and exclusive property of Alaris. Caesarea shall cooperate fully with Alaris in effecting any patent and/or copyright coverage with respect to the Improvements made by or on behalf of Alaris.

    (c) Except as otherwise provided in Section 6 hereto, the parties acknowledge and agree that nothing contained herein shall obligate Caesarea to make any Improvements.

    4.  SALE OF ASSETS. Caesarea hereby sells, assigns, transfers, conveys and delivers to Alaris, and Alaris hereby purchases from Caesarea, all of Caesarea's right, title and interest in and to the assets listed on Schedule 4 hereto, which constitute all of the assets used by Caesarea and necessary to manufacture the NIKI Pump (the "Assets"), and the Documents. Caesarea shall retain the Assets which shall be used by Caesarea solely to manufacture the Manufacturing Assembly Kits for delivery to Alaris; provided, however, that unless the parties otherwise agree in writing, the Assets shall be delivered to Alaris no later than October 31, 1998.

    5.  PURCHASE PRICE. Alaris shall pay to Caesarea, and Caesarea shall accept from Alaris, the sum of one million ($1,000,000) dollars (the "Purchase Price"), to be paid as follows:

    (a) $120,000 of the Purchase Price (the "Advance") has been previously paid by Alaris to Caesarea as an option payment and shall not be refundable to Alaris under any circumstances; and

    (b) $880,000 shall be paid upon execution of this Agreement.

    In addition, upon execution of this Agreement, Caesarea shall establish a standby letter of credit (the "LOC"), in the form of Exhibit B hereto, in the amount of $380,000 for the benefit of Alaris. The LOC shall be maintained by Caesarea until completion of the Phase 1 Milestones in accordance with the provisions of Section 6(a) hereof. In the event Alaris terminates this Agreement in accordance with the provisions of Section 6(a) hereof, Alaris shall be entitled to draw down the full amount of the LOC.

    6.  ADDITIONAL PAYMENTS. In addition to the Purchase Price, Alaris shall

CF056967_0059

pay to Caesarea the amounts set forth in subsections (a), (b) and (c) below
(the "Additional Payments") with respect to the development and release of the
Phase 1 NIKI Pump, the Phase 2 NIKI Pump and the Phase 3 NIKI Pump.  The
parties acknowledge and agree that the failure to achieve any of the Phase 1
Milestones, Phase 2 Milestones or Phase 3 Milestones shall not be considered a
breach of this Agreement and the sole remedy of Alaris with respect to any such
failure shall be as specified in this Section 6.

        (a)  PHASE 1 NIKI PUMP.  Upon completion of each of the Phase 1 Milestones
set forth below, Alaris will make the following payments (the "Phase 1
Payments") to Caesarea:

                (i)   $500,000 shall be paid to Caesarea upon Acceptance (as
                      hereinafter defined) by Alaris of the final design (the "First
                      Final Design") of the Phase 1 NIKI Pump and receipt by Alaris
                      at the Specified Location, on or before July 1,

                                          5

<PAGE>

                      1998, of 20 Phase 1 NIKI Pumps meeting the requirements of the
                      First Final Design (the "Initial Phase 1 Pumps");

                (ii)  $250,000 shall be paid to Caesarea upon receipt by Alaris at the
                      Specified Location, on or before July 1, 1998, and Acceptance by
                      Alaris of a complete Manufacturing Documentation Package for the
                      Phase 1 NIKI Pump;

                (iii) $750,000 shall be paid to Caesarea upon receipt by Alaris at the
                      Specified Location, on or before September 15, 1998, and
                      Acceptance by Alaris, on or before October 1, 1998, of, at the
                      option of Alaris, either 500 Phase 1 NIKI Pumps meeting all of
                      the specifications set forth on Schedule 1(i) Part 1 hereto
                      (including when used with the Test Disposables) and which meet
                      the requirements of the First Final Design (the "Final Phase 1
                      Pumps") or 500 Manufacturing Assembly Kits sufficient to permit
                      Alaris to manufacture the Final Phase 1 NIKI Pump; provided,
                      that prior to delivery of the Final Phase 1 Pumps or
                      Manufacturing Assembly Kits, Alaris shall have first Accepted
                      the First Final Design, the Initial Phase 1 Pumps and the
                      Manufacturing Documentation Package on or prior to August 15,
                      1998; and

                (iv)  $500,000 shall be paid to Caesarea upon receipt by Alaris at the
                      Specified Location, on or before October 15, 1998, and
                      Acceptance by Alaris, on or before November 15, 1998, of 500
                      Manufacturing Assembly Kits sufficient to permit Alaris to
                      manufacture an additional 500 Final Phase 1 NIKI Pumps.

        In the event that Caesarea fails to meet any of the Phase 1 Milestones set
forth in subparagraphs (a)(i) through (a)(iv) above by the applicable dates,
Alaris may require Caesarea to refund to Alaris the Purchase Price (less an
amount equal to two times the Advance and any amounts paid to Alaris under the
LOC) and all Phase 1 Payments made to Caesarea by Alaris hereunder and Alaris
shall be under no further obligation to make any payments to Caesarea under
this Agreement.  In such event, this Agreement shall terminate and (i) Alaris
shall return to Caesarea (a) all right, title and interest in and to the
License, the NIKI Technology and the Assets and (b) all Documents, physical
property and Intellectual Property previously delivered by Caesarea to Alaris.
In addition, (i) Alaris shall not be liable to Caesarea for any loss of profits
or prospective profits or any other losses or damages of any kind sustained or
arising out of such termination and Caesarea hereby irrevocably waives any such
rights to the fullest extent permitted under the laws of the State of Israel
and further agrees that it shall not bring any action or proceeding of any
nature whatsoever in any court, before any tribunal, or under any arbitration

CF056967_0060

proceeding, seeking or claiming any such damage or loss; and (ii) Caesarea
shall not be liable to Alaris for any loss of profits or prospective profits or
any other losses or damages of any kind sustained or arising out of such
termination and Alaris hereby irrevocably waives any such rights to the fullest
extent permitted under the laws of the State of Israel and further agrees that
it shall not bring any action or proceeding of any nature whatsoever in any
court, before any tribunal, or under any arbitration proceeding, seeking or
claiming any such damage or loss.

     (b)  PHASE 2 NIKI PUMP. Upon completion of each of the Phase 2 Milestones
set forth below, Alaris will make the following payments (the "Phase 2
Payments") to Caesarea:

                                         6

<PAGE>

          (i)   $250,000 shall be paid to Caesarea upon Acceptance by Alaris of
                the final design (the "Second Final Design") of the Phase 2 NIKI
                Pump, and receipt by Alaris at the Specified Location, on or
                before December 31, 1998, and Acceptance by Alaris, on or before
                February 15, 1999, of 20 Phase 2 NIKI Pumps meeting the
                requirements of the Second Final Design;

          (ii)  $500,000 shall be paid to Caesarea upon receipt by Alaris at the
                Specified Location, on or before December 31, 1998, and
                Acceptance by Alaris, on or before February 15, 1999, of 20
                Manufacturing Assembly Kits and a complete Manufacturing
                Documentation Package for the Phase 2 NIKI Pump sufficient to
                permit Alaris to manufacture the Phase 2 NIKI Pump; and

          (iii) $250,000 shall be paid to Caesarea upon CE approval of the Phase
                2 NIKI Pump, which approval shall be obtained by Alaris (at its
                sole cost and expense).

     (c)  PHASE 3 NIKI PUMP. Upon completion of each of the Phase 3 Milestones
set forth below, Alaris will make the following payments (the "Phase 3
Payments") to Caesarea:

          (i)   $250,000 shall be paid to Caesarea upon Acceptance by Alaris of
                the final design (the "Third Final Design") of the Phase 3 NIKI
                Pump, and receipt by Alaris at the Specified Location, on or
                before March 1, 1999, and Acceptance by Alaris, on or before
                April 15, 1999, of 20 Phase 3 NIKI Pumps meeting the
                requirements of the Third Final Design;

          (ii)  $500,000 shall be paid to Caesarea upon receipt by Alaris at the
                Specified Location, on or before March 1, 1999, and Acceptance
                by Alaris, on or before April 15, 1999, of 20 Manufacturing
                Assembly Kits and a complete Manufacturing Documentation Package
                for the Phase 3 NIKI Pump sufficient to permit Alaris to
                manufacture the Phase 3 NIKI Pump; and

          (iii) $250,000 shall be paid to Caesarea upon FDA 510(k) approval of
                the Phase 3 NIKI Pump.

     (d)  Other than as set forth in subsection (a) above, this Agreement may
not be terminated due to the failure of Caesarea to meet any Phase 1 Milestone,
Phase 2 Milestone or Phase 3 Milestone.  Notwithstanding the failure of
Caesarea to meet any of such Milestones and provided that this Agreement is not
terminated as provided in Section 6(a) above, Alaris shall make Additional
Payments to Caesarea as follows:

          (i)   in the event the Phase 1 NIKI Pump is sold by Alaris on a
                commercial basis in any country other than the US or any country
                located in the EU, Alaris shall pay to Caesarea an amount equal

CF056967_0061

to the aggregate amount of the Phase 1 Payments less an amount
equal to any Phase 1 Payments previously made to Caesarea.

7

<PAGE>

> (ii) in the event the Phase 2 NIKI Pump is sold by Alaris on a
> commercial basis in any country located in the EU, Alaris shall
> pay to Caesarea an amount equal to the aggregate amount of the
> Phase 2 Payments less an amount equal to the sum of (i) any
> Phase 2 Payments previously made to Caesarea and (ii) all direct
> costs and expenses incurred by Alaris to develop the Phase 2
> NIKI Pump.

> (iii) in the event the Phase 3 NIKI Pump is sold by Alaris on a
> commercial basis in the US, Alaris shall pay to Caesarea an
> amount equal to the aggregate amount of the Phase 3 Payments
> less an amount equal to the sum of (i) any Phase 3 Payments
> previously made to Caesarea and (ii) all direct costs and
> expenses incurred by Alaris to develop the Phase 3 NIKI Pump.

    7.    ACCEPTANCE CERTIFICATE.  "Acceptance" by Alaris of any matter,
device, design, document, kit or product specified in Section 6 hereof as
requiring the Acceptance of Alaris shall mean and be evidenced only by a
written certificate (an "Acceptance Certificate") delivered by Alaris to
Caesarea, on or before the date specified for Acceptance, specifying that the
matter, device, design, document, kit or product has been delivered by Caesarea
to Alaris, and that the matter, device, design, document, kit or product has
been completed and presented in a form and manner which is satisfactory to
Alaris.  In the event that the matter, device, design, document, kit or product
has been completed and presented in a form and manner which is not satisfactory
to Alaris, Alaris shall deliver a written certificate (a "Rejection
Certificate") to Caesarea, on or before the date specified for Acceptance,
containing a general description of the relevant items which require correction
for an Acceptance by Alaris to take place.  Caesarea shall be granted an
extension of 30 days from the date of receipt of such Rejection Certificate
(the "Correction Period") to correct the items which are required for an
Acceptance by Alaris to take place (the "Correction Items") and Alaris shall
(at the sole cost and expense of Caesarea), upon the reasonable request of
Caesarea, meet or engage in communications with Caesarea in order to assist
Caesarea in understanding the reason that Alaris has delivered the Rejection
Certificate.  If the Correction Items are corrected within the Correction
Period in a manner satisfactory to Alaris, Alaris shall deliver an Acceptance
Certificate to Caesarea.  In such event, Acceptance will be deemed to have
taken place within the time period specified in Section 6 and any additional
payment which is conditioned upon such Acceptance shall be made. If the
Correction Items are not corrected in a manner satisfactory to Alaris within
the Correction Period, the applicable additional payment shall not be made.

    8.    PURCHASE OF NIKI PUMPS.  In addition to the Additional Payments, for
each NIKI Pump delivered to Alaris pursuant to and in accordance with Section 6
hereof, Alaris shall pay to Caesarea the sum of three hundred fifty ($350)
dollars within 30 days from the later of (i) receipt by Alaris of Caesarea's
invoice issued upon shipment of the NIKI Pumps or (ii) delivery of the NIKI
Pumps to the Specified Location.

    9.    MANNER OF DELIVERY.  All NIKI Pumps, Manufacturing Assembly Kits,
Assets and all other devices, goods, documents and products to be delivered by
Caesarea under this Agreement shall be delivered by Caesarea to Alaris F.O.B.,
Israel.  NIKI Pumps and Manufacturing Assembly Kits are supplied by Caesarea as
a sub-contractor of Alaris.

8

<PAGE>

CF056967_0062

10. PUMP PAYMENT.

(a) In consideration of the Sale and the other undertakings of Caesarea hereunder, Alaris shall pay to Caesarea, in accordance with the provisions of subsection (b) below, $25.00 (the "Payment Amount") for each NIKI Pump which is manufactured and sold by Alaris or by any third party under agreement with or with the consent of Alaris, other than any sale by or to Caesarea, during the period commencing on the date of first commercial sale by Alaris of a NIKI Pump and ending on the seventh anniversary of said date (the "Payment Period"). For purposes of this Agreement, the assembly of a NIKI Pump using a Manufacturing Assembly Kit shall be considered the manufacture of a NIKI Pump. The parties acknowledge and agree that Caesarea shall only be entitled to payment of the Payment Amount upon the first commercial sale of a NIKI Pump.

(b) Within 45 days after the end of each calendar quarter during the Payment Period, Alaris shall pay to Caesarea an amount equal to the number of NIKI Pumps in respect of which the Pump Payment is required to be made pursuant to subsection (a) above (less the number of NIKI Pumps returned or recalled during the quarter or any prior quarter in accordance with the provisions of subparagraph (c) below) multiplied by the Payment Amount. All payments shall be accompanied by a statement, certified by an officer of Alaris, setting forth the number of NIKI Pumps sold, returned and recalled during the quarter. In the event any NIKI Pump which had previously been returned or recalled is redelivered to the customer or end-user returning same, such redelivery shall be deemed a sale of such NIKI Pump (for which a Pump Payment shall be required to be made) in the quarter in which such NIKI Pump is redelivered.

(c) In the event that the number of NIKI Pumps returned or recalled during any quarter exceeds the number of NIKI Pumps in respect of which the Pump Payment is required to be made during such quarter pursuant to subsection (a) above (the "Excess Amount"), the number of NIKI Pumps in respect of which the Pump Payment is required to be made pursuant to subsection (a) above during the immediately succeeding quarter shall be reduced (in addition to any reduction based upon the number of NIKI Pumps returned or recalled during such quarter pursuant to subsection (b) above) by the Excess Amount.

11. PURCHASE OF MANUFACTURING ASSEMBLY KITS.

(a) Upon the terms and subject to the conditions herein contained, Caesarea agrees to manufacture and sell to Alaris and Alaris may purchase from Caesarea, Manufacturing Assembly Kits for the NIKI Pump.

(b) For each Manufacturing Assembly Kit purchased by Alaris, Alaris agrees to pay Caesarea a price equal to Caesarea's Direct Costs plus ten (10%) percent, which shall not exceed an aggregate of $170 for each Phase 1 NIKI Pump during the period commencing on the date hereof and ending on the first anniversary of the date of completion of the Phase 1 Milestones. Payment for the Manufacturing Assembly Kits purchased from Caesarea shall be made within 30 days from the later of (i) receipt of Caesarea's invoice issued upon shipment of the Manufacturing Assembly Kits or (ii) delivery of the Manufacturing Assembly Kits to the Specified Location.

9

<PAGE>

(c) On the first Business Day of each month following completion of the Phase 1 Milestones (each, a "Specified Date"), Alaris shall provide Caesarea with a forecast of its requirements of Manufacturing Assembly Kits covering the next 180 days deliveries at a minimum and indicating the requested delivery dates and Specified Location for delivery. On the first Business Day following a Specified Date, the immediately following 90 days of the forecast shall be considered a firm and binding order for the number of Manufacturing Assembly Kits specified therein and any forecasts covering more than 90 days from such Specified Date (the "Extended Forecast Period") shall be considered non-binding

CF056967_0063

Case: 1:15-cv-09986 Document #: 551-7 Filed: 09/07/23 Page 64 of 76 PageID #:24143

and subject to change, modification and cancellation by Alaris; provided,
however, that the number of Manufacturing Assembly Kits specified for delivery
during the Extended Forecast Period in any forecast delivered by Alaris to
Caesarea may not, without the consent of Caesarea, which consent shall not be
unreasonably withheld, be increased by more than 50% from the number of
Manufacturing Assembly Kits specified for delivery during the Extended Forecast
Period in the immediately preceding forecast delivered by Alaris to Caesarea.
At the request of Caesarea, or at the option of Alaris, Alaris will provide
non-binding forecasts covering a period from six (6) months to twelve (12)
months from a Specified Date.

    (d)  If Caesarea determines that it will be unable to timely deliver
Manufacturing Assembly Kits in accordance with Alaris' orders issued in
accordance with the provisions of Section 11(c) hereof, then Caesarea shall
give Alaris prompt notice thereof and shall indicate the anticipated length of
the delay.  If the delay will exceed 15 days from the date specified by Alaris
for delivery, Alaris shall have the right at any time prior to delivery to
cancel its order for such Manufacturing Assembly Kits; provided, however, that
if the delay in delivery is a result of force majeure (as set forth in Section
28(o) hereof) Alaris shall only have the right to cancel such order if the
delay will exceed 30 days from the date specified by Alaris for delivery.

    12.  ENGAGEMENT OF SUBCONTRACTORS.  Caesarea may sub-contract the
manufacture of NIKI Pumps and Manufacturing Assembly Kits only with the prior
written consent of Alaris, which consent shall not be unreasonably withheld;
provided, however, that the subcontracting by Caesarea of the NIKI Pumps and
Manufacturing Assembly Kits shall not relieve Caesarea of any of its
obligations hereunder and Caesarea shall remain responsible for all NIKI Pumps
and Manufacturing Assembly Kits subcontracted as if Caesarea had manufactured
the NIKI Pumps and Manufacturing Assembly Kits itself.  The parties acknowledge
and agree that in the event Caesarea elects to sub-contract the manufacture of
the NIKI Pumps and/or Manufacturing Assembly Kits, Alaris shall have the right
to require that any sub-contractor selected by Caesarea submit to a Good
Manufacturing Practice audit by Alaris.  If any such sub-contractor does not
meet (i) all applicable regulatory requirements relating to the manufacturing
of the NIKI Pumps or Manufacturing Assembly Kits, as the case may be, including
Good Manufacturing Practices and other requirements of the FDA and applicable
US and EU regulatory agencies, including, without limitation, the European
Medical Device Directives and EN 46001 or EN 46002, as applicable, and (ii) any
additional requirements which Alaris may reasonably require of its own
subcontractors, Alaris may withhold its consent to the engagement of such
subcontractor.

                                    10
<PAGE>

    13.  MOLDS AND TOOLS.  Caesarea hereby grants to Alaris the right and
option to purchase from Caesarea the molds and tooling utilized by Caesarea to
manufacture the NIKI Pump at a purchase price equal to Caesarea's direct costs
for such molds and tooling, excluding Caesarea's engineering costs related
thereto, all of which costs are set forth on Schedule 13 hereto.  In the event
Alaris purchases such molds and tooling, Caesarea shall no longer be obligated
to supply Manufacturing Assembly Kits to Alaris pursuant to Section 11 hereof;
provided, however, that if there are any outstanding orders for Manufacturing
Assembly Kits, Caesarea shall have the option to fulfill such orders prior to
delivery to Alaris of the molds and tooling.

    14.  TECHNICAL ASSISTANCE. Upon execution of this Agreement, Caesarea
shall deliver to Alaris all technical information and written manifestations of
Intellectual Property with respect to the NIKI Technology.  Caesarea shall
provide Alaris, at Caesarea's expense, with such technical assistance as may be
reasonably necessary to inform Alaris fully about the NIKI Technology.  In
addition, Caesarea shall, at Caesarea's sole cost and expense, (i) provide to
Alaris, upon reasonable request from Alaris from time to time, progress reports
and updates regarding the status of development of the Phase 1 NIKI Pump, the

CF056967_0064

Phase 2 NIKI Pump, and the Phase 3 NIKI Pump, (ii) provide to Alaris, upon
reasonable request from Alaris from time to time, such development,
manufacturing and other resources and efforts as shall be reasonably necessary
or appropriate to ensure the satisfaction of the Phase 1 Milestones, the Phase
2 Milestones and the Phase 3 Milestones and (iii) upon reasonable notice by
Alaris and at reasonable times, but not more often than 60 days per year (the
"Annual Assistance Days"), make all appropriate technical, production,
engineering and marketing personnel available to Alaris, in order to permit
Alaris to establish its own manufacturing capability for the NIKI Pump, the
I.V. Valve and the I.V. administration sets to be used by Alaris with the NIKI
Pump; provided, however, that reasonable direct out-of-pocket expenses, if any,
incurred by Caesarea in providing such assistance to Alaris outside of Israel
shall be borne by Alaris. In the event Alaris requests Caesarea to provide
assistance in excess of the number of Annual Assistance Days, Alaris shall be
responsible for payment of all reasonable direct out-of-pocket expenses, if
any, incurred by Caesarea in providing such additional assistance.

    15. REGULATORY RESPONSIBILITY.

    (a) Alaris shall comply with all FDA and EU labeling requirements with
respect to the NIKI Pump.

    (b) Caesarea shall (i) be responsible for complying with all applicable
regulatory requirements relating to the manufacturing and design activities of
Caesarea contemplated herein, including Good Manufacturing Practices and other
requirements of the FDA and applicable US and EU regulatory agencies,
including, without limitation, the European Medical Device Directives and EN
46001 or EN 46002, as applicable; and (ii) use its best efforts to obtain, at
its sole cost and expense, the CE mark for the Phase 1 NIKI Pump on or prior to
September 1, 1998.  In addition to the foregoing, Caesarea shall (i) submit to
Good Manufacturing Practices audits by Alaris upon reasonable notice and (ii)
provide Alaris with a written failure analysis and corrective action plan
relating to all complaints regarding Caesarea or the NIKI Pump within 30
Business Days of receiving documentation or samples.

                                          11
<PAGE>

    (c) Alaris shall be responsible for obtaining, at its sole cost and
expense, all other regulatory authorizations, approvals, permits and licenses
(collectively, "Approvals") necessary to sell and distribute the NIKI Pump in
the US, the EU and any other country in which it desires to sell the NIKI Pump,
including, without limitation, FDA approval.  Caesarea agrees that to the
extent it currently has obtained or made any of such Approvals, it will assign
them to Alaris at no cost to Alaris and cooperate with Alaris to permit Alaris
to complete such assignment or otherwise obtain or complete such Approvals.

    (d) Alaris and Caesarea shall each notify the other in writing within one
Business Day of their respective knowledge of a death involving the NIKI Pump
and within three Business Days of their respective knowledge of the occurrence
of any safety alert, significant customer complaint or any other event which
would require the filing of a Medical Device Report.

    (e) Alaris and Caesarea shall each keep the other fully informed with
respect to any information, inquiry or correspondence from any government
agency or authority (a "Governmental Inquiry") relating to the investigation or
review of the compliance of the NIKI Pump with applicable legal, health or
safety requirements.  Alaris and Caesarea shall each notify the other of its
receipt of any Governmental Inquiry within three Business Days following the
date of such receipt.

    16. QUALITY CONTROL.  Caesarea shall comply with all applicable quality
control standards and procedures of Alaris and those required by all applicable
regulatory authorities.  Upon reasonable prior notice, Caesarea shall permit
Alaris to review periodically Caesarea's production and quality control

CF056967_0065

Case: 1:15-cv-09986 Document #: 551-7 Filed: 09/07/23 Page 66 of 76 PageID #:24145

procedures and records and to visit Caesarea's facilities, at reasonable times with a representative of Caesarea present, in order to assure satisfaction of the requirements of this Section 16.

    17.  PRODUCT WARRANTY.  Caesarea warrants to Alaris that for a period commencing on the date of delivery to Alaris and ending on the eighteen (18) month anniversary of the date of first shipment to the end-user or customer (the "Warranty Period"), each NIKI Pump and each Manufacturing Assembly Kit will: (i) conform to the specifications set forth on Parts 1, 2 and 3 of Schedule 1(h) hereto and to the First, Second and Third Final Design, as applicable; (ii) be free from manufacturing defects; (iii) not be "adulterated" or "misbranded" as such terms are defined in the Act; and (iv) be in merchantable condition and fit and safe for its intended use.  Subject to the provisions of Section 27 hereof, Caesarea's sole obligation under this product warranty shall be, at the option of Alaris, either to repair or replace, at Caesarea's sole cost and expense, or, if repair or replacement is not feasible or is not made by Caesarea, to refund the purchase price of, any NIKI Pump or Manufacturing Assembly Kit returned within the Warranty Period that Alaris reasonably determines fails to meet any of the conditions of (i), (ii), (iii) or (iv) above.  This warranty shall not apply to any NIKI Pump or Manufacturing Assembly Kit that has been damaged by accident or has been misused, abused, altered or repaired by anyone other than Caesarea or its representatives.  In the case of a standard part supplied to Caesarea by a subcontractor engaged by Caesarea and approved by Alaris pursuant to the provisions of Section 12 hereof, Caesarea shall grant to Alaris the benefit of any product warranty provided to Caesarea by such subcontractor and Caesarea will not bear any further liability to Alaris for such part under this Section 17; provided, that Alaris shall

                                    12

<PAGE>

have first approved in writing the terms of the sub-contractor's product warranty for such part prior to the use thereof by Caesarea.

    18.  SALES AND MARKETING.  Caesarea acknowledges and agrees that Alaris will have the right to exploit the License, the NIKI Technology and the Assets and market and sell any product incorporating all or any portion of the same, upon such terms and in such manner as Alaris, in its sole and absolute discretion, shall determine; provided, that Alaris shall not promote the sale in the enteral market of any products utilizing the NIKI Technology.

    19.  PRODUCT RECALL.  In the event Alaris believes, in its sole and absolute discretion, that the NIKI Pump, the I.V. Value or any other product or device violates any provision of applicable law, should be recalled due to health or safety considerations or should otherwise be subject to alert or other appropriate treatment, Alaris shall have the sole authority to control all such actions and to determine the necessity for implementing any corrective action and the means of implementing the same.  Caesarea shall cooperate fully with Alaris in effecting any recall or any other type of corrective action, including, without limitation, communications to or with any purchasers, customers or other users of such product or device.

    20.  INSURANCE.  Alaris and Caesarea each agree to obtain and keep in force, for a period of ten (10) years from the date hereof, from an insurance carrier satisfactory to the other party, product liability insurance in an amount of not less than $1,000,000.  Each such insurance policy shall: (a) be endorsed to provide for written notification by the insurer to each of Alaris and Caesarea not less than 30 days prior to modification, expiration or cancellation thereof; (b) permit the other party to make payments to effect the continuation of such insurance coverage upon notice of cancellation due to nonpayment of premiums thereon; and (c) name the other party as an additional insured.  A certificate of insurance evidencing compliance with this paragraph and referencing this Agreement shall be furnished to the other party on the date hereof.

CF056967_0066

    21.  REPRESENTATIONS AND WARRANTIES OF ALARIS.  Alaris hereby represents
and warrants to Caesarea that:

    (a)  It is duly organized, validly existing and in good standing under the
laws of the State of Delaware and has full corporate power and authority to own
or hold under lease the assets and properties which it owns or holds under
lease and to enter into this Agreement and perform its obligations hereunder.

    (b)  The execution and delivery of this Agreement by it, the performance
by it of its obligations hereunder and the consummation by it of the
transactions contemplated hereby have been duly authorized by all necessary
corporate action. When executed and delivered by it this Agreement shall
constitute its valid and legally binding agreement enforceable against it in
accordance with the terms hereof, except as may be limited by bankruptcy,
insolvency or other laws affecting generally the enforceability of creditors'
rights and by limitations of the availability of equitable remedies.

                                    13

<PAGE>

    (c)  Neither the execution and delivery of this Agreement nor the
consummation of the transactions contemplated herein will violate any provision
of the certificate of incorporation or by-laws of Alaris or any law, rule
regulations, writ, judgment, injunction, decree, determination, award, or other
order of any court, government or governmental agency or instrumentality,
domestic or foreign, binding upon Alaris, or conflict with or result in any
breach of or event of termination under any of the terms of, or constitute a
default under or result in the termination of or the creation or imposition of
any mortgage, deed of trust, pledge, lien, security interest or other charge or
encumbrance of any nature pursuant to, the terms of any contract or agreement
to which Alaris is a party or by which Alaris or any of its assets and
properties is bound.

    22.  REPRESENTATIONS AND WARRANTIES OF CAESAREA.  Caesarea hereby
represents and warrants to Alaris that:

    (a)  It is duly organized, validly existing and in good standing under the
laws of the State of Israel and has full corporate power and authority to own
or hold under lease the assets and properties which it owns or holds under
lease and to enter into this Agreement and perform its obligations hereunder.

    (b)  The execution and delivery of this Agreement by it, the performance
by it of its obligations hereunder and the consummation by it of the
transactions contemplated hereby have been duly authorized by all necessary
corporate action. When executed and delivered by it, this Agreement shall
constitute its valid and legally binding agreement enforceable in accordance
with the terms hereof, except as may be limited by bankruptcy, insolvency or
other laws affecting generally the enforceability of creditors' rights and by
limitations on the availability of equitable remedies.

    (c)  Neither the execution and delivery of this Agreement nor the
consummation of the transactions contemplated herein will violate any provision
of the certificate of incorporation or by-laws of Caesarea or any law, rule,
regulation, writ, judgment, injunction, decree, determination, award, or other
order of any court, government or governmental agency or instrumentality,
domestic or foreign, binding upon Caesarea, or conflict with or result in any
breach of or event of termination under any of the terms of, or constitute a
default under or result in the termination of or the creation or imposition of
any mortgage, deed of trust, pledge, lien, security interest or other charge or
encumbrance of any nature pursuant to, the terms of any contract or agreement
to which Caesarea is a party or by which Caesarea or any of its assets and
properties is bound.

    (d)  Except as set forth on Schedule 22(d) hereof and the Transfer

CF056967_0067

Case: 1:15-cv-09986 Document #: 551-7 Filed: 09/07/23 Page 68 of 76 PageID #:24147

Agreement, Caesarea owns all right, title and interest in the Assets, the
Documents, the NIKI Technology and all Improvements for all purposes, in each
case on an unrestricted basis, free and clear of all liens, claims,
restrictions, limitations and encumbrances.

    (e) There are no claims, disputes, actions, suits or proceedings,
including, without limitation, suits for patent infringement, pending or, to
the knowledge of Caesarea, threatened against or affecting the NIKI Technology,
or the use thereof by Caesarea or Alaris. To the knowledge of Caesarea, after
reasonable inquiry, neither the NIKI Technology, nor the use thereof

                                       14

<PAGE>

by Alaris under this Agreement, does or will infringe or conflict with any
patents, patent applications, know-how, processes, trade secrets, techniques,
procedures or other proprietary property rights or Intellectual Property, of or
held by, any Person.

    (f) The Assets are all of the tangible assets used by Caesarea and
necessary to manufacture the NIKI Pump in its present form.

    (g) Except for the Existing Distribution Agreements, Caesarea is not a
party to any distribution, license or transfer agreement with respect to the
NIKI Technology.

    23. NON-COMPETITION.

    (a) Caesarea agrees that for a period of seven (7) years following the
date hereof, neither Caesarea, Swi Barak, nor any affiliate of either of them
will (and Caesarea and Swi Barak agree not to and to cause all such Persons not
to), directly or indirectly, either for itself or himself, or any other person,
firm, partnership, corporation or other business venture, own, manage, operate,
control, or participate in, permit its or his name, as the case may be, to be
used by, consult with, be employed by, render services for or otherwise assist
in any manner, any Person that is engaged in the research, acquisition,
manufacture, promotion, sale or marketing of a volumetric infusion pump or
technology related thereto having its primary application in the Field, other
than for the purpose of performing the obligations of Caesarea under this
Agreement. The parties acknowledge and agree that the development by Caesarea,
Swi Barak, or any affiliate of either of them, of a valve, other than the I.V.
Valve, or a syringe pump shall not be deemed a violation of this Section 23.

    (b) The parties hereto acknowledge that it is impossible to measure in
money the damages that will accrue to Alaris in the event of the breach of any
of the covenants in (a) above and, if Alaris shall institute any action or
proceeding to enforce those covenants, Caesarea and Swi Barak hereby waive and
agree not to assert the claim or defense that Alaris has an adequate remedy at
law or for damages. The foregoing shall not prejudice Alaris' right to seek
money damages from Caesarea or Swi Barak with respect to any such breach.

    (c) If the provisions of Section 23(a) are determined by any court of
competent jurisdiction to be unenforceable by reason of its extending for too
long a period of time or over too large a geographic area or by reason of its
being too extensive in any other respect or for any other reason it will be
interpreted to extend only over the longest period of time for which it may be
enforceable and/or over the largest geographical area as to which it may be
enforceable and/or to the maximum extent in all other aspects as to which it
may be enforceable, all as determined by such court and in such court.

    24. TERMINATION OF EXISTING DISTRIBUTION AGREEMENTS. Caesarea shall, as
promptly as practicable after execution of this Agreement, but in any event not
later than November 30, 1998, terminate, in a manner reasonably satisfactory to
Alaris, the Existing Distribution Agreements, other than its Existing
Distribution Agreement with its Israeli distributor. Upon the request of

CF056967_0068

Alaris at any time after December 31, 1998, Caesarea and Alaris shall cooperate
in dealing with Caesarea's Israeli distributor and shall endeavor to reach an
agreement, upon terms and conditions mutually

                                         15

<PAGE>

agreeable to Alaris and Caesarea, on the termination or renegotiation of the
Existing Distribution Agreement with Caesarea's Israeli distributor. All costs
associated with the termination or renegotiation of Caesarea's Existing
Distribution Agreement shall be borne exclusively by Caesarea, and Alaris shall
cooperate fully with Caesarea in effecting any such termination or
renegotiation. In the event Caesarea fails to terminate or, in the case of
Caesarea's Israeli distributor terminate or renegotiate to Alaris'
satisfaction, the Existing Distribution Agreements, as provided for in this
Section 24, Alaris shall only pay to Caesarea one-half of the Additional
Payments until such time as Caesarea terminates or renegotiates to Alaris'
satisfaction, as the case may be, the Existing Distribution Agreements. Upon
termination, or renegotiation to Alaris' satisfaction, of such Existing
Distribution Agreements, Alaris shall pay to Caesarea any Additional Payments
required to have been made and not so made due to the failure of Caesarea to
terminate or renegotiate such Existing Distribution Agreements.

        25. BANKRUPTCY OF CAESAREA. In the event of the Bankruptcy of Caesarea,
or the impairment or interruption of Caesarea's business, Alaris shall be under
no further obligation to make payments to Caesarea under this Agreement other
than the payments provided for in Sections 6(d) and 10 hereof.

        26. DISTRIBUTION AGREEMENT. Following the date hereof Caesarea and
Alaris shall enter into negotiations for a distribution agreement generally
upon the terms set forth on Schedule 26 hereto and otherwise upon terms and
conditions mutually agreeable to Alaris and Caesarea.

        27. INDEMNIFICATION.

        (a) Caesarea shall indemnify, defend and hold harmless Alaris, its
directors, officers, employees, agents, and their respective legal
representatives, successors and assigns (individually, an "Indemnified Party")
from and against any and all direct or consequential damages, costs, expenses,
losses, claims, demands, liabilities and/or obligations, including, without
limitation, reasonable counsel fees (collectively, "Losses"), incurred by an
Indemnified Party arising out of, resulting from or based upon: (i) any
negligence or wilful misconduct of Caesarea or its affiliates; (ii) any product
liability, warranty or other claims resulting from the sale, lease, license or
use of the NIKI Pump to the extent caused by any defect in the design of the
NIKI Pump, any defect in the manufacture of the NIKI Pump or Manufacturing
Assembly Kits manufactured by or on behalf of Caesarea or any other defect,
nonconformity or deficiency attributable to any action or activity by or on
behalf of Caesarea; and (iii) any action or claim that the NIKI Technology or
the use thereof infringes upon the rights, power or privileges of any Person,
including, without limitation, any such claim brought against Alaris or any
other Person as a result of the exercise of its rights under this Agreement.

        (b) Notwithstanding the provisions of subparagraph (a) above, Caesarea
shall not be liable to indemnify an Indemnified Party for any Losses incurred
by such Indemnified Party if such Losses arise out of, result from or are based
upon the sale or use of the NIKI Technology or the NIKI Pump where the NIKI
Technology or the NIKI Pump, as the case may be, has been modified by any
Person other than Caesarea and such Losses arise out of or result from such
modification.

                                         16

<PAGE>

CF056967_0069

(c)  If the facts giving rise to any such indemnification pursuant to this
Section 27 shall involve any actual claim or demand by any third party against
an Indemnified Party (a "Third Party Claim"), Caesarea shall be entitled to
written notice of and entitled (without prejudice to the right of any
Indemnified Party to participate at its own cost and expense through counsel of
its own choosing) to defend such Third Party Claim at its expense and through
counsel of its own choosing (which counsel shall be reasonably satisfactory to
the Indemnified Party); if it gives written notice (a "Defense Notice") of its
intention to do so no later than the 15th day following receipt of such written
notice; PROVIDED, HOWEVER, that if the defendants in any action shall include
both Caesarea and an Indemnified Party and the Indemnified Party shall have
been advised by its counsel that the counsel selected by Caesarea has a
conflict of interest because of the availability of different or additional
defenses to the Indemnified Party, the Indemnified Party shall have the right
to select separate counsel to participate in the defense of such action on its
behalf, at the expense of Caesarea.  The failure of an Indemnified Party so to
notify Caesarea shall not relieve Caesarea of any liability which it may have
to any Indemnified Party except to the extent to which such liability may have
been mitigated as a result of the timely receipt of such notice.  The
Indemnified Party shall cooperate fully in the defense of such Third Party
Claim and shall make available to Caesarea pertinent information under its
control relating thereto, but shall be entitled to be reimbursed, as provided
in this Section 27, for all out-of-pocket costs and expenses payable to third
parties incurred by it in connection therewith, including, without limitation,
reasonable fees and disbursements of counsel.  If Caesarea assumes the defense
of any Third Party Claim, it will not, without the prior written consent of the
Indemnified Party, which consent shall not be unreasonably withheld, settle or
compromise any Third Party Claim, or permit a default or consent to the entry
of a judgement in respect thereof.

(d)  If Caesarea elects to defend a Third Party Claim, an Indemnified
Party shall have the right, notwithstanding the provisions of Section 27(a)
hereof, to control, at its own cost and expense,  the defense of any Third
Party Claim with respect to such Indemnified Party and such costs and expenses
shall not constitute Losses.

(e)  Caesarea shall reimburse an Indemnified Party for all Losses incurred
by the Indemnified Party within 30 days of the Indemnified Party's demand
therefor.  In the event Caesarea fails to reimburse the Indemnified Party
within such 30 day period, Caesarea shall pay to the Indemnified Party interest
on such unpaid Losses, at the rate of nine (9%) per annum, from the date the
Indemnified Party incurred such Loss through the date of payment by Caesarea.

(f)  In the event an Indemnified Party elects to defend a Third Party
Claim, or if Alaris elects to initiate proceedings to enforce its rights in or
with respect to the NIKI Technology, including, without limitation, as a result
of any infringement thereof, Caesarea shall cooperate fully in the defense or
prosecution thereof, as the case may be, including, without limitation, making
available to Alaris or the Indemnified Party, as the case may be, all pertinent
technical and other information under its control relating thereto and making
appropriate employees officers of Caesarea available as witnesses for Alaris or
the Indemnified Party.  Alaris or the Indemnified Party, as the case may be,
shall reimburse Caesarea for all out-of-pocket costs incurred by it in
connection therewith except to the extent the same constitutes Losses subject
to indemnity hereunder.

17

<PAGE>

(g)  Under no circumstances shall the total liability of Caesarea for any
Losses arising out of, resulting from or based upon any claim under Section
27(a)(iii) hereof exceed sixty (60%) percent of the aggregate amount of all
payments received by Caesarea hereunder (excluding amounts received by Caesarea
under Sections 8 and 11 hereof) and under the distribution agreement referred
to in Section 26.

CF056967_0070

28  GENERAL.

(a) CHOICE OF LAW. This Agreement and all purchase orders issued
hereunder shall be governed and interpreted, and all rights and obligations of
the parties hereunder shall be governed and determined in accordance with the
laws of the State of Israel, without regard to its conflict of laws rules. The
courts of Jerusalem, Israel shall have exclusive jurisdiction concerning any
dispute relating to or arising out of this Agreement and Alaris and Caesarea
hereby submit to the exclusive jurisdiction of such courts. In connection with
any litigation hereunder, no party shall be required to deposit any security
for costs, and each party hereby irrevocably waives any right that it might
otherwise have to require declarations (or exhibits thereto) to be translated
from English into Hebrew.

(b) NOTICES. All notices, requests, demands, waivers, consents,
approvals or other communications to any party hereunder shall be in writing
and shall be deemed to have been duly given if delivered personally to such
party or sent to such party by telegram or telex or by international overnight
courier, as follows:

                                        18

<PAGE>

    If to Alaris:

        Alaris Medical Systems, Inc.
        10221 Wateridge Circle
        San Diego, California 92121
        Attention: John A. de Groot, Vice President and General Counsel
        Telephone: (619) 458-7508
        Facsimile: (619) 458-6217

    With a copy (which shall not constitute notice) to:

        Gordon Altman Butowsky Weitzen Shalov & Wein
        114 West 47th Street
        New York, New York 10036
        Attention: Keith L. Schaitkin, Esq.
        Telephone: (212) 626-0838
        Facsimile: (212) 626-0799

        and

        Yigal Arnon & Co.
        3 Daniel Frisch Street
        Tel Aviv, Israel 64731
        Attention: David Osborne, Adv.
        Telephone: 972-3-692-6868
        Facsimile: 972-3-696-4770

    If to Caesarea:

        Caesarea Medical Electronics Limited
        5 Rakefet Street
        Caesarea, Israel 38900
        Telephone: 972-6-326-131
        Facsimile: 972-6-326-125

    With a copy (which shall not constitute notice) to:

        Elchanan Landau Law Office
        8 Keren Hayessod Street
        Jerusalem, Israel 92101
        Attention: Zvi Nixon, Adv.

CF056967_0071

Telephone: 972-2-561-8845
Facsimile: 972-2-561-8847

19

<PAGE>

or such other address as the addressee may have specified in notice duly given
to the sender as provided herein. All notices and communications given
hereunder shall be deemed received upon (i) actual receipt thereof by the
addressee, (ii) actual delivery thereof to the appropriate address, or (iii) in
the case of a facsimile transmission, upon transmission thereof by the sender
and the issuance by the transmitting machine of a confirmation slip confirming
that the number of pages constituting the notice have been transmitted without
error. In the case of notices sent by facsimile transmission, the sender shall
contemporaneously mail a copy of the notice to the addressee by international
overnight courier service. However, such mailing shall in no way alter the
time at which the notice sent by facsimile transmission is deemed received

        (c) ENGLISH LANGUAGE. If this Agreement is translated into any language,
the English language version shall govern in the event of any conflict or
question of construction or interpretation.

        (d) SEVERABILITY. In the event that any provision of this Agreement
shall be found in any jurisdiction to be in violation of public policy or
illegal or unenforceable in law or equity, such finding shall in no event
invalidate any other provision of this Agreement in that jurisdiction, and this
Agreement shall be deemed amended to the minimum extent required to comply with
the law of such jurisdiction.

        (e) ENTIRE AGREEMENT. This Agreement and the other documents referred to
herein state the entire agreement reached between the parties hereto with
respect to the transactions contemplated hereby and may not be amended or
modified except by written instrument duly executed by the parties hereto. Any
and all previous agreements and understandings between the parties regarding
the subject matter hereof, whether written or oral, including, without
limitation, the Term Sheet dated March 11, 1998, between Alaris and Caesarea,
are superseded by this Agreement.

        (f) NO WAIVER. The failure of either party hereto to enforce at any time
or for any period of time, any provision of this Agreement shall not be
construed as a waiver of such provision or of the right of such party
thereafter to enforce each and every provision.

        (g) ASSIGNMENT, BINDING EFFECT. Caesarea shall not assign this Agreement
nor any of its rights or obligations hereunder without the prior written
consent of Alaris, which consent shall not be withheld unreasonably and any
such attempted assignment without such consent shall be void. This Agreement
and the rights herein granted shall be binding upon and shall inure to the
benefit of Alaris and its successors, assigns and transferees.

        (h) INDEPENDENT CONTRACTOR. Each party shall act as the independent
contractor of the other party. Neither party shall be the legal agent of the
other for any purpose whatsoever and therefore has no right or authority to
make or underwrite any promise, warranty or representation, to execute any
contract or otherwise to assume any obligation or responsibility in the name of
or in behalf of the other party, except to the extent hereafter specifically
authorized in writing by the other party. None of the parties hereto shall be
bound by or liable to any third persons for any act or for any obligation or
debt incurred by the other toward such third party, except to the extent
hereafter specifically agreed to in writing by the party so to be bound.

<PAGE>

20

CF056967_0072

(i) HEADINGS. All section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

(j) NUMBER AND GENDER. The definitions in this Agreement shall apply equally to both the singular and plural form of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter form. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation."

(k) COUNTERPARTS. This Agreement may be executed in one or more counterparts, each of which when executed and delivered shall be deemed to be an original and all of which counterparts, when taken together, shall constitute one and the same instrument.

(l) FURTHER ASSURANCES. The parties and Swi Barak shall, from time to time, execute all such documents and do all such things as any of the other parties hereto may reasonably require for perfecting the transactions intended to be effected under or pursuant to this Agreement.

(m) SALES AND TRANSFER TAXES. Except as otherwise provided in Section 9 hereof, all taxes, levies, impositions, deductions, charges, withholdings, premiums, custom duties and other governmental fees, like assessments or charges of any kind whatsoever including, without limitation, all transfer, documentary, sales, ad valorem, value added, use and other such taxes, any penalties, interest and additions to tax, imposed as a result of the transactions contemplated hereunder (including, without limitation, the Sale, the sale of the Assets, the payments provided in Sections 5, 6 and 10, and the purchases pursuant to Sections 8, 11 and 13) shall be borne by Caesarea (but excluding any taxes imposed on the net income of Alaris). Caesarea and Alaris shall cooperate in the timely making of all filings, returns, reports and forms as may be required in connection therewith.

(n) OFFSET. Alaris shall have the right to offset against any amount otherwise payable by Alaris to Caesarea hereunder, any and all amounts payable by Caesarea to Alaris hereunder. Caesarea shall have the right to offset against any amount otherwise payable by Caesarea to Alaris hereunder, any and all amounts payable by Alaris to Caesarea hereunder.

(o) FORCE MAJEURE. In no event will either party be liable for any delays or failure to perform hereunder when the same are caused, directly or indirectly by, or in any way arise as a result of, fire, floods, civil or military unrest, terrorist activities, acts of god, war, governmental interference, legal restrictions applicable in any relevant jurisdiction, embargoes, shortages of raw materials (including components, assembled parts, etc.) or labor, strikes (whether or not authorized by law). Any party experiencing such an event shall advise the other promptly, explaining the nature of the event and the anticipated duration.

(p) CONFLICTING COMMERCIAL FORMS. The terms and conditions of this Agreement shall supersede and control over any conflicting or additional terms or conditions of any purchase orders,

21

<PAGE>

acknowledgments, invoices or other commercial forms exchanged between the parties concerning the subject matter hereof.

(q) PAYMENTS. All payments required to be made hereunder shall be in United States Dollars.

(r) LIMITATION OF LIABILITY. Caesarea shall not be liable to Alaris for any special, indirect or consequential damages arising out of this Agreement, its performance or termination.

CF056967_0073

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day and year first above written

ALARIS MEDICAL SYSTEMS, INC.

By:
-------------------------------
  Name:
  Title:

CAESAREA MEDICAL ELECTRONICS LIMITED

By:
-------------------------------
  Name: Swi Barak
  Title: General Manager

ACCEPTED AND AGREED TO
(solely with respect to Sections
3(a), 23 and 28(1) hereof)

- -------------------------------
SWI BARAK

22

<PAGE>

LIST OF SCHEDULE AND EXHIBITS

| EXHIBIT | DESCRIPTION |
| - ------- | ----------- |
| A. | Agreement with Nestec, S.A. |
| B. | Form of Standby Letter of Credit |

| SCHEDULE | DESCRIPTION |
| - -------- | ----------- |
| 1(a) | Calculation of Direct Costs |
| 1(b) | Documents related to NIKI Technology |
| 1(c) | Existing Distribution Agreements |
| 1(d) | Existing Intellectual Property |
| 1(e) | Description of I.V. Valve |
| 1(f) | Manufacturing Assembly Kit specifications for Phase 1 NIKI Pump |
| 1(g) Part 1 | Manufacturing Documentation Package - Phase 1 NIKI Pump |
| 1(g) Part 2 | Manufacturing Documentation Package - Phase 2 NIKI Pump |
| 1(g) Part 3 | Manufacturing Documentation Package - Phase 3 NIKI Pump |
| 1(h) | Description of Peristaltic Pump |
| 1(i) Part 1 | Specifications for Phase 1 NIKI Pump |
| 1(i) Part 2 | Specifications for Phase 2 NIKI Pump |
| 1(i) Part 3 | Specifications for Phase 3 NIKI Pump |
| 1(j) | Description of Pump System with Error Detection |
| 1(k) | Description of System and Method |
| 4 | List of Assets |
| 13 | Engineering Costs |
| 22 | Rights to Intellectual Property |
| 26 | Terms of Distribution Agreements |

23

</TEXT>
</DOCUMENT>
<DOCUMENT>

CF056967_0074

```
<TYPE>EX-10.1(B)
<SEQUENCE>5
<DESCRIPTION>EX-10.1(B)
<TEXT>


<PAGE>
```

EXHIBIT 10.1(b)


ALARIS Medical, Inc. hereby agrees to furnish to the Securities and Exchange
Commission, upon its request, the schedules and exhibits to the Agreement
dated May 7, 1998 among ALARIS Medical Systems, Inc. and Caesarea Medical
Electronics Limited filed as Exhibit 10.1(a) to ALARIS Medical, Inc.'s Form
10-Q dated August 11, 1998.

                                  ALARIS MEDICAL, INC.
                                  -------------------------------
                                  (REGISTRANT)



Date:   August 11, 1998           By: /s/ DOUGLAS C. JEFFRIES
                                  -------------------------------
                                  Douglas C. Jeffries
                                  Vice President and Chief
                                  Financial Officer

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-27
<SEQUENCE>6
<DESCRIPTION>EX-27
<TEXT>

<TABLE> <S> <C>

<PAGE>
<ARTICLE> 5
<LEGEND>
THIS SCHEDULE CONTAINS SUMMARY FINANCIAL INFORMATION EXTRACTED FROM THE
CONDENSED CONSOLIDATED BALANCE SHEET AND CONDENSED CONSOLIDATED STATEMENT OF
OPERATIONS AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO SUCH FINANCIAL
STATEMENTS.
</LEGEND>
<CIK> 0000817161
<NAME> ALARIS MEDICAL, INC.
<MULTIPLIER> 1,000
```

| `<S>` | `<C>` | |
|---|---|---|
| `<PERIOD-TYPE>` | 6-MOS | |
| `<FISCAL-YEAR-END>` | | DEC-31-1997 |
| `<PERIOD-START>` | | JAN-01-1998 |
| `<PERIOD-END>` | | JUN-30-1998 |
| `<CASH>` | | 2,285 |
| `<SECURITIES>` | | 0 |
| `<RECEIVABLES>` | | 71,397 |
| `<ALLOWANCES>` | | (3,431) |
| `<INVENTORY>` | | 65,619 |
| `<CURRENT-ASSETS>` | | 172,530 |
| `<PP&E>` | | 98,554 |
| `<DEPRECIATION>` | | (41,861) |
| `<TOTAL-ASSETS>` | | 550,263 |

CF056967_0075

7/23/2020                                    https://www.sec.gov/Archives/edgar/data/817161/0001047469-98-031228.txt

```
<CURRENT-LIABILITIES>                    94,950
<BONDS>                                 417,277
<PREFERRED-MANDATORY>                         0
<PREFERRED>                                   0
<COMMON>                                    591
<OTHER-SE>                               29,411
<TOTAL-LIABILITY-AND-EQUITY>            550,263
<SALES>                                 177,654
<TOTAL-REVENUES>                        177,654
<CGS>                                    91,353
<TOTAL-COSTS>                            91,353
<OTHER-EXPENSES>                         68,155
<LOSS-PROVISION>                            150
<INTEREST-EXPENSE>                       21,795
<INCOME-PRETAX>                         (2,111)
<INCOME-TAX>                              (350)
<INCOME-CONTINUING>                     (1,761)
<DISCONTINUED>                                0
<EXTRAORDINARY>                               0
<CHANGES>                                     0
<NET-INCOME>                            (1,761)
<EPS-PRIMARY>                             (.03)
<EPS-DILUTED>                             (.03)


</TABLE>
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```

CF056967_0076